No. 14-1019

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW

*Plaintiff-Appellant,*

vs.

GENERAL MOTORS LLC

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division
No. 2:10-cv-11366 (Hon. Avern Cohn)

_____

## BRIEF OF DEFENDANT-APPELLEE
## GENERAL MOTORS LLC

_____

Shay Dvoretzky
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001-2113
(202) 879-3939

Robert S. Walker
Johanna Fabrizio Parker
Corey D. Clay
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
(216) 586-3939

*Counsel for Defendant-Appellee*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 14-1019          Case Name: UAW v. General Motors LLC

Name of counsel: Robert S. Walker

Pursuant to 6th Cir. R. 26.1, General Motors LLC
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Yes.  General Motors Company is the indirect parent of General Motors LLC.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> Yes.  General Motors Company has a financial interest in the outcome of this appeal as the indirect parent of General Motors LLC.

---

CERTIFICATE OF SERVICE

I certify that on _____ January 17, 2014 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Robert S. Walker
Jones Day, 901 Lakeside Avenue
Cleveland, Ohio 44115

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTERESTS

TABLE OF AUTHORITIES ................................................................v

STATEMENT REGARDING ORAL ARGUMENT .............................1

INTRODUCTION ................................................................................2

COUNTERSTATEMENT OF THE ISSUES PRESENTED..................4

COUNTERSTATEMENT OF THE CASE............................................4

I.    THE 2009 RSA AND OLD GM'S BANKRUPTCY ...................4

    A.    The Parties Agree to Comprehensively Settle All of GM's
        Liabilities Concerning Retiree Medical Benefits................................5

    B.    The $450 Million Payment Is Discussed in the Negotiations
        Leading to the 2009 RSA .....................................................8

    C.    The Bankruptcy Court Approves the UAW-Endorsed,
        Comprehensive 2009 RSA .....................................................9

II.   THE 2007 MOU AND THE DELPHI BANKRUPTCY ...........13

    A.    Old GM, Delphi, and the UAW Enter into a 2007 MOU That
        Creates a Contingent $450 Million Obligation ..................13

    B.    Old GM and Delphi Enter into Settlement Agreements That Are
        Never Implemented ...............................................................15

    C.    Delphi Liquidates Rather Than Reorganizes, Thus Failing to
        Satisfy the Terms of the 2007 MOU or the Amended
        GSA/MRA ............................................................................17

III.  PROCEDURAL HISTORY OF THIS LITIGATION .................20

SUMMARY OF ARGUMENT ...........................................................22

ARGUMENT .....................................................................................24

I.    UNDER THE TERMS OF THE 2009 RSA, NEW GM HAS NO
    OBLIGATION TO MAKE AN ADDITIONAL $450 MILLION
    PAYMENT FOR RETIREE MEDICAL BENEFITS.................24

    A.    Multiple Provisions of the 2009 RSA Establish That New GM
        Has No Obligation to Make the $450 Million Payment ...................25

-iii-

# TABLE OF CONTENTS
(continued)

Page

B.  The UAW's Arguments to the Contrary Are Meritless ....................31

1.  However the Argument Is Characterized, the District Court Correctly Held That New GM Has No Obligation to Make the $450 Million Payment .........................................31

2.  The UAW Misconstrues Numerous Provisions of the 2009 RSA .................................................................................34

3.  Improper Reliance on Extrinsic Evidence Cannot Overcome the Language of the 2009 RSA .............................38

4.  No Alleged Side Deal About the $450 Million Payment Survived the 2009 RSA ..........................................43

II.  EVEN IF THE CONTINGENT $450 MILLION PAYMENT HAD SURVIVED THE 2009 RSA AND OLD GM'S BANKRUPTCY, NEW GM STILL WOULD HAVE NO OBLIGATION TO MAKE THE PAYMENT ...........................................................................44

A.  The 2007 MOU Imposed Significant Conditions Precedent to the Obligation to Make the $450 Million Payment, and Those Conditions Have Not Been Satisfied................................................44

1.  Delphi's Modified Plan Was Not Consistent with the Terms of the 2007 MOU .........................................................46

2.  Delphi's Modified Plan Was Not Consistent With All of the Terms of the Comprehensive Settlement Agreement ........50

B.  The UAW's Arguments to the Contrary Are Meritless ....................51

CONCLUSION ........................................................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

**Page**

CASES

*ADR N. Am., LLC v. Agway, Inc.*,
303 F.3d 653 (6th Cir. 2002) ..................................................30, 38

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008)................................................................28

*Am. Civil Liberties Union v. Nat'l Sec. Agency*,
493 F.3d 644 (6th Cir. 2007) .................................................45

*Armistead v. Vernitron Corp.*,
944 F.2d 1287 (6th Cir. 1991) ...........................................24, 39

*Dist. of Columbia v. Greater Wash. Bd. of Trade*,
506 U.S. 125 (1992)................................................................28

*Freeland v. Freeland*,
110 F.2d 966 (6th Cir. 1940) .................................................33

*In re DPH Holdings Corp.*,
437 B.R. 88 (Bankr. S.D.N.Y. 2010)...................................19, 47

*In re General Motors Corp.*,
407 B.R. 463 (Bankr. S.D.N.Y. 2009).................................5, 9, 10, 12

*In re Motors Liquidation Co.*,
457 B.R. 276 (Bankr. S.D.N.Y. 2011)...................................20

*In re Spinnaker Indus., Inc.*,
313 F. App'x 750 (6th Cir. 2008) .........................................33

*Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.*,
330 F.3d 740 (6th Cir. 2003) ...........................................39, 40

*Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*,
210 F.3d 672 (6th Cir. 2000) .................................................39

*Millsaps v. Thompson*,
  259 F.3d 535 (6th Cir. 2001) ..............................................................27

*Ray Bell Const. Co., Inc. v. ABS Servs., Inc.*,
  No. 06-94-HRW, 2008 WL 2008166 (E.D. Ky. May 8, 2008) .........................38

*Schachner v. Blue Cross & Blue Shield of Ohio*,
  77 F.3d 889 (6th Cir. 1996) ..............................................................24

*Sec. Watch, Inc. v. Sentinel Sys., Inc.*,
  176 F.3d 369 (6th Cir. 1999) .......................................................30, 38, 39, 44

*Standard Alliance Indus., Inc. v. Black Clawson Co.*,
  587 F.2d 813 (6th Cir. 1978) ..............................................................44

*UAW v. Yard-Man, Inc.*,
  716 F.2d 1476 (6th Cir. 1983) ..............................................................24

*United States v. Donovan*,
  348 F.3d 509 (6th Cir. 2003) ..............................................................25

*Winnett v. Caterpillar, Inc.*,
  553 F.3d 1000 (6th Cir. 2009) ..............................................................24

*Witmer v. Acument Global Techs., Inc.*,
  694 F.3d 774 (6th Cir. 2012) ..............................................................40

*Zirnhelt v. Mich. Consol. Gas Co.*,
  526 F.3d 282 (6th Cir. 2008) ..............................................................25

**STATUTES**

29 U.S.C. § 185 ....................................................................................20

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee General Motors LLC believes that oral argument is not necessary because this contract dispute has been thoroughly briefed and involves the application of settled legal principles to an undisputed record.

## INTRODUCTION

In June 2009, General Motors Corporation ("Old GM") filed for bankruptcy protection. General Motors LLC ("New GM"), an entity created by the governments of the United States and Canada, then purchased certain assets and assumed certain contracts of Old GM. To achieve the critical, government-mandated restructuring of New GM's obligations, Old GM and the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") reached a settlement agreement about retiree medical benefits (the "2009 RSA"). The central feature of that agreement is that it comprehensively delineates New GM's *sole* obligations concerning medical benefits of UAW retirees.

The UAW's attempt to gain through litigation what it could not achieve in settlement negotiations or the bankruptcy process—an additional $450 million payment beyond the terms of the 2009 RSA—fails for two separate and independent reasons. *First*, New GM is entitled to summary judgment because the 2009 RSA makes clear that New GM has no obligation to make the $450 million payment that the UAW demands. The 2009 RSA (1) sets forth New GM's "sole obligations" with respect to retiree medical benefits; (2) terminates all other obligations "in any way related" to retiree medical benefits; (3) bars the UAW from requiring New GM to "make any other payments" for retiree medical

benefits; and (4) constitutes the "entire agreement between" New GM and the UAW with respect to retiree medical benefits, "supersed[ing]" any prior "understandings, agreements or representations" on the subject. In the face of these terms, the UAW cannot force upon New GM a $450 million obligation that does not appear anywhere in the text of the 2009 RSA.

*Second*, the $450 million obligation originated in a 2007 Restructuring Memorandum of Understanding among Old GM, Delphi Corporation ("Delphi"), and the UAW (the "2007 MOU"). New GM is entitled to summary judgment for the additional reason that, even under the 2007 MOU, the $450 million payment was contingent on conditions that have not been—and cannot be—satisfied. The 2007 MOU made the $450 million payable *only* if, among other things, Delphi emerged from bankruptcy as a functioning entity that continued to own, operate, and invest substantial sums in four specific sites employing UAW-represented workers to supply critical parts to GM. Moreover, the 2007 MOU required Delphi to emerge successfully from bankruptcy through a reorganization plan consistent with a comprehensive settlement agreement between Delphi and Old GM. *All* of these conditions were necessary for payment of the $450 million, but *none* of them were satisfied. Instead of emerging from bankruptcy as a functioning entity, Delphi sold its assets, liquidated, stopped employing any UAW employees, and failed to make the investments required by the 2007 MOU. Moreover, as a result

of Delphi's liquidation, *New GM* was forced to take over the sites (including the employment-related obligations to UAW members) that the parties to the 2007 MOU intended for *Delphi* to own and operate.  These events are fundamentally at odds with the preconditions set forth in the 2007 MOU for payment of the $450 million.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

1.      Whether New GM is entitled to summary judgment because, under the 2009 RSA, which comprehensively defined and circumscribed all of New GM's obligations related to retiree medical benefits, New GM has no obligation to make an additional $450 million payment that is not set forth in the 2009 RSA.

2.      Whether New GM is entitled to summary judgment because the conditions precedent to the $450 million payment in the 2007 MOU—which contemplated that Delphi would emerge from bankruptcy as a functioning entity capable of meeting numerous commitments—were not satisfied when Delphi liquidated through a plan inconsistent with the 2007 MOU and with the settlement agreement between Delphi and Old GM.

## COUNTERSTATEMENT OF THE CASE

I.      The 2009 RSA and Old GM's Bankruptcy

The 2009 RSA, which was negotiated in a government-funded bankruptcy process, exclusively set forth all of New GM's obligations regarding UAW-retiree

medical benefits.

