Case No. 14-1019

═══════════════════════════════════════════

UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

═══════════════════════════════════════════

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,

*Plaintiff-Appellant*,

v.

GENERAL MOTORS LLC,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court for the
Eastern District of Michigan
_____

# APPELLANT'S REPLY BRIEF

_____

Andrew D. Roth
Ramya Ravindran
Laurence Gold
BREDHOFF & KAISER PLLC
805 15th Street, NW, Suite 1000
Washington, DC 20005
Tel. 202-842-2600

Counsel for Plaintiff-Appellant UAW

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................i

TABLE OF AUTHORITIES ...................................................................ii

ARGUMENT ......................................................................................... 1

I.      THE DECISION BELOW GRANTING SUMMARY JUDGMENT TO
        GM ON THE GROUND THAT GM DID *NOT* "ASSUME" OLD GM'S
        $450 MILLION PAYMENT OBLIGATION UNDER THE 2007 MOU
        IS LEGALLY ERRONEOUS AND DUE TO BE REVERSED ...................1

        A.    UAW's Showing On The District Court's Legal Error.........................1

        B.    GM's Unavailing Response .....................................................2

II.     THIS COURT SHOULD DIRECT THE DISTRICT COURT TO
        GRANT SUMMARY JUDGMENT IN UAW'S FAVOR ON
        UAW'S BREACH-OF-CONTRACT CLAIM AGAINST GM ...................7

        A.    There Is No Merit In GM's Affirmative Defense That The 2009
              RSA "Extinguished" GM's $450 Million Payment Obligation...........8

        B.    The Conditions Precedent To GM's $450 Million Payment
              Obligation Have Been Satisfied .........................................21

CONCLUSION ..................................................................................... 28

CERTIFICATE OF COMPLIANCE ...................................................... 29

CERTIFICATE OF SERVICE............................................................... 30

# TABLE OF AUTHORITIES

## CASES

In re DPH Holdings, 437 B.R. 88 (S.D.N.Y. 2010),
   aff'd, 448 Fed. App'x 134 (2d Cir. 2011), cert. denied, 133 S. Ct. 51 (2012).....27

MacDonald v. General Motors Corp., 110 F.3d 337 (6th Cir. 1997).....................23

Roger Miller Music, Inc. v. Sony/ATV Publ'g, 477 F.3d 383 (6th Cir. 2007)........23

# ARGUMENT

**I.     THE DECISION BELOW GRANTING SUMMARY JUDGMENT TO GM ON THE GROUND THAT GM DID *NOT* "ASSUME" OLD GM'S $450 MILLION PAYMENT OBLIGATION UNDER THE 2007 MOU IS LEGALLY ERRONEOUS AND DUE TO BE REVERSED**

> A.     <u>UAW's Showing On The District Court's Legal Error</u>

In UAW's Opening Brief, we showed that the district court committed reversible legal error in granting summary judgment to GM on the ground that when GM purchased substantially all of Old GM's assets in Old GM's 2009 bankruptcy case, GM did *not* "assume" Old GM's $450 million payment obligation to the DC VEBA under the 2007 Memorandum of Understanding ("**2007 MOU**") between Old GM, UAW and Delphi.  <u>See</u> UAW Br. at 37-42.

And, we showed that the district court's legal error in this regard flowed from:

(1)  the district court's failure to take proper (indeed, *any*) account of the two legal instruments—the June 26, 2009 Master Purchase Agreement ("**MPA**") between GM and Old GM, and the July 5, 2009 Old GM bankruptcy court "**Sale Order**" approving the MPA—establishing, as a matter of law, that when GM purchased substantially all of Old GM's assets in Old GM's 2009 bankruptcy case, GM *did* "assume" Old GM's $450 million payment obligation to the DC VEBA under the 2007 MOU; and

(2)  the district court's corresponding failure to recognize that the collectively-bargained 2009 Retiree Settlement Agreement ("**2009 RSA**") between GM and UAW has no legal bearing on that "assumption" question, but has legal bearing only on the separate, analytically-distinct question of whether the $450 million payment obligation that GM *did* "assume" *pursuant to the MPA and Sale Order* was subsequently "extinguished."

B.     GM's Unavailing Response

1.     GM begins its response to UAW's showing that the district court's "no assumption" ruling is legally erroneous by taking issue with UAW's reading of the district court's summary judgment decision.  Specifically, as GM would have it, UAW is wrong in claiming that the district court "*fail[ed] to rule on* GM's 'extinguishment' defense [based on the language of the 2009 RSA], . . . *purportedly holding instead* that New GM did not 'assume' Old GM's contingent $450 million obligation in the 2007 MOU."  See GM Br. at 31 (emphasis added).

GM's difficulty is that UAW's reading of the district court's summary judgment decision is entirely accurate, both with respect to what the district court "fail[ed] to rule on," and with respect to what the district court's actual—rather than "purported[ ]"—"holding" was.

In the first section of its decision titled "**Introduction**," the district court clearly stated the basis of its summary judgment decision as follows:

> A careful review of the record shows that there is no disputed fact as to whether New GM assumed the $450 million payment obligation to the DC VEBA as reflected in the 2007 MOU. *New GM did not assume the obligation*. Rather, the entirety of New GM's obligations to provide for retiree medical benefits are contained in the 2009 Retiree Medical Settlement Agreement which does not contain the $450 million payment obligation. *Accordingly*, GM's motion for summary judgment will be granted and the UAW's motion will be denied.

