Case No. 14-1019

## UNITED STATES COURT OF
## APPEALS FOR THE SIXTH CIRCUIT

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,

*Plaintiff-Appellant*,

v.

GENERAL MOTORS LLC,

*Defendant-Appellee*.

_____

On Appeal from the United States District Court for the
Eastern District of Michigan
_____

# APPELLANT'S BRIEF

_____

Andrew D. Roth
Ramya Ravindran
Laurence Gold
BREDHOFF & KAISER PLLC
805 15th Street, NW, Suite 1000
Washington, DC 20005
Tel. 202-842-2600

Counsel for Plaintiff-Appellant UAW

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _____    Case Name: _____

Name of counsel: _____

Pursuant to 6th Cir. R. 26.1, _____
                                              *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

---

CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/_____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ............................................................

TABLE OF CONTENTS .............................................................i

TABLE OF AUTHORITIES .......................................................iv

RULE 34(a) STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................v

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ............................................................1

STATEMENT OF THE CASE............................................................2

    A.    Course of Proceedings ..........................................................2

        1.    The Complaint ...............................................................2

        2.    GM's Answer And Foray Into The Old GM Bankruptcy Court ......................................................................4

        3.    The Ensuing District Court Proceedings....................................6

        4.    The Parties' Cross-Motions For Summary Judgment................8

            a.    UAW's Motion...................................................8

            b.    GM's Cross-Motion.......................................10

        5.    The Parties' Court-Ordered Supplemental Filings....................11

            a.    UAW's Supplemental Filing............................12

            b.    GM's Response............................................13

    B.    The Decision Below.........................................................15

C.    The Undisputed Facts Bearing On The Two Disputed
Legal Issues Raised But Not Decided Below ....................................17

1.    The Undisputed Facts Bearing On The "Extinguishment"
Issue....................................................................................17

2.    The Undisputed Facts Bearing On The "Conditions
Precedent" Issue ................................................................25

SUMMARY OF ARGUMENT ............................................................32

ARGUMENT ......................................................................................36

Standards of Review ........................................................................36

I.    THE DECISION BELOW GRANTING SUMMARY JUDGMENT
TO GM ON THE GROUND THAT GM DID NOT "ASSUME"
OLD GM'S $450 MILLION PAYMENT OBLIGATION UNDER
THE 2007 MOU IS LEGALLY ERRONEOUS AND SHOULD BE
REVERSED ...............................................................................37

A.    GM Clearly And Indisputably "Assumed" The $450 Million
Payment Obligation Pursuant To The MPA And The Sale
Order Approving The MPA .............................................37

B.    The Court Below Went Awry In Deciding The "Assumption"
Issue By Ignoring The MPA And The Sale Order Entirely And
Focusing On The 2009 RSA Instead...................................40

II.    THIS COURT SHOULD DIRECT THE DISTRICT COURT TO
GRANT SUMMARY JUDGMENT IN UAW's FAVOR ON
UAW's BREACH-OF-CONTRACT CLAIM AGAINST GM ..............42

A.    It Is Appropriate For This Court To Take Up And Resolve The
Two Disputed Legal Issues Raised By The Parties' Cross-Motions
For Summary Judgment But Not Reached By The Court Below .......42

B.    There Is No Merit In GM's Affirmative Defense That The 2009
RSA "Extinguished" GM's $450 Million Payment Obligation..........45

ii

C.    The Conditions Precedent To GM's $450 Million Payment
Obligation Have Been Satisfied ........................................................52

CONCLUSION ..........................................................................................58

CERTIFICATE OF COMPLIANCE..........................................................59

CERTIFICATE OF SERVICE ..................................................................60

ADDENDUM: DESIGNATION OF RELEVANT DISTRICT COURT
DOCUMENTS ..........................................................................................61

## TABLE OF AUTHORITIES

### CASES

Al-Perry Enters., Inc. v. Appalachian Fuels, LLC,
    503 F.3d 538 (6th Cir. 2007) ................................................38

In re Hronek, 563 F.2d 296 (6th Cir. 1977)................................................44

Merritt v. Faulkner, 697 F.2d 761 (7th Cir. 1983)....................................44

Sec. Watch, Inc. v. Sentinel Sys., Inc., 176 F.3d 369 (6th Cir. 1999)....................51

Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs,
    641 F.3d 197 (6th Cir. 2011) ........................................ 36, 43

Trs. of the Mich. Laborers' Health Care Fund v. Gibbons,
    209 F.3d 587 (6th Cir. 2000) ........................................ 43-44

UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007) ...............................19

UMWA v. Apogee Coal Co., 330 F.3d 740 (6th Cir. 2003) ...................................47

### STATUTES

11 U.S.C. § 1121(c) ................................................57

28 U.S.C. § 1291 ................................................1

28 U.S.C. § 1331 ................................................1

29 U.S.C. § 185................................................1, 2

### MISCELLANEOUS

Collier Guide to Chapter 11 (2013) ................................................38

# <u>RULE 34(a) STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Plaintiff-Appellant UAW believes that oral argument should be held in this case for two reasons. *First*, this case presents a dispute over Defendant-Appellant GM's contractual obligation to make a $450 million payment to a retiree medical benefit fund, and thus involves a matter of substantial importance to the parties themselves as well as the retirees who are entitled to receive medical benefits from the fund. *Second*, given the sheer volume of the summary judgment record in this case, oral argument would likely be of aid to this Court in determining what undisputed facts of record genuinely are material; whether the court below erred in disposing of the parties' cross-motions for summary judgment in the manner that it did based on those undisputed material facts of record; and whether on that record the court below should be directed to grant summary judgment in UAW's favor.

# JURISDICTIONAL STATEMENT

This is an action brought under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, for breach of a labor contract to which the Plaintiff-Appellant International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("**UAW**") and the Defendant-Appellee General Motors LLC ("**GM**" or "**New GM**") are parties.  (Complaint, RE 1, Page ID # 1-8).  The district court therefore had subject matter jurisdiction under 29 U.S.C. § 185, as well as 28 U.S.C. § 1331.

On December 10, 2013, the district court entered a final judgment denying UAW's motion for summary judgment, granting GM's cross-motion for summary judgment, and dismissing UAW's case.  (Judgment, RE 65, Page ID # 4125).  On January 6, 2014, UAW filed a timely notice of appeal from that final judgment.  (Notice of Appeal, RE 66, Page ID # 4126).  Jurisdiction over this appeal therefore lies under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

1.    Did the district court commit reversible legal error in granting summary judgment in GM's favor on a ground that GM did not advance in its cross-motion for summary judgment and that is belied by the undisputed material facts of record—viz., the ground that when GM purchased substantially all of the assets of "Old GM" in Old GM's 2009 bankruptcy case, GM did *not* "assume" a

$450 million payment obligation imposed on Old GM by a prior agreement between Old GM, UAW and Delphi Corporation (the "2007 Memorandum of Understanding" or "**2007 MOU**")?

2.    Should this Court direct the district court to grant summary judgment in UAW's favor on UAW's breach-of-contract claim against GM, given the completeness of the summary judgment record created by the parties in the court below and the undisputed material facts in that record conclusively establishing as a matter of law that:  (a) GM *did* "assume" the $450 million payment obligation imposed on Old GM by the 2007 MOU when GM purchased substantially all of Old GM's assets in Old GM's 2009 bankruptcy case; (b) there is no merit in GM's affirmative defense that its $450 million payment obligation under the 2007 MOU was "extinguished" by a collectively-bargained settlement agreement between GM and UAW in the same Old GM bankruptcy case; and (c) all conditions precedent to GM's $450 million payment obligation have been satisfied?

## STATEMENT OF THE CASE

A.    Course of Proceedings

1.    The Complaint

On April 6, 2010, UAW filed its Complaint in this matter asserting a breach-of-contract claim against GM under LMRA § 301, 29 U.S.C. § 185, in the amount

of $450 million.  That UAW breach-of-contract claim against GM has four

essential elements, each of which the Complaint alleges has been met:

*First*, on June 22, 2007, in the course of Delphi Corporation's ("**Delphi**")

bankruptcy case, GM's predecessor corporation ("**Old GM**"), UAW and Delphi

entered into a tripartite Memorandum of Understanding ("the **2007 MOU**"), that

was approved by the Delphi bankruptcy court.   In the 2007 MOU, Old GM

undertook, inter alia, a $450 million payment obligation, subject to certain

specified conditions precedent, to a Voluntary Employees' Beneficiary Association

known as "the **DC VEBA**."  (Complaint, RE 1, Page ID # 2-3 (¶¶ 1, 6, 8-9)).[1]

*Second*, pursuant to a purchase agreement approved by the bankruptcy court

in Old GM's 2009 bankruptcy case, under which GM purchased substantially all of

Old GM's assets, GM "assumed," and thus became a party to, the 2007 MOU,

thereby imposing on GM *all* of the contractual obligations previously imposed on

Old GM by the 2007 MOU, *including* the $450 million payment obligation to the

DC VEBA.  (Id., Page ID # 2-3 (¶ 7)).

*Third*, that as of October 6, 2009, all of the contractually-specified

conditions precedent to GM's $450 million payment obligation under the 2007

---

[1] As set out in further detail infra p. 19, the DC VEBA was established in 2006 by
Old GM and UAW in a collectively-bargained settlement agreement to play a part
in providing medical benefits to Old GM retirees.

MOU had been satisfied, thus triggering GM's contractual obligation to make that $450 million payment.   (Id., Page ID # 2-3 (¶ 10)).

*Fourth*, GM had failed and refused to make that $450 million payment, rejecting UAW's October 29, 2009 demand that GM do so.  (Id., Page ID # 2-3 (¶ 11)).

2.    <u>GM's Answer And Foray Into The Old GM Bankruptcy Court</u>

After a court-approved extension of time for serving the Complaint stipulated to by the parties, <u>see</u> (Stipulation and Order, RE 3, Page ID # 11-12), GM filed its Answer to the Complaint on October 8, 2010.  In that Answer, GM denied UAW's breach-of-contract claim and took the position, embodied in a "Preliminary Statement" and in several separately-numbered paragraphs denominated as "Affirmative Defenses," that the parties' contract dispute should be heard and decided by the Old GM bankruptcy court rather than by the court below.  (Answer, RE 5, Page ID # 15-23).  In furtherance of that position, on October 22, 2010, GM filed a "Motion to Enforce Sale Order" in the Old GM bankruptcy court, asking that bankruptcy court to assert jurisdiction over the parties' contract dispute and decide that dispute in GM's favor.  (Motion to Enforce, RE 33-24, Page ID # 2274-2318).

In its Motion addressed to the bankruptcy court, GM acknowledged that in the 2007 MOU, Old GM had undertaken a $450 million payment obligation to the

4

DC VEBA, subject to certain conditions precedent specified in the 2007 MOU. (Id., Page ID # 2283 (¶¶ 9-10)).