A.    The Parties Agree to Comprehensively Settle All of GM's Liabilities Concerning Retiree Medical Benefits

The 2009 RSA fundamentally restructured Old GM's obligations concerning retiree medical benefits.  With the entire domestic auto industry on the brink of collapse in late 2008, the U.S. government loaned billions of dollars in emergency funding to Old GM.  (*See* Loan Agreement, RE 22-9, Page ID # 762-852.)[1]  As an express condition of the loan, the government required Old GM to restructure all obligations related to retiree medical benefits.  (*Id.* §§ 7.21, 7.22, App'x A § 1.01, definitions of "VEBA Modifications" and "Settlement Agreement," Page ID # 821, 843-44); *see also In re General Motors Corp.*, 407 B.R. 463, 473, 478 (Bankr. S.D.N.Y. 2009).

To achieve this government-mandated restructuring of retiree healthcare obligations, Old GM and the UAW negotiated the 2009 RSA, which the bankruptcy court then approved and the parties executed.  Old GM had provided retiree medical benefits, in part, through defined contributions to a trust known as a voluntary employees' beneficiary association (the "DC VEBA").  The 2009 RSA terminated the DC VEBA and transferred its assets and liabilities to a second

---

[1] In the District Court, the parties stipulated to the authenticity of certain jointly filed agreements that are cited in this Brief.  (*See* Stipulation, RE 33-2, Page ID # 1365-66.)  Counsel also authenticated other record evidence.  (*See* Ravindran

VEBA (the "New VEBA") and a new retiree health plan (the "New Plan").  (2009 RSA, RE 22-14, Page ID # 1119, 1132, Intro., § 12.C.)  The 2009 RSA also comprehensively recites *all* of New GM's obligations for UAW-retiree medical benefits.

*First*, the 2009 RSA states that the New VEBA and the New Plan will be "exclusively responsible" for providing medical benefits to UAW retirees.  (*Id.*, Page ID # 1126, § 2.)  It describes New GM's "sole" VEBA obligations, which are "fixed and capped" as set forth in the agreement.  (*Id.*, Page ID # 1119, 1126, 1128, 1130-31, Intro., §§ 2, 5.B, 8; *see also id.*, Page ID # 1130 (stating that the company would have "the following, and only the following, [VEBA] obligations" going forward).)  Critically, the 2009 RSA does not list the $450 million payment at issue in this litigation as one of New GM's obligations.

*Second*, confirming the sweeping scope of the 2009 RSA, it states that any bankruptcy court order approving and incorporating the agreement must provide that all other obligations in any way related to retiree medical benefits are terminated or otherwise amended to be consistent with the 2009 RSA:

> *all* obligations of [New GM] . . . *in any way related to* Retiree Medical Benefits for the Class and/or the

---

(continued…)

Dec., RE 33-15, Page ID # 2012-16; Parker Dec., RE 41-6, Page ID # 2620-26; Ravindran Dec., RE 53-1, Page ID 3694-98.)

Covered Group, and *all* provisions of applicable collective bargaining agreements, contracts, letters and understandings *in any way related to* Retiree Medical Benefits for the Class and the Covered Group are terminated . . . *or otherwise amended so as to be consistent with this Settlement Agreement* and the fundamental understanding that *all* [New GM] obligations regarding Retiree Medical Benefits for the Class and the Covered Group are terminated, as set forth in this Settlement Agreement.

(*Id.*, Page ID # 1128, § 5.D (emphases added).)

*Third*, in a section of the 2009 RSA entitled "Future Contributions," the UAW agreed that it would never seek to require New GM to: (1) make "any additional payments to the New VEBA other than those specifically required by [the 2009 RSA]"; (2) "make any other payments for the purpose of providing" retiree medical benefits; or (3) "provide or assume the cost" of retiree medical benefits "through any other means." (*Id.*, Page ID # 1134, § 14.)

*Finally*, the 2009 RSA includes an integration clause, stating that it constitutes the "entire agreement between the parties," and that it "supersedes" any prior "understandings, agreements or representations," whether "written or oral." (*Id.*, Page ID # 1147, § 32.C.)

These provisions of the 2009 RSA establish that the UAW and Old GM exclusively set forth all of New GM's obligations in any way related to retiree medical benefits. The terms and structure of the 2009 RSA foreclose an additional

$450 million payment that is not mentioned anywhere in the parties' unambiguous, fully integrated settlement agreement.

  B.  The $450 Million Payment Is Discussed in the Negotiations Leading to the 2009 RSA

Although resort to extrinsic evidence to interpret a clear, unambiguous, and fully integrated contract like the 2009 RSA is both unnecessary and improper, *see infra* pp. 24-25, GM provides the background below in response to the UAW's selective reliance on extrinsic evidence.

It is undisputed that the $450 million at issue in this litigation was a "topic of discussion" when the parties negotiated the 2009 RSA.  (UAW Br. at 23; *see also* Gettelfinger Depo., RE 54-7, at 218:7-8 (stating that "as part of the VEBA discussions, we wanted to make sure that 450 was covered") (filed under seal).) Indeed, it is hardly surprising that the parties discussed a potential $450 million *cash* obligation because the government required Old GM to equitize half of its retiree medical obligations. (Loan Agreement, RE 22-9, Page ID # 821, 843-44, §§ 7.21, 7.22, App'x A § 1.01.)

During the negotiations, Old GM proposed to value its total VEBA obligations at approximately $20 billion.  (VEBA Proposal (Yearly Depo Ex. 18), RE 47-2, p.4 (filed under seal).)  In reaching that total, Old GM expressly valued the contingent $450 million payment at $0.  (*Id.*)  That is because at the time of negotiations over the 2009 RSA, it was apparent that the conditions for payment of

the $450 million would not be satisfied in light of Delphi's liquidation and failure to emerge from bankruptcy as a functioning supplier operating specific critical facilities and employing UAW members.  (*Id.*); *see also infra* pp. 13-19.

The UAW concedes that it knew that the $450 million was excluded from Old GM's proposed calculations of future VEBA obligations.  Indeed, former UAW General Counsel Sherrick informed the government that he believed Old GM's VEBA valuations were "understated" because they did not include the $450 million payment.  (Sherrick Depo., RE 54-4, 182:8-183:16 (filed under seal).)  Despite this understanding, Sherrick instructed a key UAW consultant to "get[] a deal" and that, if necessary, the UAW would "go litigate to get [the $450 million]."  (Yearly Depo., RE 46-1, 140:6-22 (filed under seal).)

C.    The Bankruptcy Court Approves the UAW-Endorsed, Comprehensive 2009 RSA

As the inevitability of Old GM's bankruptcy became apparent, the U.S. government asked Old GM to consider a transaction under which a government-sponsored purchaser (New GM) would purchase substantially all of Old GM's assets in an expedited process.  *In re Gen. Motors Corp.*, 407 B.R. 463, 480 (Bankr. S.D.N.Y. 2009).  Old GM filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  (Supplemental Facts, RE 63, Page ID # 4078, No. 12; Dkt. No. 1, *In re General Motors Corp.*, No. 09-50026 (Bankr. S.D.N.Y.).)  New GM purchased substantially all of the assets of the GM debtors, free and clear of liens,

claims, and encumbrances.  *See In re Gen. Motors Corp.*, 407 B.R. 463, 481-83 (Bankr. S.D.N.Y. 2009).

The comprehensive restructuring of Old GM's retiree medical benefits, as reflected in the 2009 RSA, was essential to consummating the bankruptcy.  On June 26, 2009, Old GM, New GM, and certain other third parties entered into an Amended and Restated Master Sale and Purchase Agreement ("MPA").  (RE 22-13, Page ID # 986-1116.)  Execution of the 2009 RSA, and court approval of that agreement, were non-waivable conditions of the closing of the sale transaction.  (*Id.*, Page ID # 1077, 1080-81, 1083 §§ 7.2 (introduction), 7.2(e), 7.3 (introduction), 7.3(i).)

In the bankruptcy proceedings, the UAW never attempted to expand New GM's obligations beyond those contained in the 2009 RSA.  To the contrary, the UAW submitted a declaration and testified "support[ing] approval of the [2009 RSA]."   (Curson Dec., RE 41-17, Page ID # 2841, ¶ 1; Dkt. No. 2518, *In re General Motors Corp.*, No. 09-50026 (Bankr. S.D.N.Y.); Transcript of July 1, 2009 Old GM Bankruptcy Proceeding, RE 41-30, Page ID # 3333-39, at 200:18-21, 205:19-210:17.)  The UAW explained that it wished to ensure "adequate funding for an acceptable level of retiree health benefits," (Curson Dec., RE 41-17, Page ID # 2843, ¶ 6), and that it believed the 2009 RSA "preserve[d] a core plan of benefits."  (*Id.*, Page ID # 2844, ¶ 8.)  The UAW also noted that the 2009 RSA had

to be approved by the union's membership, and that certain "solicitation materials" were provided as part of that ratification process.  (*Id.*, Page ID # 2844-45, ¶ 12.) Though the UAW "[w]anted to be transparent to the membership and have [the solicitation material] as correct as possible," the UAW's solicitation materials do not mention the $450 million payment.  (Curson Depo., RE 41-14, Page ID # 2735, at 87:2-4; *see also id.* Page ID # 2736-37, at 88:16-89:11 (indicating that the UAW "double checked" the material); Curson Dec., RE 41-17, Page ID # 2847-63, Ex. A; Decision, RE 64, Page ID # 4120.)  At no point during the bankruptcy proceeding did the UAW indicate that it expected the $450 million payment to be part of New GM's VEBA obligations.

Indeed, the only reference to the $450 million during the bankruptcy proceedings confirmed that New GM would not be obligated to make that payment.   On June 30, 2009, interested bondholders introduced into evidence a draft of the VEBA proposal made by Old GM during the May 2009 negotiations. (Statement of Material Facts ("SMF"), RE 42, p. 17, ¶ 54 (filed under seal); Transcript of June 30, 2009 Old GM Bankruptcy Proceeding, RE 41-29, Page ID # 3315-16, at 81:21-83:2; Bondholders' Notice of Filing Exhibits, RE 41-32, Page ID # 3371; Bondholders' Ex. 3, RE 48-1 (filed under seal).)  That proposal stated that the $450 million payment was excluded from VEBA funding and that any remaining liability for UAW-retiree medical benefits would be $0.  (Bondholders'

Ex. 3, RE 48-1, at 3, 11 (filed under seal).)   Again, the UAW never objected to the absence of the $450 million payment from those calculations.

On July 5, 2009, the bankruptcy court entered a Sale Order, which (among other things) approved the 2009 RSA and found it to be "fair, reasonable and in the best interests of retirees." (Sale Order, RE 62-1, Page ID # 4050, ¶ 19.)  Noting the supporting testimony submitted by the UAW, the bankruptcy court concluded that "[t]he UAW was successful in preserving an acceptable level of core medical benefits." *In re General Motors Corp.,* 407 B.R. 463, 519 (Bankr. S.D.N.Y. 2009). The court ordered that "*all obligations* of the Purchaser and the Sellers to provide Retiree Medical Benefits to members of the Class and the Covered Group shall be governed by the [2009 RSA]."  (Sale Order, RE 62-1, Page ID # 4050-51, ¶ 20 (emphasis added)); *see also In re General Motors Corp.,* 407 B.R. 463, 484 (Bankr. S.D.N.Y. 2009) ("Under the [ 2009 RSA] New GM will put value into the New VEBA, which will then have the obligation to fund retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW.")  The court further directed all parties to "perform their obligations under, or in connection with, the implementation of the [2009 RSA] and to comply with the terms of [that document]."  (Sale Order, RE 62-1, Page ID # 4050, ¶ 19.) Pursuant to the court's order, New GM and the UAW executed the 2009 RSA on July 10, 2009.  (2009 RSA, RE 22-14, Page ID # 1118.)