(Decision, RE 64, Page ID # 4091) (emphasis added).

Then, in the body of its decision, the district court added, in a passage showing with equal clarity that the district court "fail[ed] to rule on GM's 'extinguishment' defense [based on the language of the 2009 RSA]," owing to that court's legal view that the question raised by the 2009 RSA is whether GM "assumed" rather than obtained UAW's agreement to "extinguish" the $450 million payment obligation, and thus whether there is any "assumption" as opposed to "extinguishment" language in the 2009 RSA:

> There is no significance in the fact that the UAW Retiree Settlement Agreement does not contain a provision which mentions or "extinguishes" Old GM's obligation. What is significant is that the 2009 Retiree Settlement Agreement does not contain any language to indicate that New GM was obligated to, or assumed, Old GM's obligation under the 2007 MOU.

(Id., Page ID # 4109).

And, in the final section of its decision titled "**In Sum**," the district court added, in a passage that is precisely to the same effect as the passage quoted immediately above:

- 3 -

> New GM assumed only what was in [the 2009 RSA]; the $450 million payment was not among those ['assumed'] obligations. . . .  It is not to say that Old GM's obligation was "extinguished" or "not extinguished" by New GM.  Rather, the obligation never arose in New GM in the first instance.

(Id., Page ID # 4123).

2.    In a further effort to fend off UAW's showing that the district court's "no assumption" ruling is legally erroneous, GM asserts that "[i]t is no answer to attack the District Court over the semantic distinction between whether the 2009 RSA 'extinguished' Old GM's $450 million obligation and whether New GM 'assumed' the obligation in the 2009 RSA."  See GM Br. at 32.

But UAW's "attack" on the district court's "no assumption" ruling cannot be brushed aside as resting on a mere "semantic distinction."  Rather, UAW's "attack" on that ruling rests squarely on the district court's failure to recognize that, as a substantive legal matter, the question of whether GM "assumed" Old GM's $450 million payment obligation to the DC VEBA under the 2007 MOU is answered by the MPA between GM and Old GM and the Old GM bankruptcy court Sale Order approving the MPA, and *not* by the collectively-bargained 2009 RSA between GM and UAW.  As previously noted, our showing that the district court made a substantive legal error in this regard is set out at pages 37-42 of

UAW's Opening Brief, and it speaks volume that GM, in its Brief, offers no response *on the merits* to any aspect of that showing.[1]

It also speaks volumes that GM's effort to paint UAW's "attack" on the district court's "no assumption" ruling as resting on a mere "semantic distinction" cannot be squared with GM's prior statements in this case evincing GM's own recognition that, as a substantive legal matter, the answer to the question of whether GM "assumed" Old GM's $450 million payment obligation to the DC VEBA under the 2007 MOU is to be found in the MPA and Sale Order, whereas the collectively-bargained 2009 RSA is addressed to the separate, analytically-distinct question of whether any such "assumed" obligation was subsequently "extinguished." For example, in its "Motion to Enforce" in the Old GM bankruptcy court, where GM first asserted and explained its "extinguishment" defense to UAW's breach-of-contract claim in this case (see UAW Br. at 4-6), GM stated:

---

[1] For example, GM offers no response to the showing at UAW Br. 37-38 & 40-41 that, on their face, and in accord with sound common bankruptcy case practice, the MPA and the Sale Order are the Old GM bankruptcy case legal instruments addressed to the specific subject of GM's assumption vel non of Old GM's various executory contracts and their associated contractual rights and liabilities; and that, accordingly, the MPA and the Sale Order are the proper place to find the answer to the question of whether GM assumed one of those Old GM executory contracts (the 2007 MOU) and its associated contractual rights and liabilities upon the consummation of the Old GM/GM asset sale transaction.

> *Pursuant to the terms of the Sale Order and the MPA*, New GM *assumed* the "UAW Collective Bargaining Agreement," which is defined in the MPA as any agreement between Old GM and the UAW involving employees of Old GM and its affiliates, which arguably includes the [2007 MOU]. *Any such assumption*, however, is subject to *the modifications set forth in [the 2009 RSA]. . . .* Accordingly, as set forth in more detail below, any [assumed] obligation of New GM under the [2007 MOU] *. . . was extinguished by the [2009 RSA]. . . .*

See (Motion to Enforce, RE 33-24, Page ID # 2292) (emphasis added); see also UAW Br. at 10-11 (citing GM's statements to the same effect in its summary judgment papers).

3.    In a final effort to fend off UAW's showing that the district court's "no assumption" ruling is legally erroneous, GM asserts that the undisputed fact that the 2007 MOU is part of the "UAW Collective Bargaining Agreement" assumed by GM pursuant to the MPA and Sale Order "does not answer the question" of whether GM assumed Old GM's $450 million payment obligation to the DC VEBA under the 2007 MOU.  See GM Br. at 32.  That assertion does not bear a moment's scrutiny.