At the same time, however, GM hedged on the issue of whether, in Old GM's 2009 bankruptcy case, GM had assumed the 2007 MOU containing the $450 million payment obligation—stating that GM "arguably" had done so "[p]ursuant to the terms of" a June 26, 2009 Master Purchase Agreement ("**MPA**") governing the sale of Old GM's assets to GM under Section 363 of the Bankruptcy Code and the bankruptcy court's July 5, 2009 "**Sale Order**" approving that Section 363 asset sale transaction and the MPA.  (Id., Page ID # 2280-81, 2292).  GM treated that "assumption" issue as beside the point on the asserted ground that "any obligation" that GM "arguably" had assumed to make the $450 million payment "*was extinguished by*" a collectively-bargained settlement agreement between GM and UAW in the same Old GM bankruptcy case—viz., the 2009 UAW Retiree Settlement Agreement or "**2009 RSA**" for short.  (Id.) (emphasis added); see also (id., Page ID # 2281 (¶ 4)) (asserting that "[a]ny contingent obligation in th[e] [2007 MOU] calling for contributions to a VEBA *has been superseded and extinguished by* the express terms of [the 2009 RSA]") (emphasis added).

GM went on in its Motion to spell out this "extinguishment" defense to UAW's breach-of-contract claim, and to urge the bankruptcy court to resolve the parties' contract dispute in GM's favor on the basis of that defense, without

5

reaching any other issue presented by UAW's claim.  (Id., Page ID # 2309-10 (¶¶ 58-60)).  GM also argued that if the bankruptcy court were to reject its "extinguishment" defense, that court should nonetheless rule for GM on the alternative ground that the conditions precedent to any obligation on GM's part to make the $450 million payment "have not been, and cannot be, satisfied."  (Id., Page ID # 2310-14 (¶¶ 60-68)).

UAW opposed the bankruptcy court's assertion of jurisdiction over the parties' contract dispute, and on November 3, 2010, the court below stayed proceedings in this case "pending a ruling on [that] jurisdictional issue" by the bankruptcy court.  (Order Staying Proceedings, RE 15, Page ID # 187).  On August 23, 2011, the bankruptcy court ruled that it would not assert jurisdiction over the parties' contract dispute.  (Bench Decision, RE 33-25, Page ID # 2319-48).

### 3.    The Ensuing District Court Proceedings

In light of the August 23, 2011 bankruptcy court ruling, the district court issued a Scheduling Order that, as amended on October 25, 2011:  (1) lifted the stay of proceedings in that court; (2) directed the parties jointly to file with the court "a list of the several agreements implicated in this case, together with copies of the agreements and the relevant portions highlighted"; and (3) allowed the parties to proceed with discovery.  See (Scheduling Order, RE 19, Page ID # 192-93); (Amendment to Scheduling Order, RE 21, Page ID # 196-205).

6

On November 17, 2011, per the district court's instructions, the parties jointly filed with the court highlighted copies of each of the agreements implicated in this case, including the 2007 MOU on which UAW's breach-of-contract claim rests, (RE 22-2, Page ID # 257-405), and the 2009 RSA on which GM's "extinguishment" defense to that claim rests, (RE 22-14, Page ID # 1118-54).  See (Notice of Joint Filing, RE 22, Page ID # 206-15).  The parties later re-filed these highlighted copies of the pertinent agreements in connection with their cross-motions for summary judgment, together with a stipulation as to their authenticity. (Stipulation, RE 33-2, Page ID # 1365-66).  (Because the "Page IDs" on these re-filed copies are obscured, all citations herein to the pertinent agreements in this case are to the highlighted copies of those agreements jointly filed by the parties on November 17, 2011.)

Consistent with consensual, court-approved amendments to the court's October 25, 2011 Scheduling Order, the discovery period closed on August 31, 2012, and following a September 20, 2012 status conference, the court entered a further Scheduling Order setting deadlines for the sequenced filing of cross-motions for summary judgment by UAW and then by GM.  (Scheduling Order, RE 31, Page ID # 1315-16).

4.     The Parties' Cross-Motions For Summary Judgment

a.     UAW's Motion

UAW filed its motion for summary judgment on November 15, 2012.
(Motion, RE 33, Page ID # 1326-27).  At the outset of its supporting brief, UAW
noted that GM's counsel previously had made an oral representation to the court
that GM was *not* disputing the point that GM had assumed the 2007 MOU
containing the $450 million payment obligation when GM purchased substantially
all of Old GM's assets in Old GM's 2009 bankruptcy case.  (UAW Brief, RE 33,
Page ID # 1334 n.1).  Notwithstanding that oral representation, and in a perceived
"abundance of caution only," UAW made an affirmative (albeit abbreviated)
showing in its brief that GM had indeed assumed the 2007 MOU containing the
$450 million payment obligation.  UAW set out the following undisputed material
facts of record in support of that showing:

▪ The terms of the asset sale transaction between Old GM and
  GM in the Old GM bankruptcy case were set by the Master
  Purchase Agreement ("**MPA**") between those parties and the
  bankruptcy court Sale Order approving the MPA;

▪ Under section 2.2(a)(x) of the MPA, GM agreed to assume
  many of Old GM's executory contracts, including the "UAW
  Collective Bargaining Agreement";

- The MPA defines the term "UAW Collective Bargaining Agreement" as "any written or oral Contract, understanding or mutually recognized past practice" between Old GM and UAW with respect to "Employees," and further defines the term "Employees" to include "any current, former or retired [Old GM] employees";

- The 2007 MOU is part of the "UAW Collective Bargaining Agreement" as that term is defined in the MPA, inasmuch as nearly all of the Delphi retirees covered by the 2007 MOU are former Old GM employees; and

- In a Delphi bankruptcy court filing, GM had made the following unequivocal admission:

    "Pursuant to the [Old] GM Sale Order [approving the MPA], New GM assumed the UAW 2007 MOU (which is included as a 'UAW Collective Bargaining Agreement' as that term is used in the [Old] GM Sale Order), and thus agreed, among other things, to top up the pension benefits of the covered UAW employees of the [Delphi] Debtors."

(Id., Page ID # 1353-54).

9

At the same time, UAW devoted nearly the entirety of its brief to a factual showing on, and a legal analysis of, the two issues that actually had been put in dispute by GM in its "Motion to Enforce" in the Old GM bankruptcy court, to wit: (1) The issue of whether the 2009 RSA "extinguished" the $450 million payment obligation to the DC VEBA under the 2007 MOU; and (2) The issue of whether the conditions precedent to that $450 million payment obligation had been satisfied.  See (UAW Brief, RE 33, Page ID # 1345) (stating those two issues presented).

### b.    GM's Cross-Motion

On December 17, 2012, GM filed a cross-motion for summary judgment and supporting brief.  Consistent with its prior oral representation to the district court, GM did not dispute the point made by UAW in its Complaint and summary judgment brief that GM had assumed the 2007 MOU containing the $450 million payment obligation when GM purchased substantially all of Old GM's assets in Old GM's 2009 bankruptcy case, or otherwise take issue with any aspect of the factual showing that UAW had made on this point in its summary judgment brief.

To the contrary, in the "ISSUES PRESENTED" section at the outset of its brief, GM took it as a given that GM had assumed the 2007 MOU and the $450 million payment obligation imposed by the 2007 MOU, by stating, in a manner consistent with UAW's prior formulation of the issues, that the two issues in

dispute were:  (1) Whether "New GM's obligation to make the contingent $450M Payment" was "extinguished" by the 2009 RSA; and (2) Whether, "[i]f the Court determines that the 2009 RSA did not extinguish the $450M Payment obligation," the conditions precedent to that payment obligation had been satisfied.  (GM Brief, RE 40, Page ID # 2379).

Consistent with GM's own formulation of the two issues in dispute between the parties, the argument section of the GM brief dealing with the first issue is titled:  "THE 2009 RSA EXTINGUISHED NEW GM'S $450M PAYMENT OBLIGATION."  (GM Brief, RE 40, Page ID # 2392); see also (GM Reply Brief, RE 57, Page ID # 3955) (same).

### 5.    The Parties' Court-Ordered Supplemental Filings

On May 1, 2013, the district court heard oral argument on the cross-motions for summary judgment, and on May 31, 2013, the court issued an Order requiring supplemental filings on those motions.  (Order, RE 61, Page ID # 4016-17).

In that Order, the court posited that "[t]he parties disagree on whether GM assumed Old GM's obligation under the [2007] MOU."  (Id., Page ID # 4016). Based on that posit, the court directed the UAW to submit, and GM to respond to, a supplemental statement of facts bearing on the issue of "whether or not GM agreed to be bound by the terms of the [2007] MOU."  (Id., Page ID # 4017).

11

a.     <u>UAW's Supplemental Filing</u>

In its court-ordered supplemental filing dated June 19, 2013, UAW elaborated on the abbreviated showing in its summary judgment brief that GM had assumed the 2007 MOU containing the $450 million payment obligation pursuant to the MPA and the bankruptcy court Sale Order approving the MPA.  (UAW Filing, RE 62, Page ID # 4018-23).  This elaboration included a more detailed statement of the undisputed facts previously set out by UAW in that portion of its summary judgment brief addressed to the "assumption" issue, <u>see</u> <u>supra</u> pp. 8-9, as well as additional undisputed facts together showing that:

- One of the Old GM executory contracts explicitly assumed by GM in the MPA was the "UAW Collective Bargaining Agreement";

- The 2007 MOU is part of the "UAW Collective Bargaining Agreement" explicitly assumed by GM in the MPA, inasmuch as the MPA defines the term "UAW Collective Bargaining Agreement" to include "any" Old GM/UAW "written . . . Contract" with respect to "any current, former or retired [Old GM] employees," and nearly all of the Delphi retirees covered by the 2007 MOU are former Old GM employees; and

12

- The bankruptcy court Sale Order approving the MPA

  expressly states that "[e]ffective as of the Closing of the

  363 Transaction, the Debtors will assume and assign to

  the Purchaser *the UAW Collective Bargaining Agreement*

  and *all* liabilities thereunder."

(Id., Page ID # 4019-20 (¶¶ 4-11)) (first emphasis added; second emphasis in

original); see also (Sale Order, RE 62-1, Page ID # 4035 (¶ Z)).

UAW summed up its position on the "assumption" issue that had been raised

by the district court as follows:

> The provisions of the June 26, 2009 MPA and the July 5, 2009 [Old]
> GM Sale Order dealing with New GM's assumption of the "UAW
> Collective Bargaining Agreement" do not distinguish between, or
> otherwise carve out, any individual terms of the "UAW Collective
> Bargaining Agreement."  Rather, by operation of these provisions,
> New GM assumed "all" of the liabilities of the "UAW Collective
> Bargaining Agreement," without any stated exceptions.  By virtue of
> the fact that the 2007 MOU is part of the "UAW Collective
> Agreement," . . ., one of those assumed liabilities is the $450 million
> contingent payment obligation at issue in this litigation.

(UAW Filing, RE 62, Page ID # 4020-21 (¶ 12)) (citation omitted).

### b.    GM's Response

GM responded to UAW's supplemental filing on June 28, 2013.  (GM

Response, RE 63, Page ID # 4075-87).  In its Response, GM used a different

formulation to articulate its legal position based on the 2009 RSA than GM had

used from the outset of these proceedings.  Specifically, whereas from Day 1 of

13

these proceedings GM had articulated its legal position based on the 2009 RSA as follows: "THE 2009 RSA EXTINGUISHED NEW GM'S $450M PAYMENT OBLIGATION," e.g. supra pp. 10-11, GM now articulated its legal position based on the 2009 RSA as follows: "Pursuant to the [2009 RSA], New GM did not assume any obligation to make the $450M Payment." (Id., Page ID # 4084-85); see also (Id., Page ID # 4075-76) (asserting that pursuant to the 2009 RSA, GM did not "assume" or otherwise "take on" any obligation to make the $450M Payment).