II.    The 2007 MOU and the Delphi Bankruptcy

New GM's alleged obligation to make the $450 million payment originated as a conditional obligation in a 2007 MOU among Old GM, Delphi, and the UAW. (2007 MOU, RE 22-2, Page ID # 257-405.)  As argued *infra* Part II, even if that conditional obligation had survived the 2009 RSA, the conditions for the payment were not, and cannot be, satisfied.  The following facts demonstrate that the $450 million payment was contingent upon a functional Delphi emerging from bankruptcy through a reorganization plan consistent with both the terms of the 2007 MOU and a comprehensive settlement agreement between Old GM and Delphi.  But instead of reorganizing, Delphi liquidated its holdings in a manner that made it incapable of satisfying its obligations under *either* the 2007 MOU *or* the settlement agreement, let alone both.

A.    Old GM, Delphi, and the UAW Enter into a 2007 MOU That Creates a Contingent $450 Million Obligation

The alleged $450 million payment obligation had its roots in the historic relationship between Old GM and Delphi.  A wholly owned subsidiary of Old GM, Delphi spun off and became an independent automotive-parts manufacturer and a major supplier of Old GM.  (Decision, RE 64, Page ID # 4092.)   When Delphi filed for Chapter 11 protection in 2005, Old GM had a "critical interest in Delphi's successful emergence from bankruptcy with certain UAW-represented operations," given Delphi's status as Old "GM's largest supplier."  (2007 MOU, RE 22-2, Page

ID # 257.)  Old GM thus entered into a series of agreements with Delphi and the UAW, including the 2007 MOU, to facilitate Delphi's successful emergence from bankruptcy. (2007 MOU, RE 22-2, Page ID # 257-405.)

Under the 2007 MOU, Old GM agreed to make a conditional $450 million payment to the DC VEBA.  (SMF, RE 42, at 3, ¶ 7 and response thereto (filed under seal); 2007 MOU, RE 22-2, Page ID # 276-77, § J.2.)  That obligation was expressly contingent on: (1) the "execution by Delphi and [Old] GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them"; and (2) "the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with *all* of the terms of [the 2007 MOU] and the comprehensive settlement agreement between Delphi and [Old] GM." (2007 MOU, RE 22-2, Page ID # 278, § K.2 (emphasis added).)  Among other things, the relevant conditions of the 2007 MOU included the following:

- Delphi would "successful[ly] emerge[] from bankruptcy with certain UAW-represented operations" and an improved "labor cost structure and ongoing business operations" so that it could remain one of "GM's largest supplier[s]." (*Id.*, Page ID # 257, Intro.)

- Four "Keep Sites" were to "remain owned and operated by Delphi," and Delphi would make certain financial investments totaling more than $200 million in those

Keep Sites. (*Id.*, Page ID# 258, 282-86, § B.1,
Attachment A.)

- Delphi management would have "equivalence of
  sacrifice" with UAW-represented employees. (*Id.*, Page
  ID # 276, § I.)

- Delphi-UAW collective bargaining agreements
  ("CBAs") would continue through September 2011, and
  there would be certain "flowback" opportunities between
  GM and Delphi or between different Delphi locations.
  (*Id.*, Page ID # 257-58, 260-63, §§ A.2, A.3, C.)

B.   <u>Old GM and Delphi Enter into Settlement Agreements That Are
     Never Implemented</u>

As noted above, any obligation to make the $450 million payment was

contingent on a separate, "comprehensive settlement agreement" between Old GM

and Delphi.  In September 2007, Old GM and Delphi entered into a Global

Settlement Agreement ("Original GSA," RE 22-3, Page ID # 406-69) and Master

Restructuring Agreement ("Original MRA," RE 22-4, Page ID # 470-556)

(collectively, the "Original GSA/MRA") in the Delphi bankruptcy.  The Delphi

debtors then filed their first amended plan of reorganization in bankruptcy court.

(SMF, RE 42, p. 4 ¶,10 (filed under seal).)  However, because of deteriorating

economic conditions, the Delphi debtors were unable to consummate that plan.

(*Id.*)

Delphi and Old GM then renegotiated a new comprehensive settlement

agreement, known as the Amended and Restated Global Settlement Agreement

("Amended GSA," RE 22-6, Page ID # 601-65) and Master Restructuring

Agreement ("Amended MRA," RE 22-7, Page ID # 666-757) (collectively, the "Amended GSA/MRA"). That document expressly amended the Original GSA/MRA and was approved by the Delphi bankruptcy court in September 2008. (Amended GSA, RE 22-6, Page ID # 612; SMF, RE 42, p. 9, ¶ 23 (filed under seal).) The Amended GSA/MRA recognized that Old GM's commitments in labor matters (including those under the 2007 MOU) were meant to "assist Delphi in its continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules, and staffing level issues, and to better position Delphi to retain existing business and attract new business." (Amended GSA, RE 22-6, Page ID # 640, art. III.)

Moreover, the Amended GSA/MRA provided for an operational Delphi, which, among other things, would employ UAW-represented workers. (*Id.*, Page ID # 607, Exhibit List (identifying the Amended MRA as Exhibit A); *see also* Amended MRA, RE 22-7, Page ID # 666-757.) The Amended GSA/MRA also stated that Old GM would receive approximately $2 billion in allowed administrative expense claims, as well as an allowed general unsecured claim in the amount of $2.5 billion on the effective date of the Delphi reorganization. (Amended GSA, RE 22-6, Page ID # 654-55, §§ 4.04, 5.04.)

To implement the revised transaction structure of the Amended GSA/MRA, Delphi, Old GM, and the UAW negotiated and executed an Implementation

Agreement that *expressly* amended *some* of the provisions of the 2007 MOU to conform to the new approach embodied in the Amended GSA/MRA. (SMF, RE 42, at 9, ¶ 24 and response thereto (filed under seal); Implementation Agreement, RE 22-8, Page ID # 758-61.) To avoid uncertainty regarding Old GM's obligations given the significantly changed circumstances, the Implementation Agreement also provided that the $450 million payment "would remain payable as set forth in the [2007] MOU." (RE 22-8, Page ID # 760.) The UAW specifically requested this provision because "discussions [about the $450 million payment we]re on-going." (SMF, RE 42, at 10, ¶ 26 and response thereto (filed under seal); Sherrick Email, RE 50-2, at No. 5 (filed under seal); *see also* Decision, RE 64, Page ID # 4116.) Because it was "otherwise pulling [sic] forward broad releases," the UAW felt it was "important to deal with that obligation explicitly." (SMF, RE 42, at 10, ¶ 26 and response thereto (filed under seal); Sherrick Email, RE 50-2, at No. 5 (filed under seal).)

C.    Delphi Liquidates Rather Than Reorganizes, Thus Failing to Satisfy the Terms of the 2007 MOU or the Amended GSA/MRA

By 2009, it was clear that Delphi could not reorganize in bankruptcy and emerge as a functioning entity. With no source of external financing, Delphi abandoned the Amended GSA/MRA, and entered instead into a Master Disposition Agreement ("MDA") with Old GM and certain third parties. (MDA, RE 22-15, Page ID # 1155-1290.) Unlike the Original GSA/MRA and the Amended

GSA/MRA, the MDA does not refer to itself as a "settlement agreement."
(Original GSA, RE 22-3, Page ID # 413; Amended GSA, RE 22-6, Page ID # 608.)

The MDA called for Delphi to (1) sell its operating assets to third-party
purchasers, (2) distribute the proceeds to its creditors, and (3) liquidate the shell
left behind.  (*Id.*)  Under the MDA, Old GM agreed to purchase the four Keep Sites
that, under the 2007 MOU, were to remain owned and operated by Delphi—thus
incurring a substantial burden that the 2007 MOU required Delphi to bear as a
condition for payment of the $450 million.  Old GM also agreed in the MDA to
forgo its rights to the $4.5 billion in allowed administrative expense claims and
general unsecured claims provided for in the Amended GSA/MRA.  (RE 22-15,
Page ID # 1201, § 3.1.1.)

Because the 2007 MOU contemplated that Delphi would retain the Keep
Sites, Old GM and the UAW separately negotiated a memorandum of
understanding stating that New GM would become the employer of the UAW-
represented employees working at those sites.  (Keep Sites MOU (Curson Dec. Ex.
B), RE 41-17, Page ID # 2984-85, at 103-04.)  However, the Keep Sites MOU was
*not* defined to be part of the 2007 MOU (Modified Plan, RE 33-19, Page ID #
2061, § 1.233), and did not purport to amend the 2007 MOU.  Moreover, it is
undisputed that the parties never discussed the $450 million payment during the

negotiations over the Keep Sites MOU.  (Rapson Depo., RE 41-24, Page ID # 3187-89, at 89:17-91:1.)

Unable to reorganize in a manner consistent with the terms of the 2007 MOU or the Amended GSA/MRA, in June 2009, Delphi filed a "liquidating plan" reflecting the new strategy detailed above (the "Modified Plan").  (RE 33-19, Page ID # 2025-114); *In re DPH Holdings Corp.*, 437 B.R. 88, 98 (Bankr. S.D.N.Y. 2010), *aff'd*, 448 Fed. App'x 134 (2d Cir. 2011).  The Delphi debtors substantially consummated that Modified Plan in October 2009.  (SMF, RE 42, at 14, ¶ 41 and response thereto (filed under seal).)  "Delphi then liquidated, disposing of its remaining assets, and paying its retained liabilities."  (Decision, RE 64, Page ID # 4101.)  A third party acquired substantially all of Delphi's core businesses; a New GM affiliate acquired the debtors' non-core steering business and certain U.S. manufacturing plants; and the Delphi debtors continued on as liquidating entities to dispose of remaining assets and wind up their affairs. (*Id.*, Page ID # 4101.)  Under the Modified Plan, Delphi no longer employed any UAW-represented employees or operated any UAW-represented sites, and neither Old GM nor New GM ever received the $4.5 billion provided for by the Amended GSA/MRA.  (SMF, RE 42, at 20, ¶ 65 (filed under seal); MDA, RE 22-15, Page ID # 1201, § 3.1.1; Decision, RE 64, Page ID # 4099.)

III.    Procedural History of This Litigation

Pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185,

Plaintiff-Appellant UAW filed a complaint in the U.S. District Court for the

Eastern District of Michigan alleging that New GM was obligated to pay $450

million under the 2007 MOU, which the UAW alleged that New GM had assumed

in Old GM's bankruptcy.