The undisputed fact that the 2007 MOU is part of the "UAW Collective Bargaining Agreement" assumed by GM pursuant to the MPA and Sale Order most assuredly does "answer the question" of whether GM assumed Old GM's $450 million payment obligation to the DC VEBA under the 2007 MOU, and it answers that question *in the affirmative*.  That is so because, as set out in detail in UAW's Opening Brief, under the MPA and Sale Order, GM expressly agreed to

assume "all" obligations imposed on Old GM by the "UAW Collective Bargaining Agreement," and thus "all" obligations imposed on Old GM by the 2007 MOU *including* Old GM's $450 million payment obligation to the DC VEBA.  See UAW Br. at 37-40.  GM's bald suggestion that under the MPA and Sale Order, it agreed to assume "*certain*" obligations imposed on Old GM by the 2007 MOU but not others, see GM Br. at 32, 33 (emphasis in original), is belied by the plain language of the MPA and Sale Order.

*        *        *        *

In sum, there is nothing to GM's multi-faceted effort to undermine UAW's showing that the district court committed reversible legal error in granting summary judgment to GM on the ground that GM did *not* "assume" Old GM's $450 million payment obligation to the DC VEBA under the 2007 MOU.  The district court's ruling on that "assumption" issue is plainly wrong as a matter of law and due to be reversed.

## II.   THIS COURT SHOULD DIRECT THE DISTRICT COURT TO GRANT SUMMARY JUDGMENT IN UAW'S FAVOR ON UAW'S BREACH-OF-CONTRACT CLAIM AGAINST GM

We showed in UAW Br. at 42-44 that this Court can and should resolve on this appeal the "extinguishment" and "conditions precedent" issues presented by this case that the district court did not reach as a consequence of its legally-erroneous decision to grant summary judgment to GM on the threshold

"assumption" issue.  And, we showed in UAW Br. at 45-52 & 52-57, respectively, that this Court's rulings on the "extinguishment" and "conditions precedent" issues should be in UAW's favor; and, accordingly, that this Court should direct the district court to grant summary judgment to UAW on its breach-of-contract claim against GM.

In its Brief, GM seconds, rather than contests, our point that this Court can and should resolve the "extinguishment" and "conditions precedent" issues on this appeal, but argues that the Court's rulings should be in GM's favor rather than UAW's.  None of GM's arguments in that regard is remotely availing.

A.    There Is No Merit In GM's Affirmative Defense That The 2009 RSA "Extinguished" GM's $450 Million Payment Obligation

1.    Our lead argument on the "extinguishment" issue is that the absence of any express language in the 2009 RSA "extinguishing" GM's $450 million payment obligation to the DC VEBA under the 2007 MOU is a dagger in the heart of GM's claim that the 2009 RSA had the purpose and effect of "extinguishing" that obligation.  For the 2009 RSA *does* contain express language extinguishing *other* collectively-bargained GM obligations, and GM undoubtedly would have insisted on the inclusion of express language in the 2009 RSA extinguishing the $450 million payment obligation to the DC VEBA under the 2007 MOU had GM sought and obtained UAW's agreement to that additional "extinguishment."  See UAW Br. at 41-42, 45-46.

- 8 -

The totality of GM's response is: "As the District Court recognized, this [express language] argument is precisely backwards." See GM Br. at 34. This response is no response at all. For it merely cites and embraces the passage in the district court's decision quoted supra p. 3 in which the court below stated its legal view that the question raised by the 2009 RSA is whether GM "assumed" rather than obtained UAW's agreement to "extinguish" the $450 million payment obligation, and thus whether there is any "assumption" as opposed to "extinguishment" language in the 2009 RSA.

As we have shown, and as GM's own prior statements in this case recognize, that district court legal view of the matter could not be more wrong. See UAW Br. at 40-42; supra pp. 4-6. Contrary to the district court's legal view, the question raised by the 2009 RSA *is* whether that collectively-bargained contract served to "extinguish" GM's $450 million payment obligation to the DC VEBA under the 2007 MOU; and in this proper legal light, the absence of express "extinguishment" language in the 2009 RSA is very much a dagger in the heart of GM's claim that the 2009 RSA had the purpose and effect of "extinguishing" that obligation.

2.      We also have argued that GM's "extinguishment" defense is further belied by extrinsic evidence of record showing that in the drafting of the 2009 RSA, the contract language on which GM's "extinguishment" defense rests was simply carried over by the parties in haec verba from a prior agreement

- 9 -

between them that undeniably did *not* "extinguish" the $450 million payment obligation:  the February 2008 Retiree Settlement Agreement ("**2008 RSA**").  <u>See</u> UAW Br. at 18-21, 47-48.  GM's Brief does nothing to rebut this argument.

        a.      GM's initial retort to this argument—that "New GM was never a party to [the 2008 RSA] and never assumed any of its obligations," <u>see</u> GM Br. at 40—is a patent <u>non</u> <u>sequitur</u>.  While New GM was never a party to the 2008 RSA, Old GM and UAW were, and it is undisputed that Old GM and UAW were also the parties who negotiated the 2009 RSA.  <u>See</u> UAW Br. at 22-25; GM Br. at 5.  Accordingly, it was Old GM and UAW who on two separate occasions in 2008 and 2009 wrote the contract language on which GM's "extinguishment" defense rests.  It defies reason to conclude that Old GM and UAW intended the same contract language to have one meaning in 2008 and another meaning altogether in 2009.  <u>See</u> UAW Br. at 48.

        b.      GM's only other retort to this argument is to offer up an alternative narrative pertaining to the 2008 RSA and the 2009 RSA.  According to GM:

- The 2008 RSA "*did* terminate the $450 million obligation," *not* through usage of the 2008 RSA contract language carried over <u>in</u> <u>haec</u> <u>verba</u> into the 2009 RSA on which GM's "extinguishment" defense rests, but through different 2008 RSA contract language that

has no 2009 RSA counterpart.  <u>See</u> GM Br. at 40-41 (emphasis in

original);