Notwithstanding this new formulation of GM's legal position based on the 2009 RSA, the arguments made by GM in its Response in support of that position tracked the arguments made by GM in its summary judgment papers under the heading "THE 2009 RSA EXTINGUISHED NEW GM'S $450M PAYMENT OBLIGATION." Compare (GM Brief, RE 40, Page ID # 2392-2405) & (GM Reply Brief, RE 57, Page ID # 3955-63) with (GM Response, RE 63, Page ID # 4075-85).

Of equal moment, while GM's Response struck the new theme that GM did not "assume" or "take on" the 2007 MOU's $450 million payment obligation *pursuant to the 2009 RSA*, GM's Response did not contain a word disputing UAW's showing in its summary judgment brief and court-ordered supplemental filing that GM did "assume" or "take on" the $450 million payment obligation *pursuant to the MPA and the bankruptcy court Sale Order approving the MPA*.

14

B.    The Decision Below

On December 10, 2013, the district court issued a Decision and Order denying UAW's motion for summary judgment and granting GM's cross-motion for summary judgment, (Decision, RE 64, Page ID # 4089-4124), together with a separate Judgment implementing that decision, (Judgment, RE 65, Page ID # 4125).

That district court decision rests squarely on the ground that—contrary to the allegation in UAW's Complaint that GM "assumed" Old GM's $450 million payment obligation under the 2007 MOU when GM purchased substantially all of Old GM's assets in Old GM's 2009 bankruptcy case, supra p. 3 —the undisputed facts of record establish that "GM did *not* assume the obligation."  (Decision, RE 64, Page ID # 4091) (emphasis added); see also (id., Page ID # 4123 (concluding that Old GM's $450 million payment obligation under the 2007 MOU "never arose in New GM in the first instance").

In reaching this conclusion, and disposing of the parties' cross-motions for summary judgment on this ground, the district court regarded it as dispositive and "fatal to the UAW's claim" that *the 2009 RSA* contained no language providing for GM's assumption of Old GM's $450 million payment obligation under the 2007

MOU.  (Id., Page ID # 4108-10, 4114, 4115, 4120).[2]  At the same time, the district court did not even acknowledge, much less deal with, UAW's showing in its summary judgment brief and court-ordered supplemental filing that GM had assumed the $450 million payment obligation *pursuant to the MPA and the bankruptcy court Sale Order approving the MPA.*

Given its conclusion that Old GM's $450 million payment obligation under the 2007 MOU "never arose in New GM in the first instance" *pursuant to the 2009 RSA*, the district court treated the parties' arguments over whether that payment obligation "was 'extinguished' or 'not extinguished'" by the 2009 RSA as misplaced arguments that the court need not address.  (Id., Page ID # 4123); see also (id., Page ID # 4108-09)) (faulting UAW for arguing the case as if the threshold legal issue genuinely in dispute between the parties was "extinguishment," rather than "assumption," of the $450 million obligation).

And, given that conclusion, the court below stated that it also need not "address the parties' arguments as to whether the conditions precedent in the 2007 MOU for payment of the $450 million have been satisfied."  (Id., Page ID # 4123 n.5).

---

[2] Indeed, the district court was sharply critical of UAW for having pursued its claim against GM given the absence of such language in the 2009 RSA, stating in the concluding sentence of its decision that "UAW's efforts to turn the absence of language into language is reminiscent of the efforts to capture a 'will o' the wisp.'" (Decision, RE 64, Page ID # 4123).

C.    The Undisputed Facts Bearing On The Two Disputed Legal Issues
       Raised But Not Decided Below

As we show <u>infra</u> pp. 37-42, the district court's conclusion that GM "did *not*

assume the [$450 million payment] obligation" under the 2007 MOU was

erroneous as a matter of law.  On the undisputed facts of record, it is plain that GM

*did* assume that $450 million payment obligation, and that UAW, not GM, is

entitled to a ruling in its favor on the "assumption" issue as a matter of law.

And, as we show <u>infra</u> pp. 42-44, under the circumstances presented here,

this Court can and should undertake to resolve on this appeal the two disputed

legal issues raised by the parties' summary judgment motions that the court below

did not reach as a consequence of its legal error on the "assumption" issue:  <u>to</u> <u>wit</u>,

(1) The issue of whether the 2009 RSA "extinguished" GM's $450 million

payment obligation to the DC VEBA under the 2007 MOU; and (2) The issue of

whether the conditions precedent to GM's payment obligation have been satisfied.

Against that background, we proceed at this point to set out the undisputed

facts of record bearing on each of these two disputed legal issues.  Although those

facts overlap from a temporal standpoint, for ease of analysis, we set out those

facts on an issue-specific rather than a chronological basis.

1.    The Undisputed Facts Bearing On The "Extinguishment" Issue

The 2009 RSA that formed the basis of GM's "extinguishment" defense in

the court below is set out in full in (RE 22-14, Page ID #1118-54).

17

a.     In their respective summary judgment motions, both parties argued that their position on the "extinguishment" issue should prevail based on the plain language of the 2009 RSA.  In this regard, UAW focused on the fact that the 2009 RSA does not even mention the $450 million payment obligation to the DC VEBA under the 2007 MOU, much less contain any contract language expressly stating that the $450 million payment obligation is "extinguished," "superseded" or otherwise done away with.  (UAW Motion, RE 33, Page ID # 1345-46).  GM, for its part, argued that certain snippets of contract language in various places within the 2009 RSA, "[t]aken together," and "bolster[ed]" by other textual references, lead to the conclusion that the 2009 RSA "extinguished" the $450 million payment obligation notwithstanding the absence of express contract language to that effect in the agreement.  (GM Cross-Motion, RE 40, Page ID # 2392-99).

b.     In their respective motions, both parties sought to bolster their position based on the plain language of the 2009 RSA with extrinsic evidence.  The undisputed extrinsic evidence of record that UAW believes is material to the "extinguishment" issue is as follows:

(i)   On February 21, 2008, Old GM and UAW entered into a collectively-bargained settlement agreement on which the 2009 RSA between GM and UAW ultimately was modeled.  That agreement, which alternatively has been

18

referred to by the parties as the "2008 UAW Retiree Settlement Agreement" or the "Henry II Settlement Agreement," and which we henceforth refer to as "the **2008 RSA**," is set out in full in (RE 22-5, Page ID # 557-600).

In the 2008 RSA, Old GM and UAW created a new Voluntary Employees' Beneficiary Association known as the "**New VEBA**," the stated purpose and function of which was to take over from Old GM—as of the agreement's January 1, 2010 "Implementation Date"—its collectively-bargained responsibility to provide medical benefits to Old GM retirees and Delphi retirees who were former Old GM employees, and to do so under the terms of a "**New Plan**" that would displace the then-existing "[Old] GM Plan" as of January 2010. (Id., Page ID # 562-71).

As explained by this Court in UAW v. General Motors Corp., 497 F.3d 615, 624 (6th Cir. 2007), the DC VEBA—called the "Existing External VEBA" in the 2008 RSA—was established in 2006 by Old GM and UAW in a collectively-bargained settlement agreement, commonly referred to by the parties as the "Henry I Settlement Agreement," for the purpose of mitigating the co-payment and deductible costs to Old GM retirees under the then-existing Old GM retiree medical benefit plan. Because under the 2008 RSA, Old GM was going out of the business (so to speak) of providing retiree medical benefits as of the agreement's January 1, 2010 Implementation Date, and turning that responsibility over to the

19

New Plan and New VEBA, Section 12C of the 2008 RSA provided for the termination of the DC VEBA within 15 days of January 1, 2010 and for the accompanying transfer of all DC VEBA assets and liabilities to the New VEBA. (2008 RSA, RE 22-5, Page ID # 579).   The New VEBA would then be funded by these transferred DC VEBA assets, together with the additional cash payments and asset transfers provided for in Section 8 of the 2008 RSA.  (Id., Page ID # 574-76).

The 2008 RSA did not explicitly address the status of Old GM's $450 million payment obligation to the to-be-terminated DC VEBA under the 2007 MOU.  However, the negotiating history of the 2008 RSA shows that the contracting parties did *not* intend by that agreement to "extinguish" this $450 million payment obligation to the DC VEBA.

In the course of those negotiations, Old GM and UAW worked closely together to calculate the amount of contributions to the New VEBA that would be necessary to fund the New VEBA's anticipated retiree medical benefit expenses to achieve 80 years of solvency for the New VEBA.  (Sherrick Declaration, RE 33-12, Page ID # 2001-02 (¶ 6)).  And, in these shared calculations, the $450 million payment obligation to the DC VEBA under the 2007 MOU was specifically included as a funding source by both parties.  (Id.)

In other words, in determining funding levels for the New VEBA under the 2008 RSA, the parties proceeded on the mutual understanding that the $450

20

million payment to the DC VEBA under the 2007 MOU would be made upon satisfaction of the conditions precedent to that payment obligation specified in the 2007 MOU, and would then be part of the assets transferred to the New VEBA in accordance with Section 12C of the 2008 RSA upon the DC VEBA's eventual termination.  (Id.)

That the parties to the February 21, 2008 RSA did not intend therein to "extinguish" Old GM's $450 million payment obligation under the 2007 MOU is corroborated by the later September 26, 2008 "**Implementation Agreement**" between Old GM, UAW and Delphi, which is set out in full in (RE 22-8, Page ID # 758-61).  Specifically, in the September 2008 Implementation Agreement, Old GM and UAW affirmed the continued existence of Old GM's $450 million payment obligation under the 2007 MOU by expressly providing therein that "[t]he [$450 million] payment required by sections J(2) and K(2)(e) [of the 2007 MOU] shall remain payable as set forth in the [2007] MOU."  (Id., Page ID # 760 (¶ 6)).

That the parties to the 2008 RSA did not intend therein to "extinguish" Old GM's $450 million payment obligation also is corroborated by the deposition testimony of Fritz Henderson—Old GM's lead negotiator in the negotiations that led to the 2008 RSA—that "it didn't occur to me or anybody that [this payment obligation] had been extinguished as a result of this 2008 document."  (Henderson Deposition, RE 33-17, Page ID # 2019, 2020).

21

(ii)   The worldwide economic crisis in the Fall of 2008 hit Old GM hard and depleted its cash reserves, necessitating emergency financing from the United States Treasury "to keep [Old GM] afloat."  (GM Cross-Motion, RE 40, Page ID # 2390-91).  A plan was then devised under which Old GM would file for bankruptcy protection and sell, through an expedited bankruptcy process, substantially all of its assets to a newly-created "Treasury-sponsored purchaser"— "New GM" or "GM"—which would then emerge from bankruptcy "free from many of Old GM's liabilities and obligations."  (Id.)  In accordance with this plan, Old GM filed for bankruptcy protection on June 1, 2009.  (Id.)

As a condition for providing Old GM with "billions of dollars" in additional financial assistance "to facilitate the bankruptcy process," the United States Treasury required Old GM to take various steps to reduce the liabilities and obligations that GM would have going forward.  (Id.).  One such condition was that Old GM's payment obligations to the New VEBA that had just been created pursuant to the 2008 RSA be "restructur[ed]," with "at least half" of those payment obligations "to be payable in equity, rather than cash."  (Id.)  "Towards this end," in May of 2009, "Old GM and the UAW—with the assistance and involvement of the U.S. government—negotiated the 2009 RSA" that ultimately was finalized and executed by GM and UAW on July 10, 2009 following the Old GM bankruptcy

court's approval of GM's purchase of substantially all of Old GM's assets.  (Id.,

Page ID # 2379, 2386, 2391-92).