New GM sought to have the bankruptcy court that presided over Old GM's

bankruptcy proceedings decide this related dispute.  (Decision, RE 64, Page ID #

4103; Stay Order, RE 15, Page ID # 187.)  The bankruptcy court found that it had

exclusive jurisdiction to hear the case but declined to exercise that jurisdiction.

*See In re Motors Liquidation Co.*, 457 B.R. 276, 278 (Bankr. S.D.N.Y. 2011).

The matter thus returned to the District Court, and after extensive discovery,

both parties moved for summary judgment.  (UAW Mot., RE 33, Page ID # 1326-

27; New GM Mot., RE 43, Page ID # 3416-17.)  Following oral argument, the

District Court entered an order (i) explaining that "[t]his is a contract dispute

relating to a $450 million payment to pay for retiree medical benefits"; (ii)

acknowledging the UAW's argument that New GM breached "an obligation"

under the 2007 MOU to make the $450 million payment; and (iii) requesting

supplemental filings "on whether [New] GM assumed Old GM's obligation

[regarding the $450 million] under the MOU."  (Order, RE 61, Page ID # 4016-17.)

On December 10, 2013, the District Court denied the UAW's motion for summary judgment and granted New GM's cross-motion.  (Decision, RE 64, Page ID# 4089-124; Judgment, RE 65, Page ID # 4125.)  As the District Court explained, "New GM's obligations to provide funding for retiree medical benefits are found solely within the confines of the [2009 RSA]."  (Decision, RE 64, Page ID # 4109-10.)  "That agreement," the Court further explained, "does not include the $450 million payment."  (*Id.*, Page ID # 4110.)  The Court noted that, among other things, the 2009 RSA (1) contains GM's "sole obligations" concerning retiree medical benefits; (2) precludes the UAW from requiring GM to "make any other payments" for the purpose of providing retiree medical benefits; and (3) contains an integration clause.  (*Id.*, Page ID # 4109-11.)  The Court also rejected the UAW's attempt to rely on extrinsic evidence to overcome the plain language of the 2009 RSA. (*Id.*, Page ID # 4111-15).  Finally, because it held that the language of the 2009 RSA was dispositive, the Court did not need to "address the parties' arguments as to whether the conditions precedent . . . for payment of the $450 million have been satisfied."  (*Id.*, Page ID # 4091, 4123).  The UAW appealed.

## SUMMARY OF ARGUMENT

New GM is entitled to summary judgment for two separate and independent reasons.

*First*, the 2009 RSA establishes that New GM has no obligation to make the $450 million payment that the UAW demands.  The 2009 RSA sets forth the sum total of New GM's obligations concerning medical benefits for UAW retirees.  Multiple provisions make clear that New GM's "sole obligations" related to retiree medical benefits are "fixed and capped" as set forth in the 2009 RSA; that all other obligations "in any way related" to retiree medical benefits are terminated; that New GM cannot be required to "make any other payments" beyond those specified in the agreement; and that the 2009 RSA "supersedes any prior understandings, agreements or representations by or between the parties" regarding retiree medical benefits.  The absence of any mention of the $450 million payment among the comprehensive obligations set forth by the 2009 RSA dooms the UAW's claim.

The UAW relies on cherry-picked extrinsic evidence in the hope that this Court will rewrite the 2009 RSA, but extrinsic evidence cannot overcome unambiguous contract language.  In any event, even if the relevant extrinsic evidence were considered, it would only confirm that the 2009 RSA—negotiated as part of a government-funded bankruptcy designed to restructure all of Old GM's obligations related to retiree medical benefits—eliminated any obligation to make

the $450 million payment.  There is no basis to disregard the provisions of the fully integrated 2009 RSA.

*Second*, even if the $450 million payment obligation had somehow survived Old GM's bankruptcy and the 2009 RSA, New GM would still be entitled to summary judgment because the 2007 MOU made that payment contingent on conditions that have not been and cannot be satisfied.  Under the 2007 MOU, the $450 million payment was payable *only* if, among other things, Delphi emerged from bankruptcy as a functioning supplier to GM that continued to own and operate four specific sites under labor agreements with the UAW.  Moreover, the 2007 MOU required Delphi's reorganization plan to be consistent with a subsequent comprehensive settlement agreement between Delphi and Old GM.  *All* of these conditions were necessary for payment of the $450 million, but *none* of them were satisfied.  Instead of emerging from bankruptcy as a functioning entity, Delphi liquidated, stopped operating plants or employing any UAW members, and forced *New GM* to take over the sites that the parties to the 2007 MOU intended for *Delphi* to own and operate.  That result is fundamentally at odds with the preconditions set forth in the 2007 MOU for payment of the $450 million.

## ARGUMENT

**I.    UNDER THE TERMS OF THE 2009 RSA, NEW GM HAS NO OBLIGATION TO MAKE AN ADDITIONAL $450 MILLION PAYMENT FOR RETIREE MEDICAL BENEFITS**

As the District Court correctly recognized, "[t]he single essential and controlling fact" on the question of whether New GM has any obligation to make the $450 million payment "is the language of the [2009 RSA]."  (Decision, RE 64, Page ID # 4115.)

By its terms, the 2009 RSA must be construed in accordance with "applicable federal laws."  (2009 RSA, RE 22-14, Page ID # 1147, § 32.H.) Applying "traditional rules for contract interpretation," *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983), "courts should first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991).  Courts must "interpret each provision in question as part of the integrated whole," and the "agreement's terms must be construed so as to render none nugatory and avoid illusory promises." *Yard-Man*, 716 F.2d at 1479-80.  Only if a court "find[s] ambiguity on the face of the contract" may it consider "extrinsic evidence of the parties' intent." *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996); *see also Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1008 (6th Cir. 2009) ("Extrinsic evidence . . . cannot be considered when contract language is

unambiguous." (internal quotation marks and alteration omitted)). In other words, "[a] court . . . may not use extrinsic evidence to create an ambiguity; the ambiguity must be apparent on the face of the contract." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (internal quotation marks omitted). And an agreement is not ambiguous unless it is "subject to two *reasonable* interpretations." *Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 287 (6th Cir. 2008) (internal quotation marks omitted).

Here, the UAW concedes that the language of the 2009 RSA is unambiguous. (SMF, RE 42, at 16, ¶ 48 (filed under seal); Sherrick Depo., RE 49-1, at 12:10-12 (filed under seal).) This case therefore begins and ends with the text of the agreement. For the reasons discussed below, the language of the 2009 RSA establishes that New GM has no obligation to make the $450 million payment.

## A. Multiple Provisions of the 2009 RSA Establish That New GM Has No Obligation to Make the $450 Million Payment

Numerous provisions of the 2009 RSA establish that New GM's only obligations relating to UAW-retiree medical benefits are those specified in that agreement. As detailed below, the 2009 RSA (1) contains New GM's "sole obligations" with respect to retiree medical benefits; (2) terminates all other obligations "in any way related" to retiree medical benefits; (3) precludes the UAW from seeking "any additional payments" from New GM for retiree medical benefits; and (4) constitutes "the entire agreement" between New GM and the

UAW on the subject of retiree medical benefits.

  1.  The Introduction and Sections 2, 5.B, and 8 of the 2009 RSA establish that New GM has no obligations relating to retiree medical benefits beyond those contained in that agreement.  The Introduction and Sections 2 and 5.B provide that "[New GM]'s *sole* obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement"; that the New VEBA and New Plan—not New GM—shall be "exclusively responsible" for *all* retiree medical benefits; and that the New VEBA will serve as the "exclusive funding mechanism for the New Plan."  (2009 RSA, RE 22-14, Page ID # 1119, 1125-28, Intro., § 2, § 5.B (emphasis added).)

  Section 8, in turn, lists New GM's "sole obligations," emphasizing that, "[p]ursuant to this Settlement Agreement, [New GM] shall have the following, *and only the following*, obligations to the New VEBA and the New Plan."  (*Id.*, Page ID # 1130, § 8 (emphasis added).)   Noticeably absent from this list of obligations is any reference to the $450 million payment.  (*Id.*)

  Section 8 further provides that "[New GM's] financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement."  (*Id.*; *see also id.*, Page ID # 1119, Intro. ("[New Co.]'s obligation to pay into the New VEBA is fixed and capped as described herein.").)  It also memorializes the parties' agreement that as of the

implementation date of the 2009 RSA, "the New Plan, funded by the New VEBA, shall provide Retiree Medical Benefits for [UAW retirees]" and that "all obligations of [New GM] for Retiree Medical Benefits . . . shall terminate as of [that date]."  (*Id.*, Page ID # 1130, § 8.)

As the District Court found, these provisions compel the conclusion that "New GM's obligations to provide funding for retiree medical benefits are found solely in the [2009 RSA]," which "does not include the $450 million payment." (Decision, RE 64, Page ID # 4109-10.)  It is "fatal" to the UAW's claim that the $450 million payment is not mentioned as one of New GM's "sole" remaining obligations in the 2009 RSA. (*Id.*, Page ID # 4110.); *cf. Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001) (stating the maxim, *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of others")).

2.    Section 5.D states that any bankruptcy court order approving and incorporating the 2009 RSA shall provide that any other obligations beyond those in the 2009 RSA that are in any way related to retiree medical benefits are terminated:

> *all* obligations of [New GM] . . . *in any way related to* Retiree Medical Benefits for the Class and/or the Covered Group, and *all* provisions of applicable collective bargaining agreements, contracts, letters and understandings *in any way related to* Retiree Medical Benefits for the Class and the Covered Group are terminated on the Implementation Date, *or otherwise amended so as to be consistent with this Settlement*

> *Agreement* and the fundamental understanding that *all*
> [New GM] obligations regarding Retiree Medical
> Benefits for the Class and the Covered Group are
> terminated, as set forth in this Settlement Agreement.

(2009 RSA, RE 22-14, Page ID # 1128, § 5.D (emphasis added).)  The 2009 RSA

further defines "Retiree Medical Benefits" as "*all* post retirement medical

benefits." (*Id.*, Page ID # 1125, § 1 (emphasis added).)

This section sets forth the parties' "fundamental understanding" that, except

"as set forth in th[e] Settlement Agreement," New GM has no obligation "in any

way related to Retiree Medical Benefits" for UAW retirees, and that all other

obligations beyond those in the 2009 RSA "in any way related" to retiree medical

benefits are "terminated" or "otherwise amended" to be consistent with the 2009

RSA.  This language contains no words of limitation; it applies broadly to "all" of

New GM's obligations and "all" applicable provisions "in any way related to" such

benefits.  And the UAW and New GM agree that the $450 million payment was

intended to provide retiree medical benefits for Delphi retirees. (SMF, RE 42 at 16,

¶ 50 (filed under seal).)  The 2009 RSA's expansive language—"any," "related to,"

and "all"—should be given its plain meaning.  *E.g., Ali v. Fed. Bureau of Prisons*,

552 U.S. 214, 218-19 (2008) ("We have previously noted that '[r]ead naturally, the

word 'any' has an expansive meaning, that is, 'one or some indiscriminately of

whatever kind.'" (citation omitted)); *Dist. of Columbia v. Greater Wash. Bd. of

Trade,* 506 U.S. 125, 129 (1992) ("This reading is true to the ordinary meaning of

'relate to,' . . . and thus gives effect to the 'deliberately expansive' language chosen . . . ." (citation omitted)).