- In the September 2008 Implementation Agreement between Old GM

  and UAW that post-dated the 2008 RSA, UAW "demanded" and Old

  GM agreed to "*reinstate* the $450 million contingent obligation

  *eliminated* by [the 2008 RSA]."  <u>See</u> <u>id.</u> at 41(emphasis in original);

- This "*reinstate[d]*" $450 million contingent obligation was then

  "*eliminated*" anew by the 2009 RSA contract language carried over

  <u>in</u> <u>haec</u> <u>verba</u> from the 2008 RSA on which GM's "extinguishment"

  defense rests, although that contract language was *not* the source of

  that obligation's prior "*eliminat[ion]*" by the 2008 RSA.  <u>See</u> <u>id.</u> at

  41-42 (emphasis in original).

GM's difficulty here is that none of the three foundational pillars of this

alternative narrative can support the weight it must carry, making clear that this

alternative narrative is nothing more than revisionist history.

In the first place, the 2008 RSA language that GM contends "*did* terminate

the $450 million obligation" is *preamble* language that merely foreshadows in non-

operative, broad-brush terms what the operative provisions of "this Settlement

Agreement" specifically accomplish.  <u>See</u> (2008 RSA, RE 22-5, Page ID # 557).

And, those operative provisions specifically accomplish *only* the "terminat[ion]" of

- 11 -

certain Old GM payment obligations to the DC VEBA under a prior settlement

agreement between the parties known as the Henry I Settlement, see (id., Page ID

# 577-78); in contrast, there is *no* 2008 RSA operative provision that says anything

about "terminat[ing]" Old GM's separate, $450 million payment obligation to the

DC VEBA under the 2007 MOU.  Thus, the operative provisions in the 2008

RSA—taken together with the undisputed extrinsic evidence of record showing

that the parties to the 2008 RSA had no intent to "terminate" Old GM's $450

million payment obligation to the DC VEBA under the 2007 MOU, but rather *an*

*opposite intent* that Old GM's $450 million payment obligation *would remain*

*intact* and be used to help fund the medical benefits to be provided by the New

VEBA and New Plan created by the 2008 RSA, see UAW Br. at 20-21—put the lie

to GM's assertion that the 2008 RSA "*did* terminate the $450 million obligation."

Equally to the point, GM's assertion that the September 2008

Implementation Agreement between Old GM and UAW had the purpose and effect

of "*reinstat[ing]* the $450 million contingent obligation *eliminated* by [the 2008

RSA]" cannot be squared with the Implementation Agreement's plain language,

which states:  "The [$450 million] payment required by sections J(2) and K(2)(e)

[of the 2007 MOU] shall remain payable as set forth in the [2007] MOU."  See

(Implementation Agreement, RE 22-8, Page ID # 760 (¶ 6)).  That contract

language clearly reflects the parties' mutual understanding that the $450 million

payment "required by" the 2007 MOU *was left intact by the 2008 RSA* and would thus "remain payable as set forth in" the 2007 MOU. <u>See</u> UAW Br. at 21. Had the parties had a contrary understanding respecting the impact of the 2008 RSA on Old GM's $450 million payment obligation under the 2007 MOU, they plainly would have crafted different language to explain what they were doing in the September 2008 Implementation Agreement, such as: "The $450 million payment obligation under the 2007 MOU that was eliminated by the 2008 RSA is hereby reinstated on the same terms previously set forth in the 2007 MOU."

Finally, even if one were to suspend disbelief and accept GM's revisionist posit that Old GM's $450 million payment obligation under the 2007 MOU was "*eliminated*" by the 2008 RSA and subsequently "*reinstated*" by the September 2008 Implementation Agreement, there is no logic in GM's assertion that this "*reinstated*" $450 million payment obligation was then "*eliminated*" anew by the 2009 RSA contract language carried over <u>in</u> <u>haec</u> <u>verba</u> from the 2008 RSA on which GM's "extinguishment" defense rests, although that contract language was *not* the source of that obligation's prior "*eliminat[ion]*" by the 2008 RSA.

3. The third prong of our argument is that GM's "extinguishment" defense is further belied by extrinsic evidence of record showing that in the 2009 RSA negotiations between Old GM and UAW, the parties discussed but failed to reach any agreement with respect to Old GM's $450 million payment obligation to

- 13 -

the DC VEBA under the 2007 MOU, much less an agreement to "extinguish" that payment obligation.  See UAW Br. at 23, 48.

GM does *not* dispute our account of what transpired in the 2009 RSA negotiations with respect to Old GM's $450 million payment obligation to the DC VEBA under the 2007 MOU,[2] but does make two arguments as to why our account does not advance our position on the "extinguishment" issue.  Both of these arguments are untenable.

a.    GM's first argument—that our undisputed account of the 2009 RSA negotiations should be ignored by this Court because it yields the "inconceivable" conclusion that GM was willing "to leave a nearly half-billion-dollar *cash* obligation [to the DC VEBA] on the table," see GM Br. at 42 (emphasis in original)—is doubly flawed.