In these May 2009 negotiations, Old GM's $450 million payment obligation

to the DC VEBA under the 2007 MOU was a topic of discussion.  As of May

2009, the conditions precedent to that payment obligation, described infra pp. 25-

26, had not been satisfied.  (Sherrick Declaration, RE 33-12, Page ID # 2002-03

(¶¶ 7-8)).  Against this background, UAW made a proposal to Old GM "to remove

the contingency on the $450 million payment obligation" and "include that

payment obligation among the other payment obligations that were being

restructured in these negotiations."  (Id.)  Old GM rejected this UAW proposal,

and UAW did not press the matter further.  (Id.)

Although Old GM rejected UAW's proposal "to remove the contingency on

the $450 million payment obligation," Old GM did not, in the course of the May

2009 negotiations, make a proposal of its own that UAW agree to a "waiver" or

"extinguishment" of that $450 million payment obligation.  (Sherrick Deposition,

RE 54-4, Page 214) (filed under seal in district court).

The upshot of all this is that during the course of the May 2009 negotiations,

no agreement of any kind was reached by the parties with respect to Old GM's

$450 million payment obligation to the DC VEBA under the 2007 MOU, and the

matter was left status quo.

23

(iii)   When the time came to reduce to writing, in the 2009 RSA, the matters agreed to by Old GM and UAW in the May 2009 negotiations, the parties used the 2008 RSA as a template, and "only modified" those terms in the 2008 RSA that "needed to be changed" to reflect the agreements reached in the negotiations.  (Sherrick Declaration, RE 33-12, Page ID # 2003 (¶ 9)).

One such agreement was a restructuring of Old GM's payment obligations to the New VEBA under the 2008 RSA of the kind required by the United States Treasury as a condition for its provision of billions of dollars in financial assistance to Old GM.  Accordingly, in the 2009 RSA, the parties re-wrote the 2008 RSA terms setting out those payment obligations to the New VEBA to reflect that agreed-upon restructuring.  Compare (2008 RSA, RE 22-5, Page ID # 574-76, § 8A-J) with (2009 RSA, RE 22-14, Page ID # 1130-31, § 8A-E).

At the same time, the parties did not engage in any re-writing of the various snippets of contract language relied on by GM in support of its "extinguishment" defense to UAW's breach-of-contract claim in this case.  Rather, each and every such snippet of contract language first appeared in the 2008 RSA and was simply carried over by the parties in haec verba into the 2009 RSA.  Compare (2008 RSA, RE 22-5, Page ID # 557-96, Introduction & §§ 2, 5, 8, 14, 25C, 32C) with (2009 RSA, RE 22-14, Page ID # 1118-47, Introduction & §§ 2, 5, 8, 14, 25C, 32C).

24

Moreover, the provision in the 2008 RSA providing for the termination of the DC VEBA and the accompanying transfer of the DC VEBA's assets to the New VEBA within 15 days of January 1, 2010 was carried over by the parties in haec verba into the 2009 RSA as well.  Compare (2008 RSA, RE 22-5, Page ID # 579, § 12C) with (2009 RSA, RE 22-14, Page ID # 1132, § 12C).

(iv)  Although, as set out above, the 2009 RSA was negotiated by Old GM and UAW in May of 2009, it was finalized and executed by GM and UAW on July 10, 2009—five days after the Old GM bankruptcy court had entered its July 5, 2009 Sale Order approving GM's purchase of substantially all of Old GM's assets.   Supra pp. 22-23; see also (Bench Decision, RE 33-25, Page ID # 2333 n.39).  However, the essential "terms and conditions" of the 2009 RSA had been outlined by Old GM in its June 1, 2009 motion seeking bankruptcy court approval of GM's purchase, and the bankruptcy court gave its imprimatur to those "terms and conditions" in its July 5, 2009 Sale Order.  (Id., Page ID # 2331-34).

2.     The Undisputed Facts Bearing On The "Conditions Precedent" Issue

The 2007 MOU forming the basis of UAW's breach-of-contract claim in this case is set out in full in (RE 22-2, Page ID # 257-405).

a.     It is common ground that in the 2007 MOU, Old GM undertook a $450 million payment obligation to the DC VEBA, subject to certain conditions precedent specified in the 2007 MOU.  Supra pp. 4-5.  The payment

obligation itself is stated in section J.2 of the contract, (RE 22-2, Page ID # 276-

77), and the conditions precedent, as stated in section K.2 of the contract, are as

follows:

> (a) execution by Delphi and [Old] GM of a comprehensive
> settlement agreement resolving the financial, commercial, and
> other matters between them and (b) the substantial
> consummation of a plan of reorganization proposed by Delphi
> in its chapter 11 cases and confirmed by the Bankruptcy Court
> which incorporates, approves and is consistent with all of the
> terms of this Agreement and the comprehensive settlement
> agreement between Delphi and [Old] GM.

(Id., Page ID # 278).[3]

The 2007 MOU also sets out one other agreement among the parties thereto

that bears on the matter at hand:  the agreement that Delphi would continue to

"own[ ]" and "operate[ ]" four "Keep Sites" (Kokomo, Lockport, Rochester and

---

[3]   As stated in section J.2 of the 2007 MOU, Old GM undertook the $450 million
payment obligation to the DC VEBA in satisfaction of a $450 million claim that
UAW had asserted against Delphi in the Delphi bankruptcy case.  And, as stated in
the 2007 MOU's Introduction, Old GM agreed to provide this particular form of
financial assistance to Delphi—as well as several other forms of financial
assistance specified elsewhere in the 2007 MOU—in part because Delphi was Old
GM's "largest supplier," and Old GM therefore had a "critical interest in Delphi's
successful emergence from bankruptcy."  (RE 22-2, Page ID # 257, 276-77).

Under section K.2 of the 2007 MOU, several of the other forms of Old GM
financial assistance to Delphi alluded to in the footnote paragraph above were
made subject to the same conditions precedent as Old GM's $450 million payment
obligation to the DC VEBA.  However, those conditions precedent to these other
forms of Old GM financial assistance to Delphi were waived in the September 26,
2008 Implementation Agreement between Old GM, UAW and Delphi discussed
supra p. 21.  See (Implementation Agreement, RE 22-8, Page ID # 758-61).

Grand Rapids), each of which supplied parts to Old GM and employed workers represented by UAW.  (Id., Page ID # 258).

   b.     As the language of section K.2 of the 2007 MOU indicates, the 2007 MOU itself did not address and "resolv[e]" all of "the financial, commercial, and other matters between" Old GM and Delphi raised by Delphi's bankruptcy.  Rather, when in section K.2 the contracting parties made certain of their contractual undertakings (including Old GM's contractual commitment to pay $450 million to the DC VEBA) expressly conditional on, inter alia, "execution by Delphi and [Old] GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them," they clearly contemplated that Old GM and Delphi would engage in further negotiations aimed at achieving a global "resol[ution]" of "the financial, commercial, and other matters between them" raised by Delphi's bankruptcy.

   In the event, these contemplated further negotiations took various twists and turns over the course of several years, culminating in a "comprehensive settlement agreement" between GM and Delphi that "resol[ved] the financial, commercial, and other matters between them."  The pertinent details are as follows:

   (i)  On September 6, 2007, Old GM and Delphi entered into an agreement titled "GLOBAL SETTLEMENT AGREEMENT" or "**Original GSA**" for short.  (RE 22-3, Page ID # 406-69).   That agreement set forth certain Old GM

27

commitments to provide financial support for Delphi's restructuring efforts, and also provided that Old GM would receive approximately $4 billion in cash, stock and notes from Delphi on the effective date of a Delphi plan of reorganization approved by the Delphi bankruptcy court. (Id., Page ID # 440, 456-57). On December 10, 2007, Delphi filed a proposed plan of reorganization with the Delphi bankruptcy court that incorporated and endorsed the terms of the Original GSA, but because of deteriorating economic conditions and Delphi's loss of exit financing, this plan never was consummated. (GM Motion to Enforce, RE 33-24, Page ID # 2284).

     (ii) Further negotiations between Old GM and Delphi over the terms of their financial and commercial relationship ensued at this point, culminating in a superseding, September 12, 2008 agreement between the parties titled "AMENDED AND RESTATED GLOBAL SETTLEMENT AGREEMENT" or "**Amended and Restated GSA**" for short. (RE 22-6, Page ID # 601-65). Under the terms of the Amended and Restated GSA, Old GM agreed to enhance its financial support for Delphi's restructuring efforts. (GM Motion to Enforce, RE 33-24, Page ID # 2284-85). In addition, the Amended and Restated GSA modified the compensation that would be received by Old GM from Delphi. Under the terms of the Amended and Restated GSA, Old GM would receive approximately $2 billion in allowed administrative expense claims, as well as an allowed general

unsecured claim in the amount of $2.5 billion.  (<u>Id.</u> Page ID # 2313).  The

Amended and Restated GSA was submitted to the Delphi bankruptcy court for

approval, which was given on September 26, 2008.  (<u>Id.</u> Page ID # 2285).

       (iii)   After execution and bankruptcy court approval of the

Amended and Restated GSA, the worldwide economic crisis that ultimately

precipitated Old GM's bankruptcy filing had a dramatic effect on Delphi's

restructuring efforts as well, (<u>id.</u>, Page ID # 2286), dictating further negotiations

between Delphi and Old (and, ultimately, New) GM over the terms of their

financial and commercial relationship.  Those further negotiations culminated in

the execution of a "**<u>Master Disposition Agreement</u>**" between GM, Delphi and

certain third parties.  (RE 22-15, Page ID # 1155-1290).

The Master Disposition Agreement modified the terms of the Amended and

Restated GSA in various respects, including in two respects directly pertinent here:

*First*, under section 2.1.3 of the Master Disposition Agreement, GM agreed

to purchase from Delphi the four Keep Sites (Kokomo, Lockport, Rochester and

Grand Rapids) that Delphi was to own and operate under the terms of the 2007

MOU.  (<u>Id.</u>, Page ID # 1189-92).