      3.     Sections 14 and 25.C foreclose the UAW from demanding any payments from New GM for retiree medical benefits beyond those specified in the 2009 RSA.  (Decision, RE 64, Page ID # 4110.)  Section 14 states:

> The UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, also agrees not to seek to obligate [New GM] to: (i) provide *any additional* payments to the New VEBA other than those specifically required by this Settlement Agreement; (ii) make *any other* payments for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group; or (iii) provide or assume the cost of Retiree Medical Benefits for the Class or the Covered Group through *any* other means.

(2009 RSA, RE 22-14, Page ID # 1134, § 14 (emphases added).)  Section 14's broad and plain language is bolstered by Section 25.C, in which the UAW waives and releases all claims against New GM concerning retiree medical benefits.  (*Id.*, Page ID # 1140-41, § 25.C.)

      This language unambiguously reflects the parties' understanding that, "other than those [payments] specifically required by th[e 2009 RSA]," New GM is not obligated to "make *any* . . . payments" of any sort "for the purpose of providing" medical benefits to UAW retirees, or to "provide or assume the cost" of such benefits "through *any* other means."  (*Id.*, Page ID # 1134, § 14 (emphasis added).)  Indeed, both Section 14 and Section 25.C prohibit the UAW from

seeking to obligate New GM to make the $450 million payment at issue in this litigation.

4.     Finally, Section 32 makes clear that the 2009 RSA is a fully integrated and complete expression of the parties' agreement regarding New GM's obligations to fund or provide UAW-retiree medical benefits:

> This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement. This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement.

(*Id.*, Page ID # 1147, § 32.C.)

A "written integration clause is conclusive evidence that the parties intended the document to be the final and complete expression of their agreement." *ADR N. Am., LLC v. Agway, Inc.*, 303 F.3d 653, 658 (6th Cir. 2002); *see also Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (same). Integration clauses thus prevent one party from attempting to vary agreed-upon, written terms through extrinsic evidence. *Id.* They also serve as "conclusive evidence that the parties intended to supersede any prior contract on the same subject matter." *ADR*, 303 F.3d at 658 (construing Michigan law).

Here, the 2009 RSA's integration clause establishes that the agreement represents the parties' "entire agreement regarding the matters set forth [t]herein," and that it "supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth [therein]." (2009 RSA, RE 22-14, Page ID # 1147, § 32.C.)   The District Court correctly recognized that one of the "matters set forth" in the 2009 RSA "is the extent of New GM's obligations relating to Retiree Medical Benefits for Delphi retirees." (Decision, RE 64, Page ID # 4111.)  Therefore, the integration clause confirms that New GM has no obligations to fund retiree medical benefits beyond those set forth in the 2009 RSA—and thus no obligation to make the $450 million payment.

## B.    The UAW's Arguments to the Contrary Are Meritless

The UAW's attempts to overcome the plain language of the 2009 RSA are unavailing.

### 1.    However the Argument Is Characterized, the District Court Correctly Held That New GM Has No Obligation to Make the $450 Million Payment

The UAW spends the bulk of its brief arguing that the District Court "went awry" by failing to rule on GM's "extinguishment" defense, and purportedly holding instead that New GM did not "assume" Old GM's contingent $450 million obligation in the 2007 MOU.  (*E.g.*, UAW Br. at 37-42.)  According to the UAW, the 2007 MOU was part of the "UAW Collective Bargaining Agreement" assumed

by New GM pursuant to the MPA and the Sale Order in the bankruptcy proceeding. (*Id.*) The UAW contends that this means New GM necessarily assumed all aspects of the 2007 MOU, including the conditional obligation to make the $450 million payment. (*Id.*)

The fundamental question is whether New GM has any obligation to make the $450 million payment in light of the 2009 RSA. For the reasons set forth above, New GM has no such obligation. It is no answer to attack the District Court over the semantic distinction between whether the 2009 RSA "extinguished" Old GM's $450 million obligation and whether New GM "assumed" the obligation in the 2009 RSA.

Moreover, New GM has never disputed that the 2007 MOU is part of a "UAW Collective Bargaining Agreement" as defined by the MPA, or that New GM assumed *certain* obligations under that document. But that does not answer the question either. The $450 million payment is an obligation pertaining to UAW-retiree medical benefits. (SMF, RE 42, at 16, ¶ 50 (filed under seal).) And, as explained above, the 2009 RSA set forth *all* of New GM's obligations regarding the provision and funding of medical benefits for UAW retirees, without mentioning the $450 million payment. *Supra* Part I.A. Indeed, the very Sale Order upon which the UAW relies declares that, while New GM generally assumed CBA's between Old GM and the UAW, on the more specific question of

retiree health benefits, "*all obligations* of [New GM] to provide Retiree Medical
Benefits to [*inter alia*, UAW retirees are] governed by the [2009 RSA]."  (Sale
Order, RE 62-1, Page ID # 4050-51, ¶ 20.); *see, e.g.*, *Freeland v. Freeland*, 110
F.2d 966, 968 (6th Cir. 1940) ("[W]here there are general and special provisions
relating to the same thing, the special provisions control."); *In re Spinnaker Indus.,
Inc.*, 313 F. App'x 750, 753 (6th Cir. 2008) (explaining that "the specific controls
the general").

Accordingly, New GM's post-bankruptcy obligations with respect to retiree
medical benefits must be viewed through the lens of the 2009 RSA.  While there is
no dispute that New GM assumed *certain* obligations under the 2007 MOU, New
GM did not "assume" the $450 million obligation because the only retiree medical
benefit obligations that it "assumed" were contained in the 2009 RSA.  As the
District Court explained, "[t]he record shows that, while New GM assumed certain
obligations set forth in the 2007 MOU (including particularly certain obligations
relating to pensions), it did not assume the $450 million payment."  (Decision, RE
64, Page ID # 4115.)  "[T]he entirety of New GM's obligations to provide for
retiree medical benefits are contained in the [2009 RSA]."  (*Id.*, Page ID # 4091.)
Thus, as the District Court correctly concluded, because the "$450 million payment
is not mentioned as one of New GM's 'sole' remaining obligations in the 2009

[RSA]," New GM did not "assume[]" the obligation to make that payment. (*Id.*, Page ID # 4110, 4115.)

### 2. The UAW Misconstrues Numerous Provisions of the 2009 RSA

a.     With respect to the text of the 2009 RSA, the UAW's primary contention is that the agreement "does not even mention the $450 million payment" or contain any language "expressly stating" that this obligation was "done away with." (UAW Br. at 45-46.)  As the District Court recognized, this argument is precisely backwards.  (Decision, RE 64, Page ID # 4109.)  The 2009 RSA's silence about the $450 million obligation forecloses, rather than supports, the UAW's claim.  Again, the 2009 RSA lists New GM's "sole obligations" with respect to UAW-retiree medical benefits; states that "all" other obligations "in any way related" to UAW-retiree medical benefits are "terminated"; and prohibits the UAW from seeking from New GM "any other payments for the purpose of providing" retiree medical benefits.  Thus, the 2009 RSA's failure to include the $450 million payment among New GM's obligations is "fatal" to the UAW's claim. (*Id.* at 4109-10.)

Moreover, while the Court should reject the UAW's attempt to rewrite the 2009 RSA using extrinsic evidence, *see infra* Part I.B.3, the record of extrinsic evidence must be considered as a whole if it is to be considered at all, and it undermines the UAW's interpretation of the parties' agreement.  For example, the

2009 RSA's silence about the $450 million payment is telling because the parties *included* language expressly referring to the $450 million in the 2008 Implementation Agreement. *See supra* p. 17. As the District Court recognized, "when the parties intended" to impose on Old GM "an obligation relating to the $450 million payment notwithstanding changed circumstances[, broad releases,] and new agreements, they included express language setting forth the obligation." (Decision, RE 64, Page ID # 4114-15.)

b.    The UAW next demeans as "snippets of contract language" the numerous provisions of the 2009 RSA that circumscribe New GM's obligations regarding UAW-retiree medical benefits. (UAW Br. at 48-53). Reading the language itself dispels the notion that these are isolated snippets. These are dispositive provisions that run throughout the text and structure of the 2009 RSA and foreclose the UAW's claims.

*First,* the UAW contends that Sections 2, 5, and 25.C deal with the provision —and not the funding—of retiree medical benefits. (*Id.* at 49-50.) Not so. Under the 2009 RSA, the New Plan and the New VEBA are "exclusively responsible" for all retiree medical benefits. (2009 RSA, RE 22-14, Page ID # 1126, § 2.) The New Plan is tasked with "the *provision* of Retiree Medical Benefits to [UAW retirees]," and the New VEBA is "the exclusive *funding* mechanism for the New Plan." (*Id.*, Page ID # 1119, Intro. (emphasis added); *see also id.*, Page ID # 1127-

28, § 5.B (referring to the New VEBA as the "exclusive *source of funds* to provide Retiree Medical Benefits" (emphasis added)).) Accordingly, when the 2009 RSA declares that it contains "[New GM's] sole obligations to the New Plan and the New VEBA" (as it does in Sections 2 and 5.B), it by definition limits New GM's obligations to provide *or fund* retiree medical benefits to the four corners of that agreement. That is, the New Plan and the New VEBA are the only entities responsible for providing medical benefits to UAW retirees, and the 2009 RSA delineates the full range of New GM's obligations to those entities. That is why, as stated in Section 5.D, New GM is released from "*all* obligations . . . in *any way related to* Retiree Medical Benefits" beyond those set forth in the 2009 RSA. (*Id.*, Page ID # 1128, § 5.D (emphasis added).)

*Second,* the UAW takes on Section 8 by claiming that the 2009 RSA only "fixed and capped" New GM's funding obligations to the New VEBA, not the DC VEBA. (UAW Br. at 50.) Again, this argument ignores that, by its very terms, the 2009 RSA sets forth "*all* obligations" of New GM "*in any way* related to" medical benefits for UAW retirees. (2009 RSA, RE 22-14, Page ID # 1128, § 5.D (emphasis added).) Indeed, the very first page of the 2009 RSA states that it "shall cover and ha[ve] application to" the "Existing External VEBA" (which is defined as the DC VEBA). (*Id.*, Page ID # 1118, 1122.) Moreover, the 2009 RSA forecloses the UAW from "seek[ing] to obligate" New GM to "provide any

additional payments to the New VEBA" *or* to "make *any other* payments for the purpose of providing Retiree Medical Benefits" to UAW retirees, *or* to "provide or assume the cost of Retiree Medical Benefits . . . through *any* other means."  (2009 RSA, RE 22-14, Page ID # 1134, § 14 (emphases added).)  This categorical language forecloses additional obligations not just to the New VEBA, but also to any other funding source for UAW-retiree medical benefits (such as the DC VEBA).