---

[2] To be sure, GM does seek to confuse the matter by highlighting UAW's failure in the Old GM bankruptcy case to take issue with a "Bondholders' exhibit" introduced into evidence in that case showing that, when the dust had settled on the 2009 RSA negotiations, Old GM's $450 million obligation had been "excluded" from GM's obligations under the 2009 RSA.  See GM Br. at 43.  But that UAW failure to take issue with the "Bondholders' exhibit" is entirely consistent with UAW's account of the 2009 RSA negotiations.  That "Bondholders' exhibit" simply reflects GM's rejection in the 2009 RSA negotiations of UAW's proposal "to remove the contingency on the $450 million payment obligation" and "include that payment obligation among the other payment obligations that were being restructured in these negotiations."  See UAW Br. at 23.  Because UAW acceded to GM's rejection of this proposal and did not press the matter further, id., UAW's failure to take issue with the "Bondholders' exhibit" reflecting that rejection makes perfect sense and does nothing to prop up GM's "extinguishment" defense.

- 14 -

First of all, if, *as here*, undisputed contract-negotiating-history evidence points ineluctably to the conclusion that the contracting parties intended a certain result, we are aware of no principle of law that would allow one of the contracting parties to escape that conclusion on the asserted ground that it is "inconceivable" that the parties could have intended such a result.

Second, and in any event, the conclusion dictated by our undisputed account of the 2009 RSA negotiations is anything but "inconceivable." The "nearly half-billion-dollar *cash* obligation [to the DC VEBA] that GM left "on the table" was a future contingent obligation dwarfed in amount by the due-and-owing $20 billion cash obligation to the New VEBA that GM and UAW agreed to restructure in the 2009 RSA. See GM Br. at 8. There is nothing at all remarkable, much less "inconceivable," about GM's willingness, in coming to closure on a deal with UAW to restructure GM's due-and-owing $20 billion cash obligation to the New VEBA, to leave its relatively-small future contingent obligation to the DC VEBA "on the table" and take the risk that it would have to make good on that obligation at some later date if certain contingencies occurred.

b.    GM's second argument—that our undisputed account of the 2009 RSA negotiations should be ignored by this Court because the integration clause in the 2009 RSA bars the introduction of evidence of "side deals" between the parties, see GM Br. at 43-44—fares no better.

Our account of the 2009 RSA negotiations does not show or even remotely suggest that in the course of those negotiations the parties entered into a "side deal" with respect to Old GM's $450 million payment obligation to the DC VEBA under the 2007 MOU.  To the contrary, what our account shows is that the parties discussed *but were unable to reach a deal of any kind with respect to that obligation*, thus leaving the matter where it stood at the outset of the negotiations. See UAW Br. at 23.  That being so, our account of the 2009 RSA negotiations plainly does not fall within the 2009 RSA integration clause bar on the introduction of evidence of "side deals" between the parties.

4.    Finally, in UAW Br. at 48-52, we showed that each piece of 2009 RSA contract language carried over in haec verba from the 2008 RSA on which GM's "extinguishment" defense rests, *on its face and taken in context*, has a purpose and function other than the purpose and function that GM seeks to attribute to it.

In its response to this showing, GM tortures the pertinent 2009 RSA contract language beyond recognition, thereby obscuring the true purpose and function of that language:

a.    GM begins by twice misstating the language in § 8 of the 2009 RSA—the second time through the bracketed substitution of GM's preferred language for § 8's actual language—claiming in both instances that § 8 delineates,

- 16 -

fixes and caps GM's "*VEBA obligations*."  See GM Br. at 6 (emphasis added).  To

be clear, § 8 does *not* use the broad term "VEBA obligations," as GM would have

it.  Rather, § 8's actual language of relevance here is:  "[GM's] financial obligation

and payments to the New Plan and *New VEBA* are fixed and capped by the terms

of this Settlement Agreement. . . .  Pursuant to this Settlement Agreement, [GM]

shall have the following, and only the following, obligations to *the New VEBA* and

the New Plan."  See (2009 RSA, RE 22-14, Page ID # 1130) (emphasis added).

GM's misstatement of § 8's language obscures the salient point that, on its

face, § 8 speaks *only* to the issue of GM's payment obligations to *the New VEBA,*

and says nothing about the quite different issue of GM's $450 million payment

obligation to *the DC VEBA* under the 2007 MOU.  See UAW Br. at 50.

b.     GM goes on to state—inaccurately—that § 14 of the

2009 RSA prohibits UAW from seeking or attempting "*to require*" GM to make

any payments in support of the provision of medical benefits to covered retirees

beyond those payments specified in the 2009 RSA.  See GM Br. at 7, 37 (emphasis

added).[3]  What § 14 actually says is that UAW "agrees not to seek *to obligate*" GM

to make any such additional payments in support of the provision of retiree

medical benefits.  See (2009 RSA, RE 22-14, Page ID # 1134) (emphasis added).

---

[3] Along the same lines, GM inaccurately states that § 14 "foreclose[s] the UAW
from *demanding* any payments from New GM for retiree medical benefits beyond
those specified in the 2009 RSA."  See GM Br. at 29 (emphasis added).