*Second*, under section 3.1.1(C) of the Master Disposition Agreement, GM

agreed, as part of the purchase price for the Delphi Keep Sites, to waive its rights

29

and claims under the Amended and Restated GSA to billions of dollars in

payments from Delphi.  (Id., Page ID # 1201).

        c.      Because Delphi's ownership and operation of the Keep

Sites was a term of the 2007 MOU to which UAW was a party, GM could not

properly take ownership of those Keep Sites without first obtaining UAW's

agreement to modify that term of the 2007 MOU.  In recognition of this contractual

reality, Old GM approached UAW prior to GM's entry into the Master Disposition

Agreement with Delphi seeking UAW's agreement to such a modification, which

UAW provided in a May 16, 2009 memorandum of understanding with Old GM

titled "**Memorandum of Understanding Delphi Keep Sites**."  See (RE 22-11,

Page ID # 855-56) ("the parties have agreed [that Old] GM will assume ownership

of" the Delphi Keep Sites).

        d.      On June 1, 2009, Delphi filed a proposed modified plan

of reorganization with the Delphi bankruptcy court ("**Modified Plan of**

**Reorganization**").  (RE 33-19, Page ID # 2025-2114).  Delphi's Modified Plan of

Reorganization incorporated and endorsed, in the manner spelled out in the

accompanying footnote:  (i) all of the terms of the Master Disposition Agreement;

(ii) all of the terms of the Amended and Restated GSA "except" as modified by the

Master Disposition Agreement; and (iii) all of the terms of the 2007 MOU,

including the modified term authorizing GM's purchase of the Delphi Keep Sites.[4]

       e.     On July 30, 2009, the Delphi bankruptcy court confirmed

Delphi's Modified Plan of Reorganization.  (Confirmation Order, RE 33-20, Page

ID # 2115-2204).  In doing so, the court recognized that the Master Disposition

Agreement was "an essential element of the Modified Plan," and the court thus

"approved" the Master Disposition Agreement "in all respects."  (Id., Page ID #

---

[4]  The transactions described in the Master Disposition Agreement were incorporated by reference in their entirety into the Modified Plan of Reorganization.  (RE 33-19, Page ID # 2046, § 1.80) (defining the "Disposition Transactions" as "those transactions described in the Master Disposition Agreement").  This specifically included the transactions involving GM.  (Id., Page ID # 2049, §§ 1.104, 1.108, 1.109) (incorporating by reference terms of Master Disposition Agreement regarding "GM Acquired Assets," "GM Assumed Contracts," and "GM Assumed Liabilities").

The Modified Plan of Reorganization also contained a specific "request to authorize and approve" the terms of the Master Disposition Agreement.  (Id., Page ID # 2073, § 7.7(a)).  Furthermore, it expressly reaffirmed the terms and obligations of the Amended and Restated GSA "except" as modified by the Master Disposition Agreement.  (Id., Page ID # 2044, § 1.56 (defining "Delphi-GM Definitive Documents" to include the Amended and Restated GSA); Page ID # 2095, § 11.4 (providing that "nothing in this Plan shall be deemed to release…any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, except to the extent set forth in the Master Disposition Agreement")).

Finally, the Modified Plan of Reorganization reaffirmed the terms and obligations of the 2007 MOU as well.  (Id., Page ID # 2061, §§ 1.233, 1.235 (including the 2007 MOU among the "Union Settlement Agreements" described in the Modified Plan of Reorganization); Page ID # 2095, § 11.4 (providing that "nothing in this Plan shall be deemed to release…any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby")).

2149).  Delphi's confirmed Modified Plan of Reorganization was then substantially

consummated as of October 6, 2009.  (Notice, RE 33-21, Page ID # 2205-09).

## SUMMARY OF ARGUMENT

### I.

The district court committed reversible legal error in granting summary

judgment to GM on the ground—not advanced by GM in its cross-motion for

summary judgment—that GM did *not* "assume" Old GM's $450 million payment

obligation under the 2007 MOU when GM purchased substantially all of Old

GM's assets in Old GM's 2009 bankruptcy case.  The resolution of that

"assumption" issue is controlled by the June 26, 2009 Master Purchase Agreement

or "**MPA**" between GM and Old GM and the July 5, 2009 bankruptcy court "**Sale**

**Order**" approving the MPA.  And, pursuant to the MPA's plain language and the

plain language of the Sale Order to the same effect, GM most assuredly *did*

"assume" Old GM's $450 million payment obligation under the 2007 MOU.  The

court below went awry in deciding the "assumption" issue by ignoring the MPA

and the Sale Order entirely and looking instead to the 2009 RSA for language

providing for GM's assumption of Old GM's $450 million payment obligation.

Infra pp. 37-42.

## II.

This Court should direct the district court to grant summary judgment in UAW's favor on UAW's breach-of-contract claim against GM.

**A.**     This Court can and should undertake to resolve on this appeal the "extinguishment" and "conditions precedent" issues raised by the parties' dueling summary judgment motions that the court below did not reach as a consequence of its reversible legal error on the "assumption" issue.  The correct resolution of those two issues is clear; that resolution depends on an application of legal principles to a set of undisputed facts—a task for which this Court's expertise is as great as the district court's; and given the events in this case to date, the further delay occasioned by a remand would be unjust.  Infra pp. 42-44.

**B.**     There is not a shred of contract language in the 2009 RSA that fairly can be read to effect an "extinguishment" of GM's $450 million payment obligation to the DC VEBA under the 2007 MOU, and GM's "extinguishment" defense to UAW's claim based on the 2009 RSA thus fails as a matter of law.

To begin with, the 2009 RSA does not even mention GM's $450 million payment obligation to the DC VEBA under the 2007 MOU, much less contain any contract language expressly stating that GM's payment obligation is "extinguished," "superseded" or otherwise done away with.  That absence of contract language speaks volumes, inasmuch as GM undoubtedly would have

33

insisted on the inclusion of such contract language in the 2009 RSA had GM truly obtained UAW's agreement to an "extinguishment" of GM's $450 million payment obligation in the negotiations that led to the 2009 RSA. Infra pp. 45-46.

GM has argued that certain snippets of contract language in various places within the 2009 RSA, "[t]aken together," and "bolster[ed]" by other textual references, are properly interpreted as providing for the "extinguishment" of GM's $450 million payment obligation, although none of those snippets of contract language make any mention of that $450 million payment obligation.

Before even looking at the snippets of contract language relied on by GM, GM's proffered interpretation of the 2009 RSA as providing for the "extinguishment" of GM's $450 million payment obligation can be rejected as utterly implausible based on the undisputed extrinsic evidence of record showing: (1) that in the drafting of the 2009 RSA, each snippet of contract language relied on by GM was simply carried over by the parties in haec verba from a prior agreement between them—the 2008 RSA—that undeniably did *not* "extinguish" the $450 million payment obligation; and (2) in the May of 2009 negotiations between Old GM and UAW aimed at restructuring Old GM's payment obligations to the New VEBA under the 2008 RSA, Old GM did not even propose an "extinguishment" of the $450 million payment obligation to the DC VEBA under

the 2007 MOU, much less obtain any new contract language it can point to that accomplished such an "extinguishment."   Infra pp. 46-48.

Given this undisputed extrinsic evidence, logic compels the conclusion that each snippet of contract language relied on by GM has a purpose and function other than the purpose and function that GM seeks to attribute to it; and sure enough, an examination of each such snippet confirms this reality.  Infra pp. 48-52.

C.    On the undisputed facts of record, the conditions precedent to GM's $450 million payment obligation, stated in section K.2 of the 2007 MOU, unquestionably have been satisfied.

Over time, GM and Delphi forged and executed "a comprehensive settlement agreement resolving the financial, commercial, and other matters between them"—to wit, the Amended and Restated GSA as modified by the Master Disposition Agreement—thus satisfying the first condition precedent stated in section K.2 of the 2007 MOU.  Infra pp. 52-54.

Delphi filed a proposed plan of reorganization on June 1, 2009; Delphi's proposed plan of reorganization was confirmed by the Delphi bankruptcy court on July 30, 2009 and substantially consummated as of October 6, 2009; and that Delphi plan of reorganization "incorporates, approves, and is consistent with all of the terms of" the comprehensive settlement agreement between GM and Delphi

and the 2007 MOU.  That being so, the remaining conditions precedent stated in section K.2 of the 2007 MOU have been satisfied as well.  Infra pp. 54-56.

The self-evident purpose behind the conditions precedent stated in section K.2 of the 2007 MOU was to afford Old GM a measure of contractual protection against the prospect that Delphi, Old GM's "largest supplier," would emerge from bankruptcy under a plan of reorganization that incorporated and endorsed terms which Old GM could not accept from a business standpoint.  In the final analysis, GM received the full benefit of the contractual protection that its predecessor Old GM had bargained for in the 2007 MOU, inasmuch as in the course of events, Delphi emerged from bankruptcy under a Delphi-proposed plan of reorganization that incorporated and endorsed the terms of agreements that GM was a party to and thus, by definition, found acceptable from a business standpoint.  Infra pp. 56-57.

## ARGUMENT

### Standards of Review

This Court reviews a grant of summary judgment de novo.  E.g. Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs, 641 F.3d 197, 205 (6th Cir. 2011).

Moreover, where, as here, "an appeal from a denial of summary judgment is presented in tandem with a grant of summary judgment, this [C]ourt has jurisdiction to review the propriety of the district court's denial of summary judgment."  Id.

"Finally, if a district court does not rule on . . . issue[s] that the parties raised in their summary-judgment motions, [this Court] may rule on such issues . . . without remanding them, as long as the parties were given a full and fair opportunity to address those issues [in the district court]."  Id.

## I.    THE DECISION BELOW GRANTING SUMMARY JUDGMENT TO GM ON THE GROUND THAT GM DID NOT "ASSUME" OLD GM'S $450 MILLION PAYMENT OBLIGATION UNDER THE 2007 MOU IS LEGALLY ERRONEOUS AND SHOULD BE REVERSED

The district court granted summary judgment in GM's favor on the ground—not advanced by GM in its cross-motion for summary judgment—that GM did *not* "assume" Old GM's $450 million payment obligation under the 2007 MOU when GM purchased substantially all of Old GM's assets in Old GM's 2009 bankruptcy case.  Supra p. 15.  That decision to grant summary judgment to GM on this ground was legally erroneous and should be reversed.

### A.    GM Clearly And Indisputably "Assumed" The $450 Million Payment Obligation Pursuant To The MPA And The Sale Order Approving The MPA

On its face, an overarching purpose and function of the June 26, 2009 Master Purchase Agreement or "**MPA**" between Old GM and GM was to specify with precision all of the Old GM executory contracts and associated contractual rights and liabilities that GM would "assume and thereafter pay or perform as and when due, or otherwise discharge" upon consummation of the sale of substantially all of Old GM's assets to GM.  (MPA, RE 22-13, Page ID # 991).

37

In this regard, the parties to the MPA followed the sound common practice in an asset sale transaction under Section 363 of the Bankruptcy Code of crafting a purchase agreement between the bankrupt seller and the purchaser of the seller's assets that precisely and comprehensively delineates all of the seller's executory contracts and associated contractual rights and liabilities that the purchaser will be assuming upon consummation of the asset sale transaction. See generally Al-Perry Enters., Inc. v. Appalachian Fuels, LLC, 503 F.3d 538 (6th Cir. 2007); Collier Guide to Chapter 11 ¶ 3.08[4] (Alan N. Resnick & Henry J. Sommer eds., 2013).

The MPA's plain language leaves no room for doubt that upon the consummation of the Old GM/GM asset sale transaction in July of 2009, GM "assumed" Old GM's $450 million payment obligation under the 2007 MOU.

*First*, under sections 2.1, 2.2(a)(x), and 2.3(a)(ii) of the MPA, GM explicitly agreed to "assume and thereafter pay or perform as and when due, or otherwise discharge, *all* of the Assumed Liabilities" set out in various "Purchased Contracts," one of which was the "UAW Collective Bargaining Agreement." See (MPA, RE 22-13, Page ID # 1013, 1015, 1018) (emphasis added); (UAW Supplemental Filing, RE 62, Page ID # 4019 (¶ 4)).