*Third,* the UAW contends that Section 14 only prohibits the UAW from seeking "*new* payment obligations" for retiree medical benefits, and that the $450 million obligation from the 2007 MOU is not "new."  (UAW Br. at 50-51.) Section 14's express language, however, does not refer to "*new* payment obligations."  It prohibits the UAW from attempting to require GM to: (1) provide "*additional* payments" beyond those set forth in the 2009 RSA; (2) make "*any other* payments for the purpose of providing Retiree Medical Benefits"; or (3) "provide or assume the cost" of retiree medical benefits "through *any* other means."  (2009 RSA, RE 22-14, Page ID # 1134, § 14 (emphasis added).); *supra* pp. 7, 29-30.

*Finally,* the UAW tries to get around the 2009 RSA's integration clause by arguing that the "[$450 million] payment obligation is not a 'matter' dealt with in the 2009 RSA at all."  (UAW Br. at 52.)  But, as previously discussed, the 2009

RSA addresses "*all* obligations of [New GM] . . . in any way related to Retiree Medical Benefits." (2009 RSA, RE 22-14, Page ID # 1128, § 5.D (emphasis added)); *see also supra* Part I.A.  Indeed, even the UAW concedes that the 2009 RSA "dealt with" the "subject matter of GM's obligation to pay money to fund [retiree medical] benefits." (UAW Reply, RE 52, Page ID # 3679.)  The integration clause explicitly states that the 2009 RSA supersedes "any prior . . . agreements . . . between the parties" on that subject matter. (2009 RSA, RE 22-14, Page ID # 1147, § 32.C.); *see also ADR*, 303 F.3d at 658; *Sec. Watch*, 176 F.3d at 372 n.3; *Ray Bell Const. Co., Inc. v. ABS Servs., Inc.*, No. 06-94-HRW, 2008 WL 2008166, at *3 (E.D. Ky. May 8, 2008) (stating that the "language of the integration clause in the instant matter . . . clearly subsumes prior agreements").  Accordingly, as the District Court recognized, "the integration clause sets forth the parties' understanding that New GM has no obligations other than those set forth in the 2009 [RSA]—and thus it has no obligation to make the $450 million payment." (Decision, RE 64, Page ID # 4111.)

### 3.    Improper Reliance on Extrinsic Evidence Cannot Overcome the Language of the 2009 RSA

Unable to contend with the plain language of the 2009 RSA, the UAW attempts to salvage its case through extrinsic evidence. (UAW Br. 46-48.)  Indeed, the UAW asks this Court to "look to extrinsic evidence '*before*'" even the "actual contract language, [because] doing so would 'assist the court in determining

whether' a party's proffered interpretation of a contract is 'plausible.'"   (*Id.* at 47 (citing *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.*, 330 F.3d 740, 747 (6th Cir. 2003)).)

The UAW's suggestion that a court should look to extrinsic evidence *before* contractual language turns ordinary rules of contractual interpretation on their head.  *See, e.g.*, *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991) (explaining that "courts should first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties").  This is particularly true where the contract contains an integration clause, which itself "preclude[s] the subsequent introduction of [extrinsic] evidence."  *Sec. Watch*, 176 F.3d at 372.

*Apogee* is not to the contrary.  For one thing, the court made no mention of an integration clause in the contract there.  Moreover, the language cited by the UAW is out-of-context dicta.  The *Apogee* court *held* that the contractual term at issue was "unequivocal," and considered extrinsic evidence only "to confirm the lack of ambiguity as to the meaning of the term."  *Apogee*, 330 F.3d at 744, 747. At most, therefore, *Apogee* suggests that a court may look to "surrounding circumstances" to *confirm* its interpretation of a contract's plain language.  *See also Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684 n.12 (6th Cir. 2000).

Here, unlike the contract in *Apogee*, the 2009 RSA includes an integration clause.  Moreover, the language of the 2009 RSA does not allow more than one plausible interpretation.  *Supra* Part I.A.  Indeed, the UAW concedes that the language of the 2009 RSA is unambiguous.  (SMF, RE 42, at 16, ¶ 48 (filed under seal); Sherrick Depo., RE 49-1, at 12:10-12 (filed under seal).)  The UAW is thus attempting to introduce extrinsic evidence not to interpret that unambiguous language, but in the hope that this Court will rewrite it.  That is impermissible. *See, e g.*, *Witmer v. Acument Global Techs., Inc.*, 694 F.3d 774, 778 (6th Cir. 2012) (explaining that "extra-contractual intimations of meaning cannot alter the straightforward meaning of the language" in the agreement itself).

In any event, the UAW's extrinsic evidence does not advance its case.  The UAW relies on extrinsic evidence not about the 2009 RSA, but about a completely separate settlement agreement from February 2008 between Old GM and the UAW ("Henry II").  (Decision, RE 64, Page ID # 4113.)  New GM was never a party to Henry II and never assumed any of its obligations.  (*Id.*, Page ID # 4114.) Nevertheless, the UAW argues that Henry II and the 2009 RSA use similar language, and that Henry II purportedly "did not 'extinguish' the $450 million payment obligation."  (UAW Br. at 47-48.)

*First*, Henry II *did* terminate the $450 million obligation.  Henry II "resolve[d] and settle[d] any and all claims for [Old] GM['s] contributions to the

[DC VEBA]." (Henry II, RE 22-5, Page ID # 557.) Under the 2007 MOU, the $450 million payment was a conditional contribution to the DC VEBA. (2007 MOU, RE 22-2, Page ID # 276-77, § J.2.) Because the $450 million was not listed in the Henry II agreement as one of GM's obligations to the DC VEBA, GM had no obligation, following the effective date of Henry II, to make that payment. (SMF, RE 42, at 5, response to ¶ 14 (filed under seal).) Indeed, that is why, in the separate Implementation Agreement adopted after the effective date of Henry II, the UAW demanded that Old GM *reinstate* the $450 million contingent obligation *eliminated* by Henry II. (SMF, RE 42, at 5, response to ¶ 14 (filed under seal).)[2]

*Second*, even if there were any ambiguity about the status of the $450 million obligation in the wake of Henry II, that is precisely why this case should be resolved on the *unambiguous* terms of the 2009 RSA. There is simply no basis to rely on extrinsic evidence regarding the effect of a series of earlier agreements not at issue in this litigation and as to which New GM was not even a party, when by its plain terms, the subsequent 2009 RSA forecloses any obligation to make the $450 million payment. Indeed, such an inquiry is particularly unwarranted in light

---

[2] Given the state of Old GM's finances in the summer of 2008, it was forced to negotiate with the UAW over deferring certain non-contingent VEBA obligations. (Sherrick Depo., RE 49-1, at 102:8-19, filed under seal.) For its part, the UAW insisted on an acknowledgement of the $450 million contingent obligation. (*Id.*; *see also* Jaworski Depo., RE 45-1, at 56:10-14; 112:14-19, filed under seal).

of the 2009 RSA's integration clause, which bars consideration of extrinsic evidence. *See supra* pp. 30-31.

*Third*, it would be irrelevant even if Henry II had not terminated the $450 million contingent obligation. As the UAW concedes, "[t]he context of the [RSA] negotiations in 2009 was different." (Sherrick Dec., RE 33-12, Page ID # 2002, ¶ 7; *see also* SMF, RE 42, at 18-19, ¶ 58 (filed under seal).) The parties negotiated the 2009 RSA against the backdrop of a government-funded restructuring of Old GM's financial obligations. *See supra* pp. 4-6. The $450 million payment was a "topic of discussion" in those negotiations because *all* of Old GM's obligations had to be restructured. In such circumstances, it is inconceivable that New GM would agree to leave a nearly half-billion-dollar *cash* obligation on the table.

This context also explains why GM's lead negotiator for the 2009 RSA, Fritz Henderson, testified that although it "hadn't occurred to" him that Henry II extinguished the $450 million payment, he was certain that the obligation did not survive the 2009 RSA. (SMF, RE 42, at 5-6, ¶¶ 14-15 and responses thereto (filed under seal).) As Mr. Henderson explained, "it was quite clear to us [that the 2009 RSA] was fully encompassing because we were getting ready to go through bankruptcy and we wanted to deal with everything, absolutely everything before coming out." (Henderson Depo., RE 44-1, at 215:15-216:2 (filed under seal).)

*Finally*, the UAW also relies on pre-Henry II VEBA funding calculations. (UAW Br. at 20.)  Extrinsic evidence (the Henry II VEBA calculations) about extrinsic evidence (the Henry II agreement) proves nothing about the terms of the 2009 RSA.  Tellingly, the UAW offers no evidence about calculations prepared in connection with the 2009 RSA.  The reason is obvious: those calculations zeroed-out New GM's obligation to make the $450 million payment. (SMF, RE 42, at 17, ¶ 54, p. 23, ¶ 80 (filed under seal); Bondholders' Ex. 3, RE 48-1, at 3, 11 (filed under seal).); *supra* pp. 8-9.  Making matters worse for the UAW, it fully participated in the bankruptcy proceedings yet never mentioned the $450 million payment—even after the Bondholders' exhibit (showing that the $450 million payment was excluded from New GM's obligations) was introduced into evidence. (SMF, RE 42, at 17, ¶ 55 (filed under seal).)  Thus, to the extent extrinsic evidence is relevant at all, it must be considered as a whole—and when so considered, it supports New GM's position, not the UAW's.

### 4. No Alleged Side Deal About the $450 Million Payment Survived the 2009 RSA

In a final effort to side-step the clear language of the 2009 RSA, the UAW contends that, in connection with their discussion of the $450 million payment during the 2009 RSA negotiations, the parties decided to maintain the "status quo." (UAW Br. at 23.)  But by acknowledging that the $450 million payment obligation was a "topic of discussion" during the 2009 RSA negotiations (*id.*), the UAW

concedes that the obligation falls within the same "subject matter" as that dealt with in the 2009 RSA—specifically, "GM's obligation to pay money to fund [retiree medical] benefits." (UAW Reply, RE 52, Page ID # 3679.) Thus, any alleged "agreement" is subject to the 2009 RSA's integration clause. Even if the UAW's imagined agreement to maintain the status quo occurred (which it did not), the 2009 RSA superseded that agreement by its express terms. Again, integration clauses are designed precisely to foreclose attempts, like the UAW's, to vary a written agreement through an alleged and undocumented "side agreement." *Sec. Watch*, 176 F.3d at 372.

## II. EVEN IF THE CONTINGENT $450 MILLION PAYMENT HAD SURVIVED THE 2009 RSA AND OLD GM'S BANKRUPTCY, NEW GM STILL WOULD HAVE NO OBLIGATION TO MAKE THE PAYMENT

### A. The 2007 MOU Imposed Significant Conditions Precedent to the Obligation to Make the $450 Million Payment, and Those Conditions Have Not Been Satisfied

Even if the contingent $450 million payment obligation had survived the 2009 RSA, New GM would be entitled to summary judgment on the separate and independent ground that the UAW has not satisfied its burden of proving that *all* conditions precedent to the $450 million payment have been satisfied. *See Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir. 1978) ("[I]nasmuch as [the contract section] operates as a condition precedent to

any recovery, the burden of proof is on the plaintiff to show that [the condition was satisfied].").[3]

In the 2007 MOU, the parties agreed that the obligation to make the $450 million payment would "not become effective until *all* of the following events have occurred":

> (a)    "execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them"; and

> (b)    "the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with *all* of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM."