- 17 -

GM's misstatement of § 14's language obscures the salient point that § 14's actual "agrees not to seek *to obligate*" language is, on its face and in context, a prohibition on UAW efforts to pressure or induce GM *to take on any new payment obligations* in support of the provision of retiree medical benefits, see UAW Br. at 50-51 & n.5, whereas GM's substitute "agrees not to seek *to require*" language is a broader prohibition that would reach UAW efforts to enforce GM's pre-existing $450 million payment obligation to the DC VEBA under the 2007 MOU.

       c.     Having thus misstated § 14's language, GM goes on to assert that the conclusion to be drawn from §14 "is bolstered by Section 25.C, in which the UAW waives and releases all claims against New GM *concerning* retiree medical benefits."  See GM Br. at 29 (emphasis added).  But this assertion simply piles one misstatement upon another:  Section 25C does *not* state that UAW waives and releases all claims against GM "*concerning* retiree medical benefits," but rather all claims against GM "concerning *the provision of* Retiree Medical Benefits."  See (2009 RSA, RE 22-14, Page ID # 1140-41) (emphasis added).

This additional GM misstatement obscures the salient points that:  (i) The manifest purpose and function of the language actually used in § 25C is to make it abundantly clear that GM shall have no further obligations with respect to *the provision of* medical benefits to covered retirees—through GM's then-existing Retiree Medical Benefit Plan or otherwise—upon the 2009 RSA Implementation

Date transfer of those obligations to the New Plan and New VEBA; and (ii) That § 25C language does *not* speak to the separate issue of what *payment* obligations GM has undertaken *to fund* the provision of medical benefits to covered retirees by the New Plan and New VEBA.  See UAW Br. at 49.

        d.      GM does accurately state that § 5D of the 2009 RSA contains language providing for the termination of "all" GM obligations "in any way related to Retiree Medical Benefits" upon the transfer of those obligations to the New Plan and New VEBA.  See GM Br. at 6-7, 27-28.  But GM treats with this § 5D language as if it existed in a vacuum, wholly ignoring other 2009 RSA contract language—including language in § 5B and other language in § 5D itself—that puts the § 5D language relied on by GM in its proper context.

GM's invocation of § 5D's language taken out of context obscures the following salient points:  (i) That § 5D language is but one of several pieces of belt-and-suspenders language in the 2009 RSA (the § 25C language discussed immediately above being another) the common purpose and effect of which is to leave no room for doubt that GM shall have no further obligations with respect to *the provision of* medical benefits to covered retirees—through GM's then-existing Retiree Medical Benefit Plan or otherwise—upon the 2009 RSA Implementation Date transfer of those obligations to the New Plan and New VEBA; and (ii) That § 5D language, like the § 25C language discussed immediately above, does *not*

speak to the separate issue of what *payment* obligations GM has undertaken *to fund*

the provision of medical benefits to covered retirees by the New Plan and New

VEBA.  <u>See</u> UAW Br. at 49.

Indeed, GM should not be heard to contend otherwise here, inasmuch as the

Old GM bankruptcy court Sale Order approving the 2009 RSA was drafted by Old

GM itself, <u>see</u> (Bench Decision, RE 33-25, Page ID # 2333)—the same Old GM

that negotiated the 2009 RSA with the UAW—and the Sale Order describes the

purpose and function of § 5D in precisely the same terms we have described them:

> [A]ll obligations of the Purchaser and the Sellers *to provide Retiree*
> *Medical Benefits to members of the Class and the Covered Group*
> shall be governed by the UAW Retiree Settlement Agreement, and in
> accordance with section 5.D of the UAW Retiree Settlement
> Agreement, all provisions of *the Purchaser's Plan relating to Retiree*
> *Medical Benefits for the Class and/or the Covered Group* shall
> terminate as of the Implementation Date or otherwise be amended so
> as to be consistent with the UAW Retiree Settlement Agreement . . .,
> and the Purchaser shall not thereafter have any *such* obligations as set
> forth in Section 5.D of the UAW Retiree Settlement Agreement.

(Sale Order, RE 62-1, Page ID # 4051) (emphasis added).

In short, no matter how much GM tries to manipulate the 2009 RSA contract

language carried over <u>in</u> <u>haec</u> <u>verba</u> from the 2008 RSA on which its

"extinguishment" defense rests, GM cannot magically make that 2009 RSA

contract language mean something that it plainly did *not* mean when first used in

the 2008 RSA.  GM's "extinguishment" defense is made up of whole cloth and is

due to be rejected by this Court as a matter of law.

- 20 -

## B.    The Conditions Precedent To GM's $450 Million Payment Obligation Have Been Satisfied

GM does not dispute our showing in UAW Br. at 52-54 that there was satisfaction of the first condition precedent stated in the 2007 MOU—execution by Old GM and Delphi of "a comprehensive settlement agreement" resolving the financial, commercial and other matters between them.  (Although as shown <u>infra</u> pp. 22-23, GM does makes a baseless, formalistic argument that the terms of the July 2009 "MASTER DISPOSITION AGREEMENT" or "**MDA**" between GM, Delphi and certain third parties were not part of the required "comprehensive settlement agreement.")

Nor does GM dispute our showing in UAW Br. at 55 that there was satisfaction of the following conditions precedent stated in the 2007 MOU: "substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court."

Rather, GM trains its sights on our showings in UAW Br. at 55-56 & 56, respectively, that there was satisfaction of the remaining conditions precedent stated in the 2007 MOU that Delphi's chapter 11 reorganization plan be consistent "with all of the terms of":  (1) the "comprehensive settlement agreement" between Old GM and Delphi; and (2) the 2007 MOU itself.  <u>See</u> GM Br. at 46-55.  But GM's response to both showings badly misses the mark.