*Second*, the 2007 MOU is part of the "UAW Collective Bargaining Agreement" explicitly assumed by GM in the MPA, inasmuch as the MPA defines the term "UAW Collective Bargaining Agreement" to include "any" Old

38

GM/UAW "written . . . Contract" with respect to "any current, former or retired [Old GM] employees," and nearly all of the Delphi retirees covered by the 2007 MOU are former Old GM employees.  See (MPA, RE 22-13, Page ID # 996-97, 1011); (UAW Supplemental Filing, RE 62, Page ID # 4019-20) (¶¶ 7-9)).

Given these two points—both of which UAW spelled out in its summary judgment motion and court-ordered supplemental filing, and neither of which GM ever has disputed—it is clear beyond cavil that pursuant to the MPA, GM "purchased" the 2007 MOU from Old GM and "assumed" "*all*" of Old GM's liabilities under that executory contract, *including* Old GM's $450 million payment obligation to the DC VEBA.

While the MPA itself is dispositive in this regard, the conclusion dictated by the MPA's plain language is confirmed by two additional points that GM never has disputed and cannot dispute.

*First*, in the Sale Order approving the MPA, the Old GM bankruptcy court stated, in language equally as plain as the language in the MPA itself:  "Effective as of the Closing of the 363 Transaction, the Debtors will assume and assign to the Purchaser *the UAW Collective Bargaining Agreement* and *all* liabilities thereunder."   (Sale Order, RE 62-1, Page ID # 4035 (¶ Z)) (emphasis added).

*Second*, in the Delphi bankruptcy case, GM made the following unequivocal admission:

> "Pursuant to the [Old] GM Sale Order, *New GM assumed the UAW 2007 MOU* (which is included as a 'UAW Collective Bargaining Agreement' as that term is used in the [Old] GM Sale Order), and thus agreed, *among other things*, to top up the pension benefits of the covered UAW employees of the [Delphi] Debtors."

(GM Delphi Filing, RE 33-23, Page ID # 2252) (emphasis added).

### B. The Court Below Went Awry In Deciding The "Assumption" Issue By Ignoring The MPA And The Sale Order Entirely And Focusing On The 2009 RSA Instead

In concluding that GM did *not* "assume" Old GM's $450 million payment obligation under the 2007 MOU, and in granting summary judgment to GM on that ground, the district court ignored the MPA and the Sale Order entirely, and focused instead on the 2009 RSA. Supra pp. 15-16. This is where the court below went awry in deciding the "assumption" issue.

On its face, and in accord with sound common bankruptcy case practice, the MPA between Old GM (as asset seller) and GM (as asset purchaser), and the Sale Order approving the MPA, are the Old GM bankruptcy case legal documents addressed to the specific subject of GM's assumption vel non of Old GM's various executory contracts and their associated contractual rights and liabilities. Supra pp. 37-38. That being so, the MPA and the Sale Order are the proper place to find the authoritative answer to the question: Did GM assume one of those Old GM

40

executory contracts (the 2007 MOU) and its associated contractual rights and liabilities upon the consummation of the Old GM/GM asset sale transaction?  And, as we have shown, the MPA/Sale Order answer to that question is "yes."

The 2009 RSA, on the other hand, is not addressed to the issue of GM's assumption vel non of the 2007 MOU (or of any other Old GM executory contract for that matter).  Rather, as is clear on its face, the 2009 RSA is an employer-union labor contract in which the parties to an ongoing collective bargaining relationship agreed to restructure certain specified contractual liabilities previously undertaken by Old GM under one of Old GM's then-existing labor contracts with UAW (the 2008 RSA).  Supra pp. 22-23.

The 2009 RSA restructuring agreed to by UAW included what might fairly be characterized as an "extinguishment" of Old GM's liability under the 2008 RSA to make certain cash payments to a "New VEBA" created by the 2008 RSA.  Supra p. 24.  As we show infra pp. 45-52, GM's contention that the 2009 RSA went further than this and *also* "extinguished" the $450 million payment obligation to the DC VEBA under the 2007 MOU is cut from whole cloth and should be rejected by this Court.  But for present purposes, the salient point is that as a legal matter, the question of whether GM obtained an "extinguishment" of that $450 million payment obligation from UAW pursuant to the 2009 RSA is the right question to

ask, whereas the question of whether GM "assumed" that $450 million payment obligation from Old GM pursuant to the 2009 RSA is the wrong question to ask.

Indeed, it can be no accident that GM itself framed its defense to UAW's breach-of-contract claim under the 2007 MOU in "extinguishment" terms from Day 1 of this litigation up until the eleventh-hour moment in the court below when GM re-cast its defense in "assumption" terms in an obvious effort to capitalize on that court's mistaken understanding that the "assumption" issue was in dispute between the parties. See supra pp. 4-5, 10-11, 13-14.

## II.    THIS COURT SHOULD DIRECT THE DISTRICT COURT TO GRANT SUMMARY JUDGMENT IN UAW's FAVOR ON UAW's BREACH-OF-CONTRACT CLAIM AGAINST GM

### A.    It Is Appropriate For This Court To Take Up And Resolve The Two Disputed Legal Issues Raised By The Parties' Cross-Motions For Summary Judgment But Not Reached By The Court Below

As a consequence of its grant of summary judgment in GM's favor on the legally erroneous ground that GM did *not* "assume" Old GM's $450 million payment obligation under the 2007 MOU, the court below did not reach either the "extinguishment" issue or the "conditions precedent" issue raised by the parties' cross-motions for summary judgment. Supra p. 16. The question thus arises whether—if this Court reverses the summary judgment in GM's favor on the ground we urge, viz., that as a matter of law, GM *did* "assume" Old GM's $450 million payment obligation under the 2007 MOU—the Court should then take up

42

and resolve the "extinguishment" and "conditions precedent" issues not reached by the district court, or remand the case to that court for its consideration of those issues in the first instance.

As noted supra p. 37, it is well-settled that this Court has the power to take up and resolve issues raised in dueling summary judgment motions that have not been ruled upon by the district court, "as long as the parties were given a full and fair opportunity to address those issues [in the district court]." Smith v. Jefferson Cnty., supra, 641 F.3d at 205. That pre-condition for this Court's exercise of such a power clearly is met here. Both parties made extensive factual and legal presentations in the court below in support of their respective summary judgment motions; and, as noted by that court in its decision disposing of those motions, "neither party. . . asserted" in their respective presentations "that there is a factual dispute which would render summary judgment inappropriate." (Decision and Order, RE 64, Page ID # 4106). The parties thus created a "complete" record of undisputed material facts that both they and the district court "agree[d]" framed a pure legal dispute over GM's asserted $450 million payment obligation that was ripe for decision by that court, (id.), and is no less ripe for decision by this Court.

Although the decision "to assert" such a power is "discretion[ary]," this Court "ha[s] not hesitated" to do so "when appropriate." Trs. of the Mich.

43

<u>Laborers' Health Care Fund v. Gibbons</u>, 209 F.3d 587, 594-95 & n.5 (6th Cir. 2000).   It is appropriate for the Court to do so here for three reasons:

*First*, considerations of judicial economy "dictate" that an appellate court take up and resolve "a pertinent issue" not reached by the court below "where the correct resolution of the issue is clear," <u>In re Hronek</u>, 563 F.2d 296, 298 (6th Cir. 1977), and that is the situation here, <u>see</u> <u>infra</u> pp. 45-57.

*Second*, even assuming <u>arguendo</u> that "the correct resolution of" the issues at hand is not as "clear" as we maintain, that resolution depends on an application of legal principles to a set of undisputed facts, "a task for which [this Court's] expertise is as great as the district court's."   <u>Merritt v. Faulkner</u>, 697 F.2d 761, 766 (7th Cir. 1983).

*Third*, the resolution of UAW's breach-of-contract claim has been side-tracked twice—the first time by a GM-initiated dispute over the proper forum for that resolution; and the second time by the district court's grant of summary judgment to GM on a wholly unsupportable ground not even advanced by GM in its cross-motion for summary judgment.  A further delay of that resolution occasioned by a remand would therefore be "unjust."  <u>Id.</u>

B.    There Is No Merit In GM's Affirmative Defense That The 2009 RSA
       "Extinguished" GM's $450 Million Payment Obligation

Needless to say, to prevail on its affirmative defense that the 2009 RSA

"extinguished" its $450 million payment obligation to the DC VEBA under the

2007 MOU, GM must be able to point to contract language within the 2009 RSA

that fairly can be read as having such an "extinguishing" effect.  There is no such

contract language within the 2009 RSA, and GM's "extinguishment" defense thus

fails as a matter of law.

1.    The proper starting point for assessing the legal merit of GM's

"extinguishment" defense is the fact that the 2009 RSA does not even mention the

$450 million payment obligation to the DC VEBA under the 2007 MOU, much

less contain any contract language expressly stating that the $450 million payment

obligation is "extinguished," "superseded" or otherwise done away with.

This absence of any language in the 2009 RSA expressly providing for the

"extinguishment" of the $450 million payment obligation speaks volumes, for two

related reasons.

*First*, if GM truly had obtained UAW's agreement to an "extinguishment" of

the $450 million payment obligation in the negotiations that led to the 2009 RSA,

GM undoubtedly would have insisted on the inclusion of language in the 2009

RSA stating that agreement in express terms making it undeniable that UAW had

made this major financial concession.  A sophisticated corporate entity like GM,

represented by a phalanx of attorneys in a landmark bankruptcy case, would not leave it to chance that a court would one day infer such a major UAW financial concession from contract language making no specific mention of the collectively-bargained obligation being "extinguished."

*Second*, when the parties to the 2009 RSA did truly agree on the "extinguishment" of a collectively-bargained employer obligation—i.e., the "extinguishment" of the employer obligation to provide medical benefits to covered retirees upon the creation of a New Plan and New VEBA to take over that responsibility—the parties utilized, surely at GM's insistence, classic belt-and-suspenders contract language to make their intent to "extinguish" that collectively-bargained employer obligation crystal clear and irrefutable.  See infra p. 49.  That utilization of belt-and-suspenders contract language in this true "extinguishment" context makes it all the more inconceivable that if GM truly had obtained UAW's agreement to an "extinguishment" of the $450 million payment obligation to the DC VEBA under the 2007 MOU, GM would have allowed that additional "extinguishment" to go unmentioned in the 2009 RSA rather than insist on express "extinguishment" language.

2.    In its cross-motion for summary judgment in the court below, GM argued that certain snippets of contract language in various places within the 2009 RSA, "[t]aken together," and "bolster[ed]" by other textual references, lead

46

to the conclusion that the 2009 RSA "extinguished" the $450 million payment

obligation notwithstanding the absence of express contract language to that effect

in the agreement.  <u>Supra</u> p. 18.

Under commonly-accepted principles of contract interpretation, a court

confronted with an argument along these lines would, in the normal course, begin

by examining the wording of the snippets of contract language relied on by that

argument's proponent.  But as this Court made clear in <u>UMWA v. Apogee Coal

Co.</u>, 330 F.3d 740 (6th Cir. 2003), it is on occasion proper for a court in a contract

interpretation case to look to extrinsic evidence "*before*" actual contract language,

where doing so would "assist the court in determining whether" a party's proffered

interpretation of a contract is "plausible."  <u>Id.</u> at 747 (emphasis in original)

(internal quotations omitted).  That mode of analysis is proper here, we submit,

inasmuch as the undisputed extrinsic evidence of record shows with the utmost

clarity that GM's proffered interpretation of the 2009 RSA as providing for the

"extinguishment" of GM's $450 million payment obligation *is utterly implausible*.

a.    In this regard, the undisputed extrinsic evidence of record

shows that in the drafting of the 2009 RSA, each snippet of contract language that

GM relies on in support of its "extinguishment" defense was simply carried over

by the parties <u>in</u> <u>haec</u> <u>verba</u> from a prior agreement between them—the 2008

47

RSA—that undeniably did *not* "extinguish" the $450 million payment obligation in question.  <u>Supra</u> pp. 18-21.