(2007 MOU, RE 22-2, Page ID # 278, § K.2 (emphasis added).)

Thus, the 2007 MOU required that *each* of the following had to happen before the $450 million obligation could arise: (1) Delphi and Old GM must enter into "a comprehensive settlement agreement resolving the financial, commercial, and other matters between them"; (2) Delphi must "substantial[ly] consummat[e] a plan of reorganization"; (3) the plan of reorganization must be "consistent with all of the terms" of the 2007 MOU; and (4) the plan of reorganization must be

---

[3] Although the District Court did not reach this question, this Court "can affirm on any ground fairly supported by the record." *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 713 (6th Cir. 2007).

"consistent with all of the terms" of a "comprehensive settlement agreement between Delphi and [Old] GM." These conditions reflect Old GM's willingness to facilitate Delphi's successful emergence from bankruptcy—but only if Delphi in fact successfully emerged as a functioning company, which in turn would ensure a supply of important parts for Old GM, including at specified facilities requiring substantial additional investment and the employment of UAW-represented workers.

These conditions were not satisfied. Rather than reorganizing and emerging from bankruptcy as a functioning company that would continue to serve as a principal supplier to GM, Delphi sold virtually all of its assets, and stopped operating any manufacturing plants or employing any UAW members. (SMF, RE 42, at 20, ¶ 65 (filed under seal).) These events cost Old GM billions of dollars and forced New GM to take over business operations that, under both the 2007 MOU and Amended GSA/MRA, were to remain owned and operated by Delphi. These circumstances are entirely at odds with the preconditions for payment of the $450 million in the 2007 MOU and the Amended GSA/MRA.

**1. Delphi's Modified Plan Was Not Consistent with the Terms of the 2007 MOU**

The 2007 MOU required Delphi's reorganization plan to be "consistent with *all* of the terms of [the 2007 MOU]." (2007 MOU, RE 22-2, Page ID # 278, § K.2, (emphasis added).) While even a *single* inconsistency between the Modified Plan

and the 2007 MOU would foreclose any obligation for New GM to make the $450 million payment, Delphi's Modified Plan was inconsistent with numerous key terms of the 2007 MOU.

*First*, the Modified Plan provided for the sale and liquidation of Delphi's assets, while the 2007 MOU required Delphi to continue as a functioning supplier to GM. Specifically, the 2007 MOU required "Delphi's successful emergence from bankruptcy with certain UAW-represented operations"; with "transform[ed]," "ongoing business operations"; and in a "better position . . . to retain existing business and attract new business." (2007 MOU, RE 22-2, Page ID # 257, Intro.) By contrast, "Delphi's sole purpose" following its bankruptcy under the Modified Plan was "to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *In re DPH Holdings Corp.*, 437 B.R. at 97-98 (describing Delphi's "*liquidating* plan" (emphasis added)). Indeed, even the UAW concedes that the restructuring plan for Delphi "never came to fruition [and] didn't happen." (Curson Depo., RE 41-14, Page ID # 2745, at 168:13-24.) Thus, when asked if the post-emergence Delphi was what was envisioned in the 2007 MOU, the UAW vice president tasked with GM bargaining replied: "Of course not." (Rapson Depo., RE 41-24, Page ID # 3181, at 46:7-20.)

*Second,* under the "Site Plan" of the 2007 MOU, the parties agreed that four components manufacturing operations called "Keep Sites" were "to remain owned

and operated by Delphi," and that Delphi would continue to employ UAW-represented employees and to "produce [certain GM-related] products" at each of these sites.  (2007 MOU, RE 22-2, Page ID # 258, 282-86, § B.1 & Attachment A; *see also id*., Page ID # 258, § B ("GM and Delphi agree to implement the site plans as outlined below and described in detail in Attachment A.").)  According to the UAW, this Site Plan was the "foundation" of the 2007 MOU.  (Rapson Depo., RE 41-24, Page ID # 3177-78, at 35:3-7, 24-25, 36:4.)  Under Delphi's Modified Plan, however, Delphi no longer owned or operated any of those four sites, and following its liquidation, Delphi no longer employed any UAW members.  (SMF, RE 42, at 20, ¶ 65 (filed under seal).)  Instead, New GM was forced to take over ownership and operation of the Keep Sites, along with employment of the workforce there, in order to maintain a supply of critical GM components.

*Third*, under the 2007 MOU, Delphi was required to make an "[e]ngineering and capital investment" of over $200 million in the Keep Sites.  (2007 MOU, RE 22-2, Page ID # 282-86, at Attachment A.)  Delphi's Modified Plan contained no such commitment, and the UAW concedes it has no evidence that Delphi ever made these investments.  (SMF, RE 42, at 21, ¶ 68 (filed under seal).)

*Fourth*, the 2007 MOU called for Delphi-UAW CBAs to continue through September 2011, for certain "flowback" opportunities between GM and Delphi, and for Delphi's management to have "equivalence of sacrifice" with UAW-

represented employees.  (2007 MOU, RE 22-2, Page ID # 257-58, 260-63, 276, §§ A, C, I.)  Despite its burden of proof, the UAW concedes that the CBAs did *not* continue through September 2011 and that Delphi's management had *no* "equivalence of sacrifice" with UAW-represented employees.  (SMF, RE 42, at 21, ¶¶ 69-70 (filed under seal).)  Additionally, the UAW fails even to address how there could be flowback opportunities between New GM and Delphi or between different Delphi locations, given Delphi's liquidation. (*Id.* at 67-68, ¶ 67.)

In sum, Old GM did not agree in the 2007 MOU to pay $450 million to the DC VEBA *unconditionally*.  The carefully crafted conditions in the 2007 MOU reflect that Old GM agreed to make that payment *only* if it received the benefit of a specifically defined bargain.  The relevant express conditions required that Delphi emerge from bankruptcy as a functioning company that owned, operated, and invested in certain facilities at which UAW-represented employees manufactured products for Old GM under labor agreements between the UAW and Delphi.  If Delphi's future unfolded any other way (and particularly if GM was forced to bear the burden that Delphi would otherwise bear), Old GM had no obligation to pay the $450 million.  Because Delphi liquidated in a manner fundamentally at odds with the conditions of the 2007 MOU, New GM has no obligation to make the $450 million payment.

### 2. Delphi's Modified Plan Was Not Consistent with All of the Terms of the Comprehensive Settlement Agreement

In order for the $450 million to become payable, Delphi's reorganization plan also had to "incorporate[], approve[] and [be] consistent with *all* of the terms of . . . the comprehensive settlement agreement between Delphi and [Old] GM." (2007 MOU, RE 22-2, Page ID # 278, § K.2 (emphasis added).)  These conditions were not satisfied either.

The District Court recognized that the Amended GSA/MRA was the "comprehensive settlement agreement" referenced in the 2007 MOU.  (Decision, RE 64, Page ID # 4116.)  Indeed, the UAW conceded that Delphi and Old GM "entered into" a "comprehensive settlement . . . in September 2008 that resolved the financial, commercial, and other matters between them."  (UAW Memo, RE 13, Page ID # 45.)  The agreement referenced by the UAW is the Amended GSA/MRA, which the parties adopted in September 2008.

The Modified Plan is not "consistent with"—and in fact is directly at odds with—the terms of the Amended GSA/MRA.  Under the Amended GSA/MRA, Old GM was entitled to both a $2.055 billion "administrative expense claim" and a subordinated "general unsecured claim in the amount of $2.5 billion."  (Amended GSA, RE 22-6, Page ID # 654-55, §§ 4.04(b), 5.04.)  But the Modified Plan eliminated both claims; in short, over $4.5 billion was never paid to either Old GM or New GM.  (MDA, RE 22-15, Page ID #1201.)

Moreover, the Amended GSA/MRA (like the 2007 MOU itself) provided for an operational Delphi that would employ UAW-represented workers after the Delphi bankruptcy proceedings. (*See, e.g.,* Amended GSA, RE 22-6, Page ID # 640, art. III). However, the Modified Plan liquidated Delphi, *supra* pp. 17-19, thus leaving Delphi with no plants to operate or UAW workers to employ.

## B.    The UAW's Arguments to the Contrary Are Meritless

The UAW contends that Delphi's Modified Plan is consistent with (1) the terms of the 2007 MOU, as allegedly modified by the Keep Sites MOU; (2) the comprehensive settlement agreement (i.e., the Amended GSA/MRA), as allegedly modified by the MDA; and (3) the purposes of the 2007 MOU. (UAW Br. at 52-57.) Each argument is unfounded.

1.    The UAW asserts that the Keep Sites MOU "modified" the 2007 MOU, allowing New GM to purchase the Keep Sites "pursuant to" the MDA. (UAW Br. at 56.) As an initial matter, the UAW focuses exclusively on the Keep Sites terms of the 2007 MOU, ignoring all other conditions precedent. As explained above, *all* of the conditions precedent in the 2007 MOU—not just the Keep Sites terms—were necessary to trigger the $450 million payment obligation. (2007 MOU, RE 22-2, Page ID # 278, § K.2 (emphasis added).) Because the UAW bears the burden of proof, its failure even to address all of the requirements of the 2007 MOU forecloses its claim.

However, even focusing just on the Keep Sites condition, the UAW's arguments are meritless. There is no dispute that, notwithstanding the terms of the 2007 MOU, Delphi did not retain ownership of the Keep Sites under the Modified Plan. And, contrary to the UAW's suggestion, not a single word in either the Keep Sites MOU or the MDA modifies that precondition of the 2007 MOU. As demonstrated by the Implementation Agreement (RE 22-8, Page ID # 758-61), when the parties wanted to amend the 2007 MOU, they did so through express language. Neither Delphi's Modified Plan (including the MDA) nor the Keep Sites MOU includes such language. Indeed, in the District Court, the UAW *conceded* that the 2007 MOU "was not amended or modified in any way during Delphi's bankruptcy. . . or during GM's bankruptcy." (UAW Letter, RE 33-13, Page ID # 2007, referred to in Compl. ¶ 11; *see also* SMF, RE 42, at 21-22, ¶ 73 (admitting that nothing in the Keep Sites MOU changed the preconditions for the $450 million payment) (filed under seal).)[4]

In fact, far from *eliminating* preconditions of the 2007 MOU, as the UAW suggests, the Keep Sites MOU *confirms* that those preconditions were *not* satisfied. Imagine an agreement between a contractor and a customer to renovate a kitchen. The agreement provides a bonus for the contractor if the renovation is completed

---

[4] The MDA was part of Delphi's bankruptcy; the Keep Sites MOU was part of Old GM's bankruptcy. (MDA, RE 22-15, Page ID # 1155-1290; Curson Dec. RE 41-17, Page ID # 2984-85, at Ex. B, p. 103-04.)

by June 1.  On June 15, the parties sign a separate MOU—without mentioning the bonus—that says the renovation will be completed by September 1.  The separate MOU does not entitle the contractor to a bonus for completing the project late.  Just the opposite—it establishes conclusively that the condition for the bonus, completion by June 1, was not satisfied.