1.    With respect to the showing in UAW Br. at 55-56, the entirety of GM's argument is that Delphi's chapter 11 reorganization plan was inconsistent with the express terms of the "**September 2008 Amended GSA**" between Old GM and Delphi obligating Delphi to pay Old GM over $4.5 billion and to continue certain operations employing UAW-represented workers.  See GM Br. at 50-51.

This argument fails, because it ignores the decisive point that *in the July 2009 MDA, GM and Delphi agreed to modify these very terms of the September 2008 Amended GSA*, see UAW Br. at 29-30, and that Delphi's chapter 11 reorganization plan was thus fully consistent with the September 2008 Amended GSA *as so modified*, see id. at 55-56.

To be sure, GM seeks to dismiss these July 2009 MDA modifications to the September 2008 Amended GSA as legally irrelevant here on the ground that the MDA—in contrast to both the September 2008 Amended GSA and the Original GSA—"does not refer to itself as a 'settlement agreement'" (which, according to GM, means that those July 2009 MDA modifications cannot properly be considered a part of the "comprehensive settlement agreement" between Old GM and Delphi contemplated by the 2007 MOU).  See GM Br. at 17-18, 54.

GM's argument makes a fetish of form over substance.  The July 2009 MDA modifications altered the operative terms of a comprehensive settlement agreement between Old GM and Delphi governing the financial and commercial relationship

- 22 -

between them, and were thus, *in substance*, an integral part of that comprehensive settlement agreement, wholly without regard to the contracting parties' labeling of those modifications.[4]

2.    With respect to the showing in UAW Br. at 56, GM makes two arguments, each of which is meritless.

a.    GM's principal argument largely mirrors its argument respecting the Delphi chapter 11 reorganization plan's asserted inconsistency with the "comprehensive settlement agreement" between GM and Delphi, and fails for largely the same reasons.

Specifically, GM's principal argument is that Delphi's chapter 11 reorganization plan was inconsistent with the provision in the 2007 MOU providing for Delphi's ownership and operation of four "Keep Sites" employing

---

[4] GM posits a UAW "conce[ssion]" to the contrary in the district court, see GM Br. at 50, but recedes from its argument in that court that this posited "conce[ssion]" should be taken as a binding judicial admission, see (GM District Court Brief, RE 40, Page ID # 2411), and for good reason. Under this Court's precedents, binding judicial admissions "'concern only matters of fact'" and not law. Roger Miller Music, Inc. v. Sony/ATV Publ'g, 477 F.3d 383, 394-95 (6th Cir. 2007) (quoting MacDonald v. General Motors Corp., 110 F.3d 337, 341 (6th Cir. 1997)). And, GM's contention here that the July 2009 MDA modifications cannot properly be considered a part of the "comprehensive settlement agreement" between Old GM and Delphi because the MDA "does not refer to itself as a 'settlement agreement,'" raises a pure issue *of law* and *not* fact. That being said, we feel compelled to add that GM has taken this posited UAW "conce[ssion]" entirely out of context and tried to make it into something that it plainly is not. See (UAW Response to GM SMF ¶ 75, RE 55, Page 17) (filed under seal)).

- 23 -

UAW-represented workers and several other provisions in the 2007 MOU inextricably tied to this Keep Sites provision (e.g., provisions relating to Delphi's investments in the Keep Sites and its employment of UAW-represented workers at those Sites).  See GM Br. at 47-49.

This argument fails, because it ignores the decisive point that the Keep Sites provisions in the 2007 MOU *were modified and rendered inoperative by the May 2009* "*Memorandum of Understanding Delphi Keep Sites*" ("**Keep Sites MOU**") *between Old GM and UAW*, see UAW Br. at 30, and that Delphi's chapter 11 reorganization plan was thus fully consistent with the 2007 MOU *as so modified*, see id. at 56.

To be sure, GM seeks to dismiss the May 2009 Keep Sites MOU as legally irrelevant here on the ground that in their May 2009 Keep Sites MOU—in contrast to their prior September 2008 Implementation Agreement—Old GM and UAW did not by "express language" refer to the agreements reached therein as "amendments" or "modifications" to the 2007 MOU (which, according to GM, means that the May 2009 Keep Sites MOU cannot properly be regarded as having "modified" the 2007 MOU in any way).  See GM Br. at 52.

In this instance as well, GM's argument makes a fetish of form over substance.  The May 2009 Keep Sites MOU *does* contain "express language"

stating that "the parties have agreed [that Old] GM will assume ownership of" the Keep Sites.  See UAW Br. at 30.  This May 2009 agreement between Old GM and UAW was, *in substance*, a modification of the term in the 2007 MOU assigning ownership of the Keep Sites to Delphi, wholly without regard to the contracting parties' labeling of that agreement.  Indeed, given the term in the 2007 MOU assigning ownership of the Keep Sites to Delphi, GM could not properly take ownership of those Keep Sites without first obtaining UAW's agreement to modify that term.  See id.[5]

b.    GM's other argument—that Delphi's chapter 11 reorganization plan is inconsistent with a "key" 2007 MOU term "requir[ing]" that the Delphi plan provide for Delphi's emergence from bankruptcy as a "functioning" entity rather than a "liquidating" entity, see GM Br. at 47—is doubly flawed.