Against this background, GM's "extinguishment" defense ultimately reduces to the proposition that contract language in the 2008 RSA that did *not* have the effect of "extinguishing" the $450 million payment obligation in question *did* have such an "extinguishing" effect when that contract language was simply carried over by the parties <u>in</u> <u>haec</u> <u>verba</u> into the 2009 RSA.  That proposition defies all reason and cannot possibly carry the day for GM.

    b. The conclusion to be drawn from the undisputed extrinsic evidence of record set out above needs no buttressing, but is in fact buttressed by other undisputed extrinsic evidence of record.  That other undisputed extrinsic evidence is that in the course of the May 2009 negotiations between Old GM and UAW aimed at restructuring Old GM's payment obligations to the New VEBA under the 2008 RSA, Old GM did not even propose an "extinguishment" of the $450 million payment obligation to the DC VEBA under the 2007 MOU, much less obtain any new contract language it can point to that accomplished such an "extinguishment."  <u>Supra</u> p. 23.

    3. Given the foregoing undisputed extrinsic evidence of record, logic compels the conclusion that each snippet of contract language relied on by GM in support of its "extinguishment" defense has a purpose and function other

48

than the purpose and function that GM seeks to attribute to it.  And sure enough, an

examination of each such snippet confirms this reality.

        a.    The main snippets of contract language relied on by GM

are those in the Introduction and §§ 2, 5 & 25C of the 2009 RSA stating—in

slightly different ways, and in classic belt-and-suspenders fashion—that GM and

the then-existing "GM Plan" shall have no further obligation "to provide" medical

benefits to covered retirees upon the transfer of that responsibility to the New Plan

and New VEBA in January of 2010.  <u>See</u> (GM Cross-Motion, RE 40, Page ID #

2394-97), (2009 RSA, RE 22-14, Page ID # 1118-41).

     The plain purpose and function of this belt-and-suspenders contract language

is to reflect and implement—through a set of words that could not possibly be

misunderstood by anyone—the parties' "fundamental understanding," <u>see</u> 2009

RSA § 5D (<u>id.</u>, Page ID # 1128), that GM was getting out of the business (so to

speak) of providing retiree medical benefits and turning that responsibility over

lock-stock-and-barrel to the New Plan and New VEBA created by the 2008 RSA.

On its face, this belt-and-suspenders contract language has nothing whatsoever to

do with the *funding* of the retiree medical benefits to be provided by the New Plan

and New VEBA under the terms of the 2009 RSA, and thus nothing whatsoever to

do with GM's *payment obligations* with respect to the provision of those benefits.

      b.     Another snippet of contract language relied on by GM is the language at the outset of § 8 of the 2009 RSA stating that GM's "financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement." See (GM Cross-Motion, RE 40, Page ID # 2394-95), (2009 RSA, RE 22-14, Page ID # 1130).

The plain purpose and function of this contract language is to reflect and implement the parties' understanding that GM would not be obligated to make any payments *to the New VEBA* to fund the provision of retiree health benefits by the New Plan and New VEBA other than those payments specified in the 2009 RSA itself. On its face, this contract language has nothing whatsoever to do with GM's obligation under the 2007 MOU to make a $450 million payment *to the DC VEBA* upon the satisfaction of the conditions precedent stated in the 2007 MOU.

      c.     Yet another snippet of contract language relied on by GM is the language in § 14 of the 2009 RSA stating that UAW "agrees not to seek to obligate" GM to make "any additional payments" in support of the provision of medical benefits to covered retirees. See (GM Cross-Motion, RE 40, Page ID # 2397-98), (2009 RSA, RE 22-14, Page ID # 1134-35).

The plain purpose and function of this contract language, as reflected by the operative words "seek to obligate," is to prohibit the UAW from taking any steps to pressure or otherwise induce GM to take on any *new* payment obligations with

respect to the provision of medical benefits to covered retirees.[5]  On its face, this contract language has nothing whatsoever to do with the continued existence <u>vel non</u> of GM's *previously-undertaken* $450 million payment obligation to the DC VEBA under the 2007 MOU.

        d.    The final snippet of contract language relied on by GM is the language in the 2009 RSA's integration clause, § 32C, stating that "[t]his Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement."  <u>See</u> (GM Cross-Motion, RE 40, Page ID # 2397-98), (2009 RSA, RE 22-14, Page ID # 1147).

        Consistent with "the universally understood" purpose and function of integration clauses generally, the plain purpose and function of this contract language "is to preclude the subsequent introduction of evidence of preliminary negotiations or side agreements" with respect to a "matter" dealt with in the 2009 RSA itself.  <u>Sec. Watch, Inc. v. Sentinel Sys., Inc.</u>, 176 F.3d 369, 372 (6th Cir. 1999).  For example, under this contract language, UAW would be precluded from introducing evidence in support of an argument that whereas the express terms of

---

[5] That purpose and function is confirmed by the one exception to this prohibition stated in § 14, under which UAW "may propose" in future collective bargaining that GM active employees "be permitted to make contributions to the New VEBA of amounts otherwise payable in profit sharing, COLA, wages and/or signing bonuses, if not prohibited by law."  (2009 RSA, RE 22-14, Page ID # 1134-35).

the 2009 RSA relieve GM and the GM Plan of any obligation to provide medical benefits to covered retirees as of January 2010, GM entered into a "side agreement" with UAW in which it agreed to provide such benefits in certain circumstances, such as in the event of a New VEBA funding shortfall.

On its face, this contract language has nothing whatsoever to do with GM's $450 million payment obligation to the DC VEBA under the 2007 MOU, inasmuch as that payment obligation is not a "matter" dealt with in the 2009 RSA at all.

*          *          *          *

In sum, there is not a shred of contract language in the 2009 RSA that fairly can be read to effect an "extinguishment" of GM's $450 million payment obligation to the DC VEBA under the 2007 MOU. That being so, to borrow the catchphrase used by the district court and apply it where appropriate, GM's pursuit of its "extinguishment" defense in this case "is reminiscent of the efforts to capture a 'will o' the wisp.'"  (Decision, RE 64, Page ID # 4123).

C.    The Conditions Precedent To GM's $450 Million Payment Obligation Have Been Satisfied

On the undisputed facts of record, the conditions precedent to GM's $450 million payment obligation unquestionably have been satisfied—as we now show.

1.    The first condition precedent to GM's $450 million payment obligation stated in section K.2 of the 2007 MOU—and bolded below for emphasis—is as follows:

52

**execution by Delphi and [Old] GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them.**

As detailed <u>supra</u> pp. 27-30, it is undisputed (and indisputable) that the following sequence of events transpired over a period of years following the execution of the 2007 MOU:  *First*, Old GM and Delphi entered into a "GLOBAL SETTLEMENT AGREEMENT" or "Original GSA" dealing with various financial and commercial matters between them that had not been resolved by the 2007 MOU itself.  *Second*, Old GM and Delphi subsequently executed an "AMENDED AND RESTATED GLOBAL SETTLEMENT AGREEMENT or "Amended and Restated GSA" that—as its name indicates—superseded the Original GSA as the agreement dealing with the financial and commercial matters between Old GM and Delphi.  *Third*, GM, Delphi and various third parties subsequently entered into a "MASTER DISPOSITION AGREEMENT" in which GM and Delphi agreed on certain modifications to the Amended and Restated GSA that altered in various respects the terms of the financial and commercial relationship between GM and Delphi to be incorporated into Delphi's proposed plan of reorganization—two of those key alterations being GM's purchase of the Delphi Keep Sites and GM's waiver of its right to recover on billions of dollars in claims against Delphi as part of the purchase price for the Keep Sites.

Against this undisputed factual background, it is clear that, over the course of time, GM and Delphi forged and executed "**a comprehensive settlement agreement resolving the financial, commercial, and other matters between them**"—to wit, the Amended and Restated GSA as modified by the Master Disposition Agreement—thus satisfying the first condition precedent to GM's $450 million payment obligation.

2.     The remaining conditions precedent to GM's $450 million payment obligation stated in section K.2 of the 2007 MOU—and bolded below for emphasis—are as follows:

> **the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with all of the terms of this Agreement and the comprehensive settlement agreement between Delphi and [Old] GM.**

For clarity's sake, these remaining conditions precedent can be broken down into three constituent parts:

a.     the "**substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court**";

b.     the plan of reorganization "**incorporates, approves and is consistent with all of the terms of . . . the comprehensive settlement agreement between Delphi and [Old] GM**";

c.     the plan of reorganization "**incorporates, approves and is consistent with all of the terms of [the 2007 MOU]**"

54

It is equally clear on the undisputed facts of record that each of these
conditions precedent has been satisfied as well:

    **a.    the "substantial consummation of a plan of
reorganization proposed by Delphi in its chapter 11
cases and confirmed by the Bankruptcy Court"**

As detailed <u>supra</u> pp. 30-32, it is undisputed (and indisputable) that Delphi
filed a proposed plan of reorganization in its Chapter 11 cases on June 1, 2009; that
Delphi's proposed plan of reorganization was confirmed by the Delphi bankruptcy
court on July 30, 2009; and that the Delphi plan of reorganization confirmed by the
Delphi bankruptcy court was substantially consummated as of October 6, 2009.
All this being so, there clearly has been satisfaction of these conditions precedent
stated in the 2007 MOU.

    **b.    the plan of reorganization "incorporates, approves
and is consistent with all of the terms of… the
comprehensive settlement agreement between Delphi
and [Old] GM"**

As detailed <u>supra</u> pp. 30-31 & n.4, it is undisputed (and indisputable) that
the Delphi Modified Plan of Reorganization incorporates and endorses in every
respect the terms of the Amended and Restated GSA as modified by the Master
Disposition Agreement (<u>i.e.</u>, the terms of what we have shown in subsection C.1
above is the "comprehensive settlement agreement" between GM and Delphi
contemplated by the 2007 MOU).  That being so, the Delphi Modified Plan of
Reorganization "incorporates, approves, and is consistent with all of the terms of"

55

that comprehensive settlement agreement between GM and Delphi, and this further condition precedent has been satisfied.

> **c.**    **the plan of reorganization "incorporates, approves and is consistent with all of the terms of [the 2007 MOU]"**

Finally, as detailed supra pp. 30-31 & n.4, it is undisputed (and indisputable) that: (i) at Old GM's request, UAW agreed to a modification of the 2007 MOU that cleared the path for GM's subsequent purchase of the Delphi Keep Sites from Delphi pursuant to the Master Disposition Agreement; and (ii) that modified term of the 2007 MOU authorizing GM's purchase of the Delphi Keep Sites pursuant to the Master Disposition Agreement was incorporated into and endorsed by the Delphi Modified Plan of Reorganization. That being so, the Delphi plan of reorganization "incorporates, approves, and is consistent with all the terms of" the 2007 MOU, and this further condition precedent has been satisfied.