Likewise, here, the parties contemplated that Delphi's future might unfold in several ways.  Only if Delphi emerged from bankruptcy in accordance with the terms of the 2007 MOU was Old GM obligated to pay the $450 million.  Indeed, the nature of the conditions in the 2007 MOU contemplated that the parties might reach future agreements with terms inconsistent with the 2007 MOU, and that such agreements would not satisfy the conditions for payment of the $450 million.  By requiring New GM to take over manufacturing facilities that the 2007 MOU called for Delphi to own and operate, the Keep Sites MOU establishes conclusively that the 2007 MOU's conditions for payment of the $450 million were not met.   The UAW's contrary interpretation would impermissibly read the preconditions of the 2007 MOU out of that agreement altogether.

2.    The UAW also claims that Delphi's Modified Plan was consistent with the comprehensive settlement agreement between Old GM and Delphi referenced in the 2007 MOU, which the UAW now claims is the Amended GSA/MRA "as modified by the [MDA]."  (UAW Br. at 55.)

- 53 -

However, as the UAW has admitted, the comprehensive settlement agreement referenced in the 2007 MOU is the Amended GSA/MRA, *not* the MDA. *See supra* Part II.A.2.  Indeed, both the Original GSA/MRA and the Amended GSA/MRA refer to themselves as "settlement agreement[s]," and the Amended GSA/MRA explicitly "amended and restated" the Original GSA/MRA.  (Original GSA, RE 22-3, Page ID # 413; Amended GSA, RE 22-6, Page ID # 608.)  There is no comparable language in the MDA, because the MDA was not meant to be a settlement agreement as contemplated by the 2007 MOU.   Instead, the MDA completely abandoned the deal for a restructured and operational Delphi.  *See supra* Part II.A.2.

3.     Finally, the UAW argues that whatever the terms of the 2007 MOU, Delphi's Modified Plan is consistent with the purportedly "self-evident" purpose of the conditions precedent: namely, to protect Old GM from a Delphi emergence that Old GM "could not accept from a business standpoint."  (UAW Br. at 36, 56-57.)

As described above, Delphi's liquidation eviscerated the purpose of the 2007 MOU—to facilitate Delphi's emergence from bankruptcy as a company that owned and operated several manufacturing facilities under agreements with the UAW, and that continued as a principal supplier to GM.  (2007 MOU, RE 22-2, Page ID # 257.)  Regardless, appeals to a perceived "purpose" behind the conditions precedent cannot vitiate the express provisions of the 2007 MOU.  By

its terms, the 2007 MOU allocated to the UAW the risk that Delphi might not consummate a "plan of reorganization . . . consistent with all of the terms of [the 2007 MOU] and the comprehensive settlement agreement." (2007 MOU, RE 22-2, Page ID # 278, § K.2.) If Delphi was unable to consummate such a plan, or if there was *any* inconsistency, Old GM's obligation to make the $450 million payment would "not become effective." (*Id.*)

At bottom, the UAW argues that the $450 million should be payable regardless of the expectations of the parties or the terms of the 2007 MOU. In the UAW's view, notwithstanding the express terms of the 2007 MOU, any subsequent outcome that circumstances compelled Old GM to accept should be deemed to fulfill the conditions for payment of the $450 million. But the UAW cannot evade the effect of the explicit conditions precedent set forth in the 2007 MOU.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

Respectfully submitted,

Date:  April 21, 2014                    /s/ Shay Dvoretzky

Robert S. Walker
Johanna Fabrizio Parker
Corey D. Clay
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216) 586-3939

Shay Dvoretzky
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3474

*Counsel for Defendant-Appellee
General Motors LLC*

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, | ) ) ) ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| vs. | ) | No. 14-1019 |
| | ) | |
| GENERAL MOTORS LLC | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

CERTIFICATE OF COMPLIANCE PURSUANT
TO FED. R. APP. P. 32(a)(7)(C)

Counsel for Defendant-Appellee General Motors LLC certifies the

following:

Pursuant to Fed. R. App. P. 32, the attached Brief of Defendant-Appellee

General Motors LLC is printed using a proportionally-spaced, 14-point Times New

Roman typeface, and contains 12,911 words.


Date: April 21, 2014                    /s/ Shay Dvoretzky

                                        *Counsel for Defendant-Appellee*
                                        *General Motors LLC*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 21, 2014, I electronically filed the foregoing Brief of Defendant-Appellee General Motors LLC with the Clerk of the Court using the ECF system, which will send notification of such filing to the following: Andrew D. Roth, Ramya Ravindran and Laurence Gold, Bredhoff & Kaiser P.L.L.C., 805 15th Street N.W., Suite 1000, Washington, D.C. 20005.

/s/ Shay Dvoretzky

*Counsel for Defendant-Appellee*
*General Motors LLC*

ADDENDUM

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Description of Contents | Date Filed In District Court | Page ID Range |
|---|---|---|---|
| 13 | UAW Memo (Motion to Strike "Affirmative Defense" of Lack of Subject Matter Jurisdiction and Memorandum in Support) | 10/21/2010 | 45 |
| 15 | Stay Order | 11/3/2010 | 187 |
| 22-2 | 2007 MOU, Ex. 2 to Notice of Joint Filing | 11/17/2011 | 257-405 |
| 22-3 | Original GSA, Ex. 3 to Notice of Joint Filing | 11/17/2011 | 406-69 |
| 22-4 | Original MRA, Ex. 4 to Notice of Joint Filing | 11/17/2011 | 470-556 |
| 22-5 | Henry II, Ex. 5 to Notice of Joint Filing | 11/17/2011 | 557 |
| 22-6 | Amended GSA, Ex. 6 to Notice of Joint Filing | 11/17/2011 | 601-65 |
| 22-7 | Amended MRA, Ex. 7 to Notice of Joint Filing | 11/17/2011 | 666-757 |
| 22-8 | Implementation Agreement, Ex. 8 to Notice of Joint Filing, Implementation Agreement | 11/17/2011 | 758-61 |
| 22-9 | Loan Agreement, Ex. 9 to Notice of Joint Filing | 11/17/2011 | 762-852 |
| 22-13 | MPA, Ex. 13 to Notice of Joint Filing | 11/17/2011 | 986-1116 |
| 22-14 | 2009 RSA, Ex. 14 to Notice of Joint Filing | 11/17/2011 | 1118-19, 1125-28, 1132, 1134-35, 1147 |
| 22-15 | MDA, Ex. 15 to Notice of Joint Filing | 11/17/2011 | 1155-1290 |

| 33 | UAW Motion | 11/15/2012 | 1326-27 |
|---|---|---|---|
| 33-2 | Stipulation,<br>Ex. 1 to UAW Motion | 11/15/2012 | 1365-66 |
| 33-12 | Sherrick Dec.,<br>Ex. 11 to UAW Motion | 11/15/2012 | 2002 |
| 33-13 | UAW Letter,<br>Ex. 12 to UAW Motion | 11/15/2012 | 2007 |
| 33-15 | Ravindran Dec.,<br>Ex. 14 to UAW Motion | 11/15/2012 | 2012-16 |
| 33-19 | Modified Plan,<br>Ex. 18 to UAW Motion | 11/15/2012 | 2025-114 |
| 41-6 | Parker Dec.,<br>Ex. 25 to New GM Index of Exhibits | 12/17/2012 | 2620-26 |
| 41-14 | Curson Depo.,<br>Ex. 31 to New GM Index of Exhibits | 12/17/2012 | 2735-37,<br>2745 |
| 41-17 | Curson Dec.,<br>Ex. 31-3 to New GM Index of<br>Exhibits | 12/17/2012 | 2841, 2843-45,<br>2847-63,<br>2984-85 |
| 41-24 | Rapson Depo.,<br>Ex. 35 to New GM Index of Exhibits | 12/17/2012 | 3177-78,<br>3181,<br>3188-89 |
| 41-29 | Transcript of June 30, 2009 Old GM<br>Bankruptcy Proceeding,<br>Ex. 40 to New GM Index of Exhibits | 12/17/2012 | 3315-18 |
| 41-30 | Transcript of July 1, 2009 Old GM<br>Bankruptcy Proceeding,<br>Ex. 41 to New GM Index of Exhibits | 12/17/2012 | 3333-39 |
| 41-32 | Bondholders' Notice of Filing<br>Exhibits,<br>Ex. 43 to New GM Index of Exhibits | 12/17/2012 | 3371 |
| 42 | Response to UAW's Statement of<br>Material Facts Not Genuinely In<br>Dispute, filed under seal | 12/17/2012 | pp. 3-6, 9-10,<br>14, 16-22 |
| 43 | New GM Motion | 12/17/2012 | 1326-27 |
| 44-1 | Henderson Depo.,<br>Ex. 28 to New GM Index of Exhibits,<br>filed under seal | 12/17/2012 | 215:15-216:2 |

| 45-1 | Jaworski Depo., Ex. 29 to New GM Index of Exhibits, filed under seal | 12/17/2012 | 56:10-14 112:14-19 |
|---|---|---|---|
| 46-1 | Yearly Depo., Ex. 33 to New GM Index of Exhibits, filed under seal | 12/17/2012 | 140:6-22 |
| 47-2 | VEBA Proposal (Yearly Depo Ex. 18), Ex. 33-2 to New GM Index of Exhibits, filed under seal | 12/17/2012 | p. 4 |
| 48-1 | Bondholders' Ex. 3, Ex. 44 to New GM Index of Exhibits, filed under seal | 12/17/2012 | pp. 3, 11 |
| 49-1 | Sherrick Depo., Ex. 27 to New GM Index of Exhibits, filed under seal | 12/17/2012 | 12:10-12, 102:8-19 |
| 50-2 | Sherrick Email, Ex. 27-2 to New GM Index of Exhibits, filed under seal | 12/17/2012 | No. 5 |
| 52 | UAW Reply | 1/15/2013 | 3679 |
| 53-1 | Ravindran Dec., Ex. 47 to UAW Reply | 1/15/2013 | 3694-98 |
| 54-4 | Sherrick Depo., Ex. 52 to UAW Reply, filed under seal | 1/15/2013 | 182:12-183:12 |
| 54-7 | Gettelfinger Depo., Ex. 56 to UAW Reply, filed under seal | 1/15/2013 | 218:7-8 |
| 61 | Order Regarding Supplemental Filings | 5/31/2013 | 4016-17 |
| 62-1 | Sale Order, Ex. 62 to UAW Supplemental Filings | 6/17/2013 | 4050-51 |
| 63 | Supplemental Facts | 6/28/2013 | 4078 |
| 64 | Decision | 12/10/2013 | 4089-124 |
| 65 | Judgment | 12/10/2013 | 4125 |