First, there is *no* 2007 MOU term "requir[ing]" that the Delphi chapter 11 reorganization plan provide for Delphi's emergence from bankruptcy as a "functioning" entity rather than a "liquidating" entity:  that GM assertion rests

---

[5] In this instance as well, GM posits a UAW "conce[ssion]" to the contrary in the district court, see GM Br. at 52, but GM never has gone so far as to claim that this second posited "conce[ssion]" should be taken as a binding judicial admission, and could not credibly make such a claim under this Court's applicable precedents, see supra p. 23 n.4.  Nevertheless, in this instance as well, we feel compelled to add that GM has taken the UAW's "conce[ssion]" entirely out of context and tried to make it into something that it plainly is not.  See (UAW Response to GM SMF ¶ 74, RE 55, Pages 16-17) (filed under seal)).

entirely on *introductory* language in the 2007 MOU stating the parties' "critical interest in Delphi's successful emergence from bankruptcy with certain UAW-represented operations" and noting their "commit[ment] to take specific actions" aimed at achieving this end.  See (id.; 2007 MOU, RE 22-2, Page ID # 257).

Second, and in any event, GM's assertion that the Delphi chapter 11 reorganization plan did *not* provide for Delphi's emergence from bankruptcy as a "functioning" entity rather than a "liquidating" entity is belied by the Delphi bankruptcy court's plan approval order and GM's own public statements following Delphi's emergence.  In its plan approval order, the Delphi bankruptcy court expressly found that plan confirmation "is not likely to be followed by the liquidation" of either "the Debtors or the Reorganized Debtors."  See (Approval Order, RE 33-20, Page ID # 2145).  And, following plan approval and consummation, GM issued a press release applauding the fact that, under an agreement incorporated in the plan, Delphi would be emerging from bankruptcy as a new (albeit leaner) operating entity.  See (Press Release, RE 53-11, Page ID # 3711) ("wish[ing] the newly emerged Delphi success," and stating that the restructuring transactions provided for by the plan will "allow" this "newly

emerged Delphi" "to effectively serve its customers by focusing on its core business").[6]

*            *            *            *

In the final analysis, GM's position on the "conditions precedent" issue boils down to the proposition that, under the "carefully crafted" conditions-precedent provision in the 2007 MOU, Old GM agreed to make the $450 million payment to the DC VEBA required by the 2007 MOU "*only* if it received the benefit of a specifically defined bargain" set out in the 2007 MOU.  <u>See</u> GM Br. at 49 (emphasis in original).  But that simply is not so.

Under the plain terms of the conditions-precedent provision in the 2007 MOU, Old GM agreed to make the $450 million payment to the DC VEBA if, *subsequent* to the "specifically defined bargain" struck in the 2007 MOU, Old GM was able to reach "a comprehensive settlement agreement" with Delphi resolving—*to Old GM's sole satisfaction, and without any "specifically defined" parameters whatsoever*—the financial and commercial matters between Old GM and Delphi *that had been left open and unsettled by the 2007 MOU*.

---

[6] GM's reliance on a reference in a 2010 district court decision to Delphi's plan as a "*liquidating*" plan," <u>see</u> GM Br. at 47 (emphasis in original), is misplaced, inasmuch as it was, in context, a reference to the fact that the residual Old Delphi estate left behind upon the New Delphi's emergence from bankruptcy was being "liquidated" in a post-confirmation claims process, thus giving the Delphi bankruptcy court jurisdiction over a post-confirmation dispute relating to the "distribution of th[at] estate."  <u>See</u> <u>In re DPH Holdings</u>, 437 B.R. 88, 98 (S.D.N.Y. 2010), <u>aff'd</u>, 448 Fed. App'x 134 (2d Cir. 2011), <u>cert.</u> <u>denied</u>, 133 S. Ct. 51 (2012).

As we have shown, at the end of the day, Old GM *was* able to reach "a comprehensive settlement agreement" with Delphi resolving, to Old GM's satisfaction, the financial and commercial matters between them that had been left open and unsettled by the 2007 MOU.   And, having done so, Old GM then turned to UAW and obtained from UAW *a modification of the parties' original* "*specifically defined bargain*" that was necessary for Old GM to consummate its satisfactory "comprehensive settlement agreement" with Delphi.

On these undisputed (and indisputable) facts of record, the conditions precedent to GM's $450 million payment obligation to the DC VEBA under the 2007 MOU plainly have been satisfied—both in their letter, <u>see</u> UAW Br. at 52-56, and in their purpose, <u>see</u> <u>id.</u> at 56-57.

## <u>CONCLUSION</u>

The relief requested in UAW's Opening Brief should be granted.

Respectfully submitted,

/s/ Andrew D. Roth
Andrew D. Roth
Ramya Ravindran
Laurence Gold
BREDHOFF & KAISER, PLLC
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600

Counsel for Plaintiff-Appellant UAW

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Reply Brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7).  The foregoing Reply Brief was prepared using Microsoft Word 2007 and contains 6,988 words in 14-point proportionately-spaced Times New Roman Font.

/s/ Andrew D. Roth
Andrew D. Roth

Counsel for Plaintiff-Appellant UAW

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Reply

Brief to be served this 8th day of May, 2014 on the following counsel for

Defendant-Appellee via the Court's electronic filing system:

Mr. Corey D. Clay
Ms. Johanna Fabrizio Parker
Mr. Robert Stanley Walker
Jones Day
901 Lakeside Avenue, E.
Cleveland, OH 44114

Shay Dvoretzky
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001- 2113

/s/ Andrew D. Roth
Andrew D. Roth

Counsel for Plaintiff-Appellant UAW