> 3.    The conclusion that the conditions precedent to GM's $450 million payment obligation have been satisfied is buttressed by the following additional point as to which there is no room for genuine disagreement.

On their face, the conditions precedent stated in the 2007 MOU were aimed at affording Old GM a measure of contractual protection against the prospect that Delphi, Old GM's "largest supplier," would emerge from bankruptcy under a plan of reorganization that incorporated and endorsed terms which Old GM could not

accept from a business standpoint.[6]  The conditions precedent served this purpose by conditioning Old GM's provision of billions of dollars in financial relief to Delphi in aid of Delphi's reorganization efforts—including Old GM's satisfaction of UAW's $450 million claim against Delphi at issue here—on Delphi's emergence from bankruptcy under a Delphi-proposed plan of reorganization that incorporated and endorsed the terms of agreements that Old GM was a party to and thus, by definition, found acceptable from a business standpoint.

In the final analysis, GM received the full benefit of the contractual protection that its predecessor Old GM had bargained for in the 2007 MOU, inasmuch as in the course of events, Delphi emerged from bankruptcy under a Delphi-proposed plan of reorganization that—as we have shown—incorporated and endorsed the terms of agreements that GM was a party to and thus, by definition, found acceptable from a business standpoint.

---

[6] That threat to Old GM's business interests was magnified by the fact that under the federal bankruptcy statute, a third party not within Old GM's sphere of influence would have had the opportunity to propose a plan of reorganization for Delphi that neither Old GM nor Delphi itself were in favor of.  See 11 U.S.C. § 1121(c) (providing that "[a]ny party in interest," including creditors and bondholders, may propose a plan of reorganization for a debtor after a statutorily-prescribed grace period in which the debtor itself has the exclusive right to propose such a plan).  Section K.2 of the 2007 MOU thus specified that the Delphi plan of reorganization had to be "proposed by" Delphi itself.  Supra p. 26; see also (Sherrick Deposition, RE 54-4, Page 52) ("the purpose of [Section K.2] . . . was . . . to make sure that [Old] GM's obligations . . . would not be triggered  . . . if these three parties, Delphi, [Old] GM, and UAW, lost control of the process because the plan of reorganization that ended up being confirmed, for example, was not proposed by Delphi") (filed under seal in district court).

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the grant of summary judgment in GM's favor, and remand the case to the district court with a direction to enter summary judgment in UAW's favor on UAW's breach-of-contract claim against GM.[7]

Respectfully submitted,

/s/ Andrew D. Roth
Andrew D. Roth
Ramya Ravindran
Laurence Gold
BREDHOFF & KAISER, PLLC
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600

Counsel for Plaintiff-Appellant UAW

---

[7] In its summary judgment motion and supporting brief in the court below, UAW sought and argued that it was entitled to an award of pre-judgment and post-judgment interest on the claimed $450 million amount, to be calculated on the basis specified by UAW in its motion papers. See (UAW Motion, RE 33, Page ID # 1326-27); (UAW Brief, RE 33, Page ID # 1359-61). Although this Court has the power to resolve these additional issues raised by UAW's motion but not reached by the district court, supra p. 37, UAW believes that these additional issues are of a kind most appropriately resolved by the district court in the first instance on remand. Accordingly, UAW does not address these additional issues in this Brief.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7).  The foregoing Brief was prepared using Microsoft Word 2007 and contains 13,772 words in 14-point proportionately-spaced Times New Roman Font.

/s/ Andrew D. Roth
Andrew D. Roth

Counsel for Plaintiff-Appellant UAW

59

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing Brief to be served this 5th day of March, 2014 on the following counsel for Defendant-Appellee via the Court's electronic filing system:

Mr. Corey D. Clay
Ms. Johanna Fabrizio Parker
Mr. Robert Stanley Walker
Jones Day
901 Lakeside Avenue, E.
Cleveland, OH 44114

/s/ Andrew D. Roth
Andrew D. Roth

Counsel for Plaintiff-Appellant UAW

60

# ADDENDUM: DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

### Pursuant to Sixth Circuit Rule 30

| Record Entry Number | Date Filed | Description of Entry | Page Number(s) |
|---|---|---|---|
| 1 | 4/6/2010 | Complaint | 1-8 |
| 3 | 7/26/2010 | Stipulation and Order to Extend Time for Serving Complaint | 11-12 |
| 5 | 10/8/2010 | Defendant General Motors LLC's Answer to Plaintiff's Complaint | 15-23 |
| 15 | 11/3/2010 | Order Staying Proceedings | 187 |
| 19 | 10/19/2011 | Scheduling Order | 192-193 |
| 21 | 10/25/2011 | Amendment to Scheduling Order (Doc. 19) | 196-205 |
| 22 | 11/17/2011 | Notice of Joint Filing | 206-215 |
| 22-2 | 11/17/2011 | UAW-Delphi-GM Memorandum of Understanding Delphi Restructuring dated 6/22/2007 | 257-405 |
| 22-3 | 11/17/2011 | Global Settlement Agreement Between Delphi Corporation and General Motors Corporation dated 9/6/2007, As Amended 12/7/2007 | 406-469 |
| 22-5 | 11/17/2011 | UAW Retiree Settlement Agreement dated 2/21/2008 | 557-600 |
| 22-6 | 11/17/2011 | Amended and Restated Global Settlement Agreement Between Delphi Corporation and General Motors Corporation dated 9/12/2008 | 601-665 |
| 22-8 | 11/17/2011 | UAW-Delphi-GM Implementation Agreement Regarding 414(l) Transfers, Implementation of Term Sheet, Delphi Pension Freeze and Cessation of OPEB, and Application of Release | 758-761 |

| Record Entry Number | Date Filed | Description of Entry | Page Number(s) |
|---|---|---|---|
| 22-11 | 11/17/2011 | Memorandum of Understanding Delphi Keep Sites dated 5/16/2009 | 855-856 |
| 22-13 | 11/17/2011 | Amended and Restated Master Sale and Purchase Agreement by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc. *as Sellers* and NGMCO, Inc., *as Purchaser* dated 6/26/2009 | 986-1117 |
| 22-14 | 11/17/2011 | UAW Retiree Settlement Agreement dated 7/10/2009 | 1118-1154 |
| 22-15 | 11/17/2011 | Master Disposition Agreement Among Delphi Corporation, GM Components Holdings, LLC, General Motors Company, Motors Liquidation Company, DIP Holdco 3, LLC and the Other Sellers and Other Buyers Party Hereto dated 7/30/2009 | 1155-1290 |
| 31 | 9/21/2012 | Scheduling Order No. 2 | 1315-1316 |
| 33 | 11/15/2012 | Plaintiff UAW's Motion for Summary Judgment and Brief in Support of Plaintiff UAW's Motion for Summary Judgment | 1326-1362 |
| 33-2 | 11/15/2012 | Stipulation Regarding Authenticity of Agreements Submitted to the Court on November 17, 2011 | 1365-1366 |
| 33-12 | 11/15/2012 | Declaration of Daniel Sherrick in Support of Plaintiff's Motion for Summary Judgment | 2000-2005 |
| 33-17 | 11/15/2012 | Excerpts of Frederick Henderson Deposition taken on 6/27/2012 | 2018-2023 |

| Record Entry Number | Date Filed | Description of Entry | Page Number(s) |
|---|---|---|---|
| 33-19 | 11/15/2012 | First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) dated 7/30/2009 (*In re: Delphi Corporation, et. al.*, Case No. 05-44481 (RDD) U.S. Bankruptcy Court for the Southern District of New York) | 2025-2114 |
| 33-20 | 11/15/2012 | Order Approving Modifications Under 11 U.S.C. § 1127(b) to (I) First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, As Modified and (II) Confirmation Order (Docket No. 12359) dated 7/30/2009 (*In re: Delphi Corporation, et. al.*, Case No. 05-44481 (RDD) U.S. Bankruptcy Court for the Southern District of New York) | 2115-2204 |
| 33-21 | 11/15/2012 | Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession and (B) Occurrence of Effective Date dated 10/6/2009 (*In re: Delphi Corporation, et. al.*, Case No. 05-44481 (RDD) U.S. Bankruptcy Court for the Southern District of New York) | 2205-2209 |

| Record Entry Number | Date Filed | Description of Entry | Page Number(s) |
|---|---|---|---|
| 33-23 | 11/15/2012 | Reply of General Motors LLC (f/k/a General Motors Company) to Objection to Motion to Enforce Modified Plan and Plan Modification Order | 2239-2273 |
| 33-24 | 11/15/2012 | Motion of General Motors LLC (f/k/a General Motors Company) to Enforce Sale Order dated 10/22/2010 (*In re: Motors Liquidation Company, f/k/a General Motors Corp., et. al.*, Case No. 09-50026 (REG) U.S. Bankruptcy Court for the Southern District of New York) | 2274-2318 |
| 33-25 | 11/15/2012 | Bench Decision and Order on New GM's Motion to Enforce Sale Order with Respect to Dispute with UAW dated 8/23/2011 (*In re: Motors Liquidation Company, f/k/a General Motors Corp., et. al.*, Case No. 09-50026 (REG) U.S. Bankruptcy Court for the Southern District of New York) | 2319-2348 |
| 40 | 12/17/2012 | Defendant General Motors LLC's Memorandum of Law in Opposition to Plaintiff UAW's Motion for Summary Judgment and in Support of General Motors LLC's Motion for Summary Judgment | 2377-2414 |
| 53-6 | 1/15/2013 | Excerpts of Daniel Sherrick Deposition taken on 7/10/2012 (filed under seal) | 3703 |
| 54-4 | 1/15/2013 | Excerpts of Daniel Sherrick Deposition taken on 7/10/2012 (unsealed) | Deposition Pp. 52, 214 |

| Record Entry Number | Date Filed | Description of Entry | Page Number(s) |
|---|---|---|---|
| 57 | 1/31/2013 | Defendant General Motors LLC's Reply Memorandum of Law in Opposition to Plaintiff UAW's Motion for Summary Judgment and in Support of General Motors LLC's Motion for Summary Judgment | 3951-3969 |
| 61 | 5/31/2013 | Order Requiring Supplemental Filing Regarding the Pending Cross Motions for Summary Judgment (Docs. 33, 40) | 4016-4017 |
| 62 | 6/19/2013 | Plaintiff UAW's Supplemental Statement of Material Facts | 4018-4023 |
| 62-1 | 6/19/2013 | Order (I) Authorizing Sale of Assets Pursuant to the Restated Master Sale and Purchase Agreement with NGMCO, Inc., A U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the sale; and (III) Granting Related Relief (*In re: General Motors Corp., et. al.*, Case No. 09-50026 (REG) U.S. Bankruptcy Court for the Southern District of New York) | 4024-4074 |
| 63 | 6/28/2013 | Defendant General Motors LLC's Consolidated and Chronological Response to Plaintiff UAW's Supplemental Statement of Material Facts and Statement of Additional Material Facts | 4075-4087 |

| Record Entry Number | Date Filed | Description of Entry | Page Number(s) |
|---|---|---|---|
| 64 | 12/10/2013 | Decision and Order Granting Defendant's Motion for Summary Judgment (Doc. 43) and Denying Plaintiff's Motion for Summary Judgment (Doc. 33) and Dismissing Case | 4089-4124 |
| 65 | 12/10/2013 | Judgment | 4125 |
| 66 | 1/6/2014 | Notice of Appeal | 4126-4127